1           IN THE UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF ARKANSAS
2                WESTERN DIVISION

3  UNITED STATES OF AMERICA,
                Plaintiff,
4    v.                    No. 4:15CR00300-01 BRW

5                             July 18, 2016
                             Little Rock, Arkansas
6  THEODORE E. SUHL,                9:58 a.m.

7                  Defendant.

8         **TRANSCRIPT OF TRIAL - VOLUME 4**
         BEFORE THE HONORABLE BILL WILSON,
9      UNITED STATES DISTRICT JUDGE, and a jury

10  APPEARANCES:

11  On Behalf of the Government:

12     MR. JOHN D. KELLER, Trial Attorney
      MS. LAUREN BELL, Trial Attorney
13     MS. AMANDA R. VAUGHN, Trial Attorney
      U.S. Department of Justice - Public Integrity Section
14     1400 New York Avenue NW
      Washington, D.C.  20530
15

On Behalf of the Defendant:
16

17     MR. ROBERT M. CARY, Attorney at Law
      MR. THOMAS LANGDON HARRIS, Attorney at Law
      MR. SIMON A. LATCOVICH, Attorney at Law
18     MR. ALEX GISCARD ROMAIN, Attorney at Law
        Williams & Connolly LLP
19     725 Twelfth Street NW
      Washington, D.C.  20005-5901
20

MR. CHARLES A. BANKS, Attorney at Law
21     Banks Law Firm, PLLC
      Post Office Box 251310
22     Little Rock, Arkansas  72225-1310

23  Defendant present.

24     Proceedings reported by machine stenography and displayed
    in realtime; transcript prepared utilizing computer-aided
25  transcription.

```
           I N D E X (Volume 4 - July 18, 2016)


WITNESSES FOR GOVERNMENT:    Direct    Cross    Redirect    Recross

STEVEN JONES                   477      532       586

KATHERINE BLACK                596

WITNESSES FOR DEFENDANT:

RHONDA PEARSON                 643      651

TINA SMITH                     653      655

GREG YOUNG                     656      660

                      * * * * * * *

EXHIBITS:                                              RECEIVED

Government's Exhibit 9-B...............................P.   476
Government's Exhibit 40................................P.   488
Government's Exhibit 48................................P.   516
Government's Exhibit 45................................P.   519
Government's Exhibit 56................................P.   603
Government's Exhibit 53................................P.   607
Government's Exhibit 57................................P.   611
Government's Exhibit 57-A..............................P.   613
Government's Exhibit 58-A..............................P.   615
Government's Exhibit 58-B..............................P.   616
Government's Exhibit 58-C..............................P.   617
Government's Exhibit 59................................P.   619
Defendant's Exhibit 1300..............................P.   544
Defendant's Exhibit 775...............................P.   551
Defendant's Exhibit 1724..............................P.   556
Defendant's Exhibit 4.................................P.   558
Defendant's Exhibit 788...............................P.   568
Defendant's Exhibit 1675..............................P.   658


                      * * * * * * *

MOTIONS...............................................P.   622

                      * * * * * * *
```

1           (Proceedings continuing in open court at 9:58 a.m.; jury

2      not present.)

3                THE COURT:  I understand we have an issue.

4                MR. CARY:  Yes, Your Honor.

5                THE COURT:  How about coming up here to the lectern

6      and telling me about it.

7                MR. CARY:  Your Honor, we moved in limine to keep out

8      evidence of Mr. Suhl's personal wealth, and Government

9      Exhibit 59 is something we raised in the pretrial conference,

10     is a figure that has -- or a chart that has a line item for

11     Mr. Suhl's personal wealth, personal income per year, not

12     necessarily linked to Medicaid money received, and we object to

13     it.  And I understand that it has been ruled out under your in

14     limine order.

15               THE COURT:  What says the prosecution?

16               MR. KELLER:  I don't know if it's helpful for you to

17     actually see the exhibit, but it's the last line here that I

18     believe the defense is objecting to.

19               THE COURT:  Where?

20               MR. KELLER:  The last line --

21               THE COURT:  Let me come down there and just point it

22     to me -- point me to it.

23               MR. KELLER:  Yes, sir.

24               THE COURT:  Okay.

25               MR. KELLER:  So this is obviously not Mr. Suhl's

1   overall wealth for that year.  This is just the money that he

2   received from Triennia, this one company, and so this exhibit

3   shows the money going from the two companies in Arkansas that

4   are at issue in this case, the two companies receiving

5   Medicaid.  It shows that Medicaid money then going to a Florida

6   company and then going to another Florida company and then

7   ending up in the defendant's pocket.

8           THE COURT:  Assuming they explain that, what's the

9   objection?

10          MR. CARY:  The objection is that this is from a

11  separate company.  It's from a W2 K1 for a separate company,

12  not the company that received Medicaid funds.  There is ---

13          THE COURT:  Hold on.

14      What about that?

15          MR. KELLER:  The point of the exhibit is it shows the

16  Medicaid money flowing through to this last company from which

17  he received the money.  This is tracing the Medicaid money

18  starting in Arkansas all the way down to Florida and then --

19          THE COURT:  Are you saying all of this shows Medicaid

20  money that came to him or one of his companies, that line?

21          MR. KELLER:  Yes.

22          MR. CARY:  Your Honor, there is no way of knowing

23  that.  Those numbers do not tie to other numbers in the chart

24  and --

25          THE COURT:  How do we know that then?

1          MR. KELLER:  So you can see on the chart there is

2     6.5 million in 2007 received from ACA and Trinity Behavioral

3     Health.  Those two companies were receiving the Medicaid money

4     at issue in this case.  And then 8.4 million is transferred

5     from Millenia to Triennia, that same year.  In the subsequent

6     years, you see they get 7 million from the Arkansas companies,

7     and they only transfer 6 and a half.

8          THE COURT:  Overrule the objection.  Save your

9     exception.

10          MR. CARY:  Your Honor, if I may, he wasn't talking

11     about -- he didn't get to the last line, which is Mr. Suhl's

12     money.  That number does not tie to the other numbers,

13     Mr. Suhl's personal line.  He is still talking about the amount

14     that went to this company called Triennia.  There could be any

15     other number of reasons that Mr. Suhl got income from that

16     other company as reported in the W2 and K1 that is not Medicaid

17     money.

18          MR. KELLER:  They can cross-examine the witness if

19     they are going to say that the money that went to Mr. Suhl was

20     not derived from the amounts that came from Arkansas, but the

21     witness will testify that this is accurate and that --

22          THE COURT:  I am going to overrule the objection, but

23     save your exception.

24          MR. CARY:  Thank you, Your Honor.

25          MR. KELLER:  Your Honor, two other evidentiary

1    housekeeping matters.

2           THE COURT:  Come on over here so all of us get

3    together.

4           MR. KELLER:  Government's Exhibit 29-D --

5           THE COURT:  What were we referring to, the number that

6    we just worked on?

7           MR. CARY:  Government's Exhibit 59, Your Honor.

8           THE COURT:  Okay.

9           MR. KELLER:  Government's 29-D was offered on -- I

10   believe on Friday, and it was missing a page with the Bates

11   stamp 878.  I believe the defense -- the defense's copy

12   included that page, but the copy that was handed to the

13   courtroom deputy did not include that page.  So we have

14   provided her with that page now, and I just want to make sure

15   that was on the record.

16          THE COURT:  What exhibit number is that?

17          MR. KELLER:  29-D.

18          THE COURT:  Agreed?

19          MR. CARY:  Yes, Your Honor.

20          MR. KELLER:  And then, Your Honor, also, we intended

21   to move into evidence Government's Exhibit 9-B on Friday.  I

22   believe we inadvertently did not move that into evidence, and

23   so I would move to admit it now.  This is a recorded

24   conversation.  I have the transcript here if the defense

25   objects or if the Court wants to review the transcript.

1          MR. CARY:  The pertinent parts of the transcript --

2          MR. KELLER:  This is a call between Phillip Carter and

3   Chip Barnes.

4          MR. CARY:  I would have to review it and --

5          THE COURT:  Yeah.  Let him see it.

6          MR. ROMAIN:  Your Honor, there is one other slight

7   housekeeping matter with respect to some of the exhibits we

8   entered into evidence.  I gave the wrong number.  I gave the

9   transcript instead of the audio, and so defense --

10         THE COURT:  Can you get with the courtroom deputy and

11  the prosecutor and get that squared away?

12         MR. ROMAIN:  Sure.  They have no objection.

13         THE COURT:  Okay.

14     Mr. Hicks --

15         MR. HICKS:  Good morning, Your Honor.

16         THE COURT:  -- how are you doing?  I have to get my

17  sunglasses so I can look at your shirt and tie.

18         MR. CARY:  Your Honor, we object to 9-B.

19         THE COURT:  You object to it?

20         MR. CARY:  Yes.

21         THE COURT:  On what grounds?

22         MR. CARY:  Relevance and hearsay, Your Honor.

23         THE COURT:  Let me look at it.  The yellow parts are

24  the parts that you are going to play or are you playing all of

25  it?

1        MR. KELLER:  We might play more than the highlighted

2   portion.  The highlighted portion is to direct Your Honor to

3   the relevance.

4        THE COURT:  All right.  What's your objection?  What's

5   your response to hearsay?

6        MR. KELLER:  Your Honor, it's offered as a

7   coconspirator's statement during the furtherance of the

8   conspiracy.

9        THE COURT:  During the conspiracy and in the

10  furtherance thereof?

11       MR. KELLER:  That's correct, Your Honor.

12       MR. CARY:  We object.  It's just a statement, not

13  influencing a conspiracy.

14       THE COURT:  Overrule the objection and save your

15  exception.  It's admitted.

16     Bring the jury in.

17     (Government's Exhibit 9-B received in evidence.)

18     (Jury enters the courtroom.)

19       THE COURT:  Be seated, please.  With respect to this

20  case only, hearts and minds, anybody's heart and mind not as

21  pure as when you left Friday with respect to this case?  If so,

22  raise your hand.

23     All right.  No hands.

24     I understand Mr. Davis has provided some eggs this

25  morning.  I don't know -- how many jurors have not got a

1    six-pack of eggs that wants some eggs?  How many of you are we

2    short?  One, two, three, four.

3         All right.  Mr. Davis, can you provide any more tomorrow?

4         He is not in here.  I think I can bring one or two.  We

5    will get it tended to.

6         Anything else we need to do before we resume the

7    testimony?

8              MR. KELLER:  No, Your Honor.

9              THE COURT:  All right.  Put the witness in the stand.

10             MR. KELLER:  Your Honor, the government calls Steven

11   Jones.

12             **STEVEN JONES, GOVERNMENT'S WITNESS, DULY SWORN**

13                        DIRECT EXAMINATION

14   BY MR. KELLER

15   Q    Mr. Jones, can you spell your name and state your name for

16   the record.

17   A    Sure.  It's Steven Jones.  S-T-E-V-E-N J-O-N-E-S.

18   Q    Where are you from?

19   A    I live in Marion, Arkansas.

20   Q    How long have you lived there?

21   A    About 20 years.

22   Q    Are you married?

23   A    I am.

24   Q    What does your wife do?

25   A    She works at a community health center over in Crittenden

1    County.

2    Q    At one point did you work in the Arkansas state

3    legislature?

4    A    I was an elected member of the Arkansas legislature.

5    Q    And when was that?

6    A    From 1998, I think, until 2005.

7    Q    You served your home district in the area of Marion,

8    Arkansas?

9    A    That's correct.  The county.

10   Q    Were you later appointed to the deputy director position

11   at the Department of Human Services?

12   A    I was.

13   Q    When was that?

14   A    2007, I think.

15   Q    How long did you serve in that role as deputy director?

16   A    For about seven years.

17   Q    Are you currently in prison, Mr. Jones?

18   A    I am.

19   Q    And what are you in prison for?

20   A    Bribery and conspiracy were the two charges.

21   Q    Were you paid bribes to help the defendant's companies?

22   A    I believe I was.

23   Q    As part of your plea agreement, did you enter into a

24   cooperation agreement with the government?

25   A    Yes.

1  Q    And as part of that agreement, did you agree to tell the

2  government everything that you knew about this bribery scheme

3  and who was involved?

4  A    I did.

5  Q    And what did you hope to get out of that cooperation

6  agreement?

7  A    Well, the -- it would be nice to get a reduction in my

8  sentence, but I don't know.  I probably will end up serving the

9  whole time.  I don't know.

10 Q    Have any promises been made to you about a sentencing

11 reduction?

12 A    None at all.

13 Q    And what do you understand to be the most important thing

14 that you have to do to be eligible for a sentencing reduction?

15 A    To be truthful.

16 Q    As part of that cooperation agreement, did you agree to be

17 interviewed in this case?

18 A    Yes.

19 Q    And have you been interviewed a number of times?

20 A    Yes.

21 Q    Do you remember everything that you said in every

22 interview that you have had in this case?

23 A    Every word?

24 Q    Word for word everything that you have said in every

25 interview in this case?

1    A    I can't say that I do.

2    Q    Did you plead guilty because you did, in fact, accept

3    bribes?

4    A    I did accept money, yes.

5    Q    Prior to this case had you ever been convicted of a crime?

6    A    No, I had not been.

7    Q    And so how has this experience affected your life?

8    A    It has taken a tremendous toll on me and on my family,

9    both emotionally, financially, lots of ways.

10   Q    Was it a difficult decision for you to decide to plead

11   guilty in this case?

12   A    Indeed I did struggle with it.

13   Q    Were you embarrassed by your involvement in this case?

14   A    Yes.

15   Q    Do you know a man named David Upton?

16   A    I do know David Upton.

17   Q    Did you ever talk to him about this case?

18   A    Will this move?  I can hardly see you.

19        THE COURT:  I don't know about that.  Can it be moved?

20        THE WITNESS:  Okay.  I'm fine.  I can see you now.

21   BY MR. KELLER

22   Q    Do you know a man named David Upton?

23   A    I do know David Upton.

24   Q    Have you ever talked to him about this case?

25   A    Yes.

1    Q     In what context did you talk to him?

2    A     One night I was at one of my favorite restaurants in

3    Memphis.  It's a few minutes from my house, and I ran into

4    David there.  I have known David for probably 25 years.  He

5    used to work for the congressman over in Memphis.  The

6    congressman was one of my clients, and I ran into him.  He

7    expressed his thoughts to me about what he had been reading in

8    the news or seeing in the news and just wanted me to know he

9    was thinking about me.

10   Q     Was that some time after you had pled guilty in this case?

11   A     I believe it was because he knew quite a bit.  So it would

12   have probably come from, again, the information that was out in

13   the news.

14   Q     And did you minimize your role when you spoke to him

15   because you were embarrassed?

16   A     I spoke pretty frankly with him about how I thought, what

17   I thought about the case.  I didn't minimize my thoughts about

18   the case.

19   Q     Well, I guess more specifically, did you believe it would

20   be a waste of money to go to trial in this case?

21             MR. CARY:  I am going to object to the leading, Your

22   Honor.

23             THE COURT:  It's leading.  I will allow a little of

24   it, but not too much.

25             THE WITNESS:  Oh, would you -- I'm sorry.  Would you

1    repeat your question?

2    BY MR. KELLER

3    Q     Yes.  Did you believe it would be a waste of money to go

4    to trial in this case?

5    A     Are you asking me if I said those words to him?

6    Q     No.  Did you believe that.  When you were considering your

7    guilty plea and in the context of this case, did you believe it

8    would be a waste of money to go to trial in this case?

9    A     I didn't think that it was -- I didn't -- my initial

10   thoughts were that I wasn't doing anything illegal, and so I

11   would have thought that it was a waste of money.

12          THE COURT:  Let me stop here just a minute.  Ladies

13   and gentlemen, there has been several leading questions

14   objections.  A leading question is one that suggests an answer.

15   Take an automobile accident case.  The lawyer representing the

16   injured party, the plaintiff, calls the plaintiff to the stand

17   and says, "The speed limit is 50 miles an hour," and says,

18   "Were you going about 40 miles an hour?"  That suggests an

19   answer of yes.  The neutral question was, "How fast were you

20   going?"

21          As a general rule, as a general rule the lawyer who calls

22   a witness to the stand cannot lead that witness.  The idea is

23   that witness, if the lawyer called him, that witness would be

24   friendly towards him.  There are exceptions to that.  Sometimes

25   a lawyer will call a witness who is hostile to him, and they

1    are allowed to lead.

2         On cross-examination, when the other side examines,

3    leading questions generally are allowed.  So a leading question

4    is one that kind of suggests an answer.  So if there are other

5    leading question objections, maybe that will give you a

6    guideline on what they are.

7         Go ahead.  Lead.

8    BY MR. KELLER

9    Q    Mr. Jones, I guess what I am trying to clarify is, did you

10   plead guilty in this case because you knew that you were in

11   fact guilty?

12   A    At the time that I pled guilty, I thought I was guilty.

13   Q    And what do you think today?

14   A    The -- some of the things that have occurred since then

15   have made me think twice about it, but at the time that I --

16   that I was -- the recent Supreme Court decision to be very

17   specific.  But at the time I knew that I had accepted some

18   money.  I knew the context that I accepted the money in, some

19   of which wasn't exactly accurate in what was in the newspaper

20   when I was -- when I made my plea.

21   Q    Well, let's get into the details.  Who did you accept

22   money from?

23   A    Phillip Carter and John Bennett.

24   Q    And where did you understand that money was coming from?

25   A    I was told by, that -- I was told by John Bennett that Ted

1    Suhl was one of the sources of the money, and I was told by

2    Phillip that it was always Ted.

3    Q    And is that where you believed the money was coming from?

4    A    Yes.

5    Q    Why did you believe you were receiving that money?

6    A    I had an arrangement with John Bennett to do some work

7    with him through my company.

8    Q    Mr. Jones, I believe that you just testified that you

9    believed the money was coming from Ted Suhl.

10   A    Yes.

11   Q    So what in relation to Ted Suhl was the reason you

12   received that money?

13   A    John Bennett, who is a distant relative of mine, was

14   trying to advance in our church, and he had asked me at a

15   meeting that we had in Forrest City if I would help him.  And

16   he told me what he was trying to do.  I thought it was a good

17   idea.  I thought he was a good person for it, and he asked me

18   what I would charge.  And I told him I would do it pro bono.

19   So we started doing the work.  And later on -- and I told him

20   that he would need some money to do it, he would need to do

21   some fundraising.  And later on he told me that money was not

22   going to be a problem.  Not that day, but some time later.  He

23   said that some people were going to help him, and he mentioned

24   his brother-in-law and he mentioned some of the brothers.  By

25   that, I'm thinking he meant some of the people in church, and

1    he also mentioned Ted, saying Ted Suhl was a big fundraiser,

2    you know, a big supporter of his campaign.

3              THE COURT:  Counsel, approach.

4         (Bench conference reported as follows:)

5              THE COURT:  I am going to allow leading.  The witness

6    is -- this is not as I remember the statement when he pled

7    guilty.  So I am going to allow leading.

8              MR. CARY:  Note our objection, Your Honor.

9              THE COURT:  Yes.  Exception saved.

10        (Return to open court.)

11   BY MR. KELLER

12   Q    Mr. Jones, when you were paid money by Phillip Carter and

13   Pastor Bennett, was that after you had met with the defendant,

14   Ted Suhl, at restaurants?

15   A    All but the first time.

16   Q    And so all but the first time, were you paid money after

17   the defendant asked you to do things to help his companies?

18   A    Yes.

19   Q    So the money you were paid had nothing to do with Pastor

20   Bennett's bishop campaign?

21   A    Actually, I don't agree with that because I actually did

22   work for the campaign.  I didn't do anything for Ted.

23   Q    When was the bishop's campaign, Mr. Jones?

24   A    It was three phases.  There was two things that we were

25   doing.  The first phase was to convince the then, who was

1  living at the time bishop to split off the jurisdiction, the

2  first part of the jurisdiction.  And that was the work that was

3  done around that.  And then the bishop died, and there was

4  another phase.  And then another bishop was elected, and there

5  was a third phase.  So it went on for some years.

6  Q    When did you have the conversation with Pastor Bennett

7  about Ted Suhl donating to his bishop campaign, before or after

8  you became deputy director?

9  A    I believe that was after deputy director.

10  Q    When you were deputy director, did you meet with the

11  defendant?

12  A    Several times, yes.

13  Q    Do you see Ted Suhl in the courtroom today?

14  A    I do.

15  Q    Can you point him out and note something he is wearing for

16  the record?

17  A    He is wearing a black suit, nice tie, white shirt.  Or a

18  dark suit.

19  Q    Did you meet with the defendant a number of times when you

20  were working at the Department of Human Services?

21  A    I did.

22  Q    And at each of those meetings, did he talk to you about

23  things that affected his business, that were happening at the

24  Department of Human Services?

25  A    He did.

1   Q    And did he ask you to do things at the Department of Human

2   Services to help his business?

3   A    Yes.

4   Q    And then after those meetings, some of those meetings,

5   were you paid?

6   A    Yes.

7   Q    In cash?

8   A    Yes.

9   Q    And where did you believe that money was coming from?

10  A    I believe that Ted was the source.

11  Q    Before you worked at the Department of Human Services,

12  before you were appointed deputy director, did you have an

13  earlier contract with the defendant?

14  A    Yes.

15  Q    What was that contract for?

16  A    Marketing.

17         MR. KELLER:  If we could show the witness what has

18  been marked as Government's Exhibit 40.  Just to the witness,

19  please.  If we could scroll to page 2 and page 3 of that

20  document.

21  BY MR. KELLER

22  Q    What is Government's Exhibit 40, Mr. Jones?

23  A    That's a contract.

24  Q    That's an accurate copy of the contract between you and

25  the defendant?

1    A    I believe it is.

2    Q    Is it signed by you?

3    A    Yes, it is.

4    Q    Signed by the defendant?

5    A    Yes, it is.

6         MR. KELLER:  I move to admit Government's Exhibit 40

7    and publish to the jury.

8         MR. CARY:  Objection to relevance.

9         THE COURT:  Overruled.  Exception saved.

10        (Government's Exhibit 40 received in evidence.)

11   BY MR. KELLER

12   Q    Mr. Jones, when was this contract signed or entered into

13   between you and the defendant?

14   A    January of 2004.

15        MR. KELLER:  And if we could, go back to page 2 of the

16   exhibit, and if you could, blow up the highlighted paragraph.

17   BY MR. KELLER

18   Q    How much did the contract call for you to be paid?

19   A    $1,000 per month.

20   Q    Were you, in fact, paid under this contract?

21   A    I was.

22   Q    Did you do any work under this contract?

23   A    The contract didn't run very long.  I don't remember but

24   two or three payments.  I don't think any of the work really

25   got off the ground.  I don't know if he decided to just go a

1    different direction or he just terminated altogether.

2    Q    So did you do any work under this contract?

3    A    I don't recall doing anything.

4    Q    But you were still paid?

5    A    Yes.

6    Q    Would you describe this as a retainer agreement?

7    A    Yes.

8    Q    So you were available if the defendant needed you?

9    A    Yes.

10   Q    Kind of an insurance policy for the defendant?

11   A    I had a number of retainers with clients.  Yes, some of

12   them referred to it as -- yes.  Some people referred to them as

13   insurance policies.

14   Q    Where were you working at the time you entered into this

15   agreement with the defendant?

16   A    I have always had a company that did marketing,

17   advertising.  Name has changed a couple of times, but I've been

18   affiliated with a few other companies.  I was probably with

19   Crittenden Publishing at the time.

20   Q    Were you serving in the state legislature at the time you

21   entered into this contract with the defendant?

22   A    I was in the legislature in '04.

23   Q    So you were paid under this contract when you were serving

24   as a legislator?

25   A    Yes.

1    Q    And you did no work under the contract?

2    A    Yes.

3    Q    And you were reviewing legislation, all different types of

4    legislation that affected business in the state of Arkansas?

5    A    Yeah.  We have a citizen legislature in Arkansas.

6           THE COURT:  Talk just a little slower.

7           THE WITNESS:  Okay.  We have a citizen legislature in

8    Arkansas, and everyone who serves is in business or retired or

9    something.  So there would be instances where there might be a

10   client that has things come before the legislature, and what

11   you would do in an instance like that is disclose if there is a

12   conflict.  That's the law.

13   BY MR. KELLER

14   Q    Mr. Jones, I wasn't asking about rules in the legislature.

15   I was asking whether you dealt with legislation when you were

16   being paid under this contract that affected businesses in the

17   state of Arkansas?

18   A    Oh, yes.  Absolutely.

19   Q    How did you get appointed to your position as deputy

20   director at the Department of Human Services?

21   A    I was in what's called a Grade 99 position.  Those are

22   positions that are generally referred to at the discretion of

23   the governor.

24   Q    So were you either appointed or recommended by the

25   governor?

1    A    Yes.

2    Q    What kind of budgets were you working with at the

3    Department of Human Services?

4    A    I believe our annual budget was somewhere in the

5    neighborhood of 6 and a half billion dollars.

6    Q    How many employees worked at the Department of Human

7    Services when you were deputy director there?

8    A    About 6,000.

9    Q    Out of those 6,000 employees, where did you rank?

10   A    I was generally referred to as the mirrored No. 2 position

11   because there was two of us in that position, in similar

12   positions.

13   Q    Was there anyone superior to you at the Department of

14   Human Services?

15   A    Yes, sir.

16   Q    Who was that?

17   A    John Selig.  He was the director.

18   Q    Is that the only person at the department who was superior

19   to you when you worked at the Department of Human Services?

20   A    Yes.

21   Q    Does -- what does the Department of Human Services do for

22   the state of Arkansas generally?

23   A    It's a huge agency that looks after the sick, the frail,

24   the elderly, children caught up in the welfare system, or

25   juvenile justice system.  It's a huge agency and does a lot

1    things for the state of Arkansas.  Generally about

2    $1.2 million -- 1 and a half million of our population was

3    coming through our doors in one capacity or another.

4    Q    Does the department, in addition to providing services,

5    also regulate service providers?

6    A    That's one of our functions, yes.

7    Q    And is the department also involved in the legislative

8    process?

9    A    Very much so.

10   Q    Were you involved specifically in the legislative process

11   in the department's role in reviewing legislation and proposing

12   legislation?

13   A    That's one of my duties.

14   Q    Were you in a position to influence the policy and

15   operational decisions at the department?

16   A    Yes, sir.

17   Q    After you had been appointed, did you tell the defendant

18   that you had been appointed at some point?

19   A    Yes.

20   Q    And what was the context for that discussion?

21   A    When I decided to take the position at the department,

22   there were at least a couple contracts that I needed to end

23   because I didn't feel comfortable with them.  And although

24   nothing had been done under this one, I think one of our

25   initial conversations was to formally end this contract, like I

1    did with a couple of others.  And he congratulated me.

2    Q    So let me just break that down.  You told the defendant

3    that you were -- that you had become deputy director at the

4    Department of Human Services in that conversation; is that

5    right?

6    A    That's correct.

7    Q    And he congratulated you?

8    A    That's correct.

9    Q    And you told him that you needed to end this contract, you

10   could no longer be paid by his companies; is that correct?

11   A    That's correct.

12   Q    And you did that because you thought it would be a problem

13   for you to receive money directly from his companies while you

14   were regulating those same companies?

15   A    I thought it was proper to end those contracts.

16   Q    Why did you think it was proper to end this specific

17   contract?

18   A    That one -- this one probably wouldn't have been a

19   problem, but I just did.  We weren't doing anything anyway, so

20   it just formally ended it.

21   Q    But why did you feel like it was necessary to take that

22   formal step?

23   A    Well, I knew that Ted's business had some business with

24   the department.  I didn't know the scope of it at that time.

25   Q    And so it would have been a problem for you to be

1    accepting money directly from his companies?

2    A    Yes.

3    Q    At the department, did you oversee Medicaid directly?

4    A    Let me revisit that question.  It would have been a

5    problem for me to receive money from his company for doing

6    something for him to help his business at DHS.  And what was

7    the question about Medicaid?

8    Q    Did you oversee Medicaid directly when you were deputy

9    director?

10   A    No, I did not.

11   Q    Who did?

12   A    The other deputy director.  Janie Huddleston did a very

13   good job with it.

14   Q    Did you sit in on meetings with Ms. Huddleston where

15   Medicaid was discussed?

16   A    Yes.

17   Q    Did you sit in on meetings with the director when Medicaid

18   issues were discussed?

19   A    Yes.

20   Q    Did you regularly meet with the director in your capacity

21   as deputy director?

22   A    We had a standing weekly meeting.  We would meet anytime

23   we needed to, but we had a standing Monday morning meeting.

24   Q    And did you provide input at those meetings?

25   A    Yes.

1   Q   On all kinds of issues that came up?

2   A   Yes.  We all did.

3   Q   Including Medicaid issues?

4   A   Sometimes.

5   Q   Did you meet with the governor on Department of Human

6   Services business?

7   A   Yes.

8   Q   Are you aware of whether the defendant's companies

9   received large reimbursements, Medicaid reimbursements through

10   the Department of Human Services when you were the deputy

11   director there?

12   A   Yes.

13   Q   Did the defendant ever talk to you about Medicaid?

14   A   Yes.

15   Q   And what did he ask you to do?

16   A   The first meeting that we had was set up by John, and he

17   said that Ted had a problem with the department.  He asked me

18   if I would meet with Ted, and I said, "Sure.  What's his

19   problem," because I met with people all the time.  And he said,

20   "It was with Medicaid."  And I said, "Medicaid is not one of my

21   divisions."  And he said, "Will you meet with him anyway?"  And

22   I said, "Sure."

23       And so we -- he -- he may have set it up through Phillip

24   Carter, and I remember asking him why he was setting it up

25   through Phillip.  But he -- we did meet, and at that particular

1    meeting, Ted mentioned to me -- I can't remember specifically

2    what it was, but he was dissatisfied with something that was

3    going on with our staff.  I think it was our Medicaid -- it

4    could have been our behavioral health staff because sometimes

5    they look alike to me.  And he was talking to me about it, and

6    I asked him, I said, "Did you bring it up to Janie?"  And he

7    didn't think she would be helpful to him.

8    Q    Did you have any reason to believe Janie Huddleston

9    treated the defendant's companies any differently than anybody

10   else's companies?

11   A    Other than the fact that he may have mentioned to me that

12   he felt that way.

13   Q    From what you observed at the department and working with

14   her, did she treat his companies any differently than any other

15   companies?

16   A    She was pretty tough.

17   Q    Was she pretty tough in general?

18   A    Yes.  She was a good manager.

19   Q    So she didn't single out the defendant's companies?

20   A    I can't say for sure.

21   Q    To your knowledge, based on your experience, did you ever

22   see anything that suggested to you that she was singling out

23   the defendant's companies?

24   A    I can't say that I did.

25   Q    So no?

1  A    I don't know of any instance when she was -- no.

2  Q    Did the defendant talk to you about Medicaid at a number

3  of meetings?

4  A    I know he mentioned it once, but he mentioned various

5  aspects over the time that we met and various meetings.  He

6  talked to me about it more than once.

7  Q    Did he ever ask you specifically if you could take over

8  Medicaid at the Department of Human Services?

9  A    There could have been the first time that we met.  I think

10 the comment was something like, "Well, you should take it over.

11 You would be more fair."

12 Q    And did you tell him that you would agree to see what you

13 could do about that?

14 A    My initial reaction would have been like when others

15 talked to me about Medicaid, was that I didn't want anything to

16 do with Medicaid.  But I may have said something like I would

17 look into it or think about it.

18 Q    And why would you have told the defendant that you would

19 look into it or think about it if you really had no intention

20 of taking over Medicaid.

21 A    To appease him.

22 Q    Why did you want to appease him?

23 A    We did not have an adversarial relationship.

24 Q    Well, did you believe that the defendant was paying you

25 money?

1    A    I am not sure at that point, but Phillip eventually

2    started -- I am not sure of exactly sequencing, but eventually

3    I did receive money from Phillip that he said came from Ted.

4    Q    And because of that money, did you give the defendant the

5    impression that you were trying to help his companies?

6    A    I led him to believe that I would at least be open minded

7    to it.

8    Q    Why did you want him to believe that?

9    A    I was told that he was the source of the money.

10   Q    So that you could keep getting paid?

11   A    Yes.

12   Q    Where were these conversations?  Like this Medicaid

13   conversation, where would they usually take place?

14   A    I believe we met once at a restaurant in West Memphis and

15   mostly at a restaurant in Memphis.

16   Q    Did you also meet in Brinkley?

17   A    Once in a place in Brinkley.

18   Q    And what was the restaurant where you most often met in

19   Memphis?

20   A    One of my favorite restaurants, about 13 miles from the

21   house called Texas de Brazil.

22   Q    Who paid for the meals at Texas de Brazil?

23   A    First time I tried to pay for mine, but Ted wouldn't let

24   me pay for it.  Ted was very generous.

25   Q    So who paid for all the meals at Texas de Brazil?

1    A    Ted Suhl, I believe.

2    Q    Did you always eat when you went to the restaurant?

3    A    No.

4    Q    Why not?

5    A    The only time that I can remember us meeting was on

6    Sundays and oftentimes after service on Sundays, I would go to

7    take my family to dinner.  So it may have been sometimes that I

8    didn't eat because I wasn't hungry.

9    Q    Outside of these meals at Texas de Brazil, did you and the

10   defendant regularly meet for dinner, just the two of you?

11   A    I don't think we ever met alone.

12   Q    Did you ever get your families together for dinner?

13   A    Our families never fellowshipped together.

14   Q    Did you ever visit each other at each other's homes?

15   A    Neither one of us has been to the other's home.

16   Q    So you weren't personal friends?

17   A    I thought we were.

18   Q    The Texas de Brazil meetings were essentially the only

19   times that you were meeting with the defendant?

20   A    Yes.

21   Q    How would these meetings be arranged?

22   A    Phillip Carter arranged the meetings.

23   Q    You would have had direct contact with the defendant

24   regarding that marketing contract before, right?

25   A    Yes.

1    Q    And yet these meetings were always arranged through

2    Phillip Carter?

3    A    Yes.

4    Q    How did you know Phillip Carter?

5    A    He's a local conman.  He -- we typically referred to him

6    as one of the election vultures.  He was one of the guys who

7    would come to people like me who were in public office and try

8    to get us to pay him money to get votes.  And I never hired him

9    because I knew that he always worked for both candidates in the

10   race, opposing candidates, and so I didn't really care for

11   that.  And he would also say that he could guarantee absentee

12   votes.

13   Q    Well, did Phillip Carter, did voters or election have

14   anything to do with these meetings with Ted Suhl?  These

15   meetings between you and Ted Suhl as arranged by Phillip

16   Carter?

17   A    We talked about Bennett's election and -- we talked about

18   a lot of things, and I am sure we talked about politics because

19   typically we would talk a lot about, you know, our families.

20   We would talk about travel.  We would talk about -- Ted was

21   very conservative and I was Democrat and so we would fight

22   about politics a little bit.  Again, I thought we developed a

23   relationship over the time that we were dealing with each

24   other.

25   Q    And the context in which you were just describing or

1   disparaging Mr. Carter is not the context in which you were

2   involved with him to meet the defendant?

3   A    Say that one more time.

4   Q    The context in which you were just describing Mr. Carter

5   and his roles in elections, that is not the context in which

6   you were meeting with him and the defendant.  It had nothing to

7   do with those elections that you were just describing?

8   A    Oh, no.  Not necessarily, no.

9   Q    Mr. Carter didn't borrow money from you, did he?

10  A    No.

11  Q    He didn't owe you any money?

12  A    No.

13  Q    What would happen after these meetings sometimes with the

14  defendant that were arranged by Phillip Carter?

15  A    He would sometimes give me money.

16  Q    Was Phillip Carter the type of person that you understood

17  had extra money to pay out?

18  A    No.  John had told me when he was coming to the first

19  meeting that he was about to lose his house and he thought that

20  he was trying to hustle Ted out of some money or something.

21  That's why he said he was at that first meeting.

22  Q    And so you believed when Phillip Carter gave you money

23  after these meetings, it was coming from the defendant?

24  A    So he stated.

25  Q    And that's what John Bennett said.

1    A    John said that Ted was one of the sources.

2    Q    One of the sources?

3    A    For his, the money -- out of his campaign.

4    Q    Didn't Pastor Bennett give you a check at some point or

5    try to give you some checks after a meeting?

6    A    Indeed, he tried to give me one.

7    Q    And what was your reaction to the check?

8    A    I refused to take it.

9    Q    And why was that?

10   A    Because if my memory serves me correctly, the check was

11   drawn on this day care that his wife runs or ran.

12   Q    You were uncomfortable taking from a day care?

13   A    Yes.

14   Q    Why was that?

15   A    Because I directly regulated day cares.

16   Q    So how were you paid instead?

17   A    He went to the back and came back with some cash.

18   Q    You didn't have any problem accepting the cash?

19   A    No.

20   Q    And where did you understand that money was coming from?

21   A    I stated a moment ago he told me that for his campaign he

22   was raising some money from the brothers, his brother-in-law,

23   and Ted Suhl.

24   Q    Mr. Jones, the payment that we are talking about had

25   nothing to do with the -- with bishop -- with Pastor Bennett's

1    campaign.

2    A    We were working on the campaign that day.

3    Q    With Ted Suhl?

4    A    No.  With John Bennett.  Ted Suhl never gave me any money.

5    Q    But Pastor Bennett told you that the money he was giving

6    you came from Ted Suhl; isn't that right?

7    A    He told me that Ted was one of the sources of money for

8    his campaign.

9    Q    But he also told you that Ted was the source of the money

10   related to the meetings at Texas de Brazil, didn't he?

11   A    I know Phillip did.

12   Q    How many times approximately did you meet with the

13   defendant at Texas de Brazil?

14   A    A dozen or so.

15   Q    And how many times were you paid?

16   A    Five or six times.

17   Q    Always in cash?

18   A    Yes.

19   Q    Always through Phillip Carter or Pastor Bennett?

20   A    Yes.

21   Q    Did you spend that money?

22   A    Or gave it away.

23   Q    You didn't deposit it, did you?

24   A    I don't think I did.

25   Q    Did Phillip Carter often need to cash a check before

1    providing you with cash?

2    A    He said that he had to cash a check a couple of times, I

3    know.

4    Q    Would you have accepted a check from the defendant

5    directly at these meetings at Texas de Brazil?

6    A    No.

7    Q    Would you have accepted a check from one of the

8    defendant's companies directly?

9    A    Not for anything illegal.

10   Q    Well, why wouldn't you have accepted a check at these

11   meetings?

12   A    I don't think that it would have been proper.

13   Q    Did you ever openly discuss money with the defendant?

14   A    Yes.

15   Q    At these Texas de Brazil meetings.

16   A    Oh, no, never.  When we were working on the marketing

17   agreement that you showed me a moment ago.

18   Q    So you talked to him about money under the contract, the

19   marketing contract; is that right?

20   A    That's correct.

21   Q    But you didn't talk about money when it came to the

22   meetings about the defendant's businesses?  You did not talk

23   about money with the defendant when it came to the meetings at

24   Texas de Brazil about the defendant's businesses; is that

25   right?

1    A    No.

2    Q    No, that's not right, or no, you didn't talk about money?

3    A    I did not discuss money with Ted at Texas de Brazil.

4    Q    And yet after those meetings, some of those meetings, you

5    received cash?

6    A    Yes.

7    Q    And you believed the money was coming from the defendant?

8    A    I was told that.

9    Q    Well, did you believe the money was coming from the

10   defendant?

11   A    Yes.

12   Q    Did you do things to give the defendant the impression

13   that you were valuable to his companies?

14   A    Yes.

15   Q    Did you do things to give him the impression that you were

16   agreeing to help his companies?

17   A    By saying I would look into things or consider them, yes.

18   Q    Did you do other things as well?

19   A    Yes.

20        MR. KELLER:  If we could bring up what has previously

21   been admitted as Government's Exhibit 32.

22   BY MR. CARY

23   Q    Mr. Jones, do you recognize that?

24   A    I do.

25   Q    And what is it?

1    A    It's an agenda for a meeting.

2    Q    What kind of meeting?

3    A    They would have these weekly meetings over at the

4    department for some field staff and some of the people in the

5    monitoring section at the department, and that's the agenda for

6    one of those meetings.

7    Q    And those meetings were about monitoring providers that

8    were regulated by the department?

9    A    Yes, sir.

10        MR. KELLER:  If we could show page 3 of the exhibit,

11   please.

12   BY MR. KELLER

13   Q    What's the company listed halfway down that page?

14   A    Maxus.

15   Q    Is that one of the defendant's companies?

16   A    Yes.

17        MR. KELLER:  And then if we could show pages 4 and 5

18   and 6 in sequence.

19   BY MR. KELLER

20   Q    Were those all the issues listed on those pages that

21   related to the defendant's company?

22   A    Yes.

23   Q    Did you provide this monitoring meeting agenda to the

24   defendant?

25   A    No.

1   Q    Did you provide it to Phillip Carter?

2   A    Not this one.  It was one similar to it.

3   Q    Did you give it to Phillip Carter so he could give it to

4   the defendant?

5   A    Yes.

6   Q    Why?

7   A    Phillip asked for it.

8   Q    Why did you give it to him?

9   A    He asked me.

10  Q    Were you trying to give the defendant the impression that

11  you were helping out his companies?

12  A    Yes.

13  Q    And didn't you actually offer the notes to Phillip in the

14  conversation where you discussed them?

15  A    He had asked me for them.  I told him about them and he

16  asked me for them and I --

17  Q    So you brought the notes up first?

18  A    Yes.

19  Q    Why did you bring the notes up to Phillip Carter before he

20  asked you about them?

21  A    I am trying to remember, see if I can recall the

22  conversation.  I may have said something like they -- I saw his

23  name on one of the agendas or his business name on one of the

24  agendas for one of the monitoring meetings.  And I think he

25  asked me for it, and I think he asked me to fax it to him or

1    something.  And I didn't fax it to him.

2    Q    Did you bring it up to provide an example of a way in

3    which you could be valuable to the --

4    A    Yes.

5    Q    Were you trying to give the defendant the impression that

6    you were looking out for him on the inside?

7    A    Yes.

8    Q    And is that because he was paying you?

9    A    Yes.

10   Q    What is the Child Welfare Review Board?

11   A    I really don't know what all they do, but they have

12   something to do with overlooking day care -- the behavioral

13   health -- children behavioral health companies, I think.

14   Q    And were they involved in some capacity with the

15   Department of Human Services?

16   A    Yes.

17   Q    Were you involved in discussing reappointments to boards

18   with the governor when you were deputy director of the

19   Department of Human Services?

20   A    Yes.

21   Q    And specifically boards that were in the industry that was

22   regulated by the department?

23   A    I advocated for a number of people to be appointed to a

24   number of boards.

25   Q    Including boards that were involved with the department?

1    A     Yes.

2    Q     Did the defendant ever ask you to do anything related

3    specifically to the Child Welfare Agency Review Board?

4    A     Yes.

5    Q     What did he ask you to do?

6    A     Asked me if I could get the governor to reappoint him to

7    the board.

8    Q     And what did you say?

9    A     I would see what I could do.  Something similar to that.

10   Q     Did you actually intend to talk to the governor about

11   reappointing him to the board?

12   A     I never got around to it.

13   Q     Why did you tell him that you would look into it or see

14   what you could do?

15   A     I don't think I was opposed to it.

16   Q     But if you never did it, why did you tell him that you

17   were willing to do it?

18   A     I just can't remember if there was nothing available.  I

19   may have looked into it and -- I just don't know.  I never got

20   around to it.  I told him that I would look into it.

21   Q     Because he was paying you?

22   A     Are you asking me if people who I recommended for boards

23   were people who paid me?  The answer would be no to that.

24   Nobody who I recommended for boards were paying me to do

25   anything.

1    Q    No.  But you didn't recommend the defendant for the board,

2    right?

3    A    That's correct.

4    Q    But you told him that you would look into recommending him

5    for the board or talk to the governor about it, right?

6    A    That's what I testified, right.

7    Q    Because he was paying you?

8    A    That would have been a motive, yes.  That's the motivating

9    factor.

10        MR. CARY:  If we could show the witness what has been

11   identified as Government's Exhibit 38-A.

12        THE COURT:  I tell you what.  We are going to take a

13   ten-minute break.  Ten minutes.  We will start back at 11:00

14   o'clock.  Don't talk about the case, anybody involved with it.

15   Let the jury stand out, and everyone else remain as you are.

16        (Jury exits the courtroom.)

17        THE COURT:  Anybody need to bring up anything?  The

18   jury is out.  Anybody need to bring up anything before we

19   break?

20        MR. KELLER:  No, Your Honor.

21        MR. CARY:  No, Your Honor.  Just to -- other than to

22   note a continuing objection to the leading, which I understand

23   is noted.

24        THE COURT:  I will continue to allow leading.

25        Anything else?

1          MR. KELLER:  No, Your Honor.

2      (Recess at 10:52 a.m.)

3                     C E R T I F I C A T E

4      I, Cheryl Nelson Kellar, Official Court Reporter, do

5  hereby certify that the foregoing is a true and correct

6  transcript of proceedings in the above-entitled case.

7

8  /s/ Cheryl N. Kellar, RPR, CRR, CCR   Date:  July 18, 2016
       United States Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Proceedings continuing at 11:05 a.m.; jury present.)

2         THE COURT:  You may proceed.

3         MR. KELLER:  Thank you, Your Honor.

4    If we could have Government's Exhibit 38-A, which has

5    already been admitted, up on the screen.

6    BY MR. KELLER:

7    Q.   Mr. Jones, do you recognize this?

8    A.   Yes, sir.

9    Q.   And just generally what is it?

10   A.   It's a denial letter for RSPMI services.

11   Q.   What is RSPMI services?

12   A.   I don't know what RSPMI stands for, but it's something to

13   do with Medicaid payments.

14   Q.   And do you know whether at some point at the department

15   there was a moratorium placed on new RSPMI providers?

16   A.   Yes, sir, there was.

17   Q.   Do you know why that was?

18   A.   To kind of stay the growth.  Medicaid was growing out of --

19   categorically, it was growing faster than it should have been at

20   one point.  And the department, in consultation with the

21   governor's office, thought that something ought to be done to

22   slow it down, so a moratorium was put in place to actually not

23   start up any new businesses for a while.

24   Q.   Was there also an issue related to RSPMI providers

25   regarding the distance within which they could serve clients?

1   A.   Yes, sir.

2   Q.   And was there a proposal to expand the distance, to enlarge

3   the distance?

4   A.   Yeah.  I believe that was all part of the same thing.

5   Q.   Did the defendant ever discuss this RSPMI issue with you?

6   A.   Yes.

7   Q.   What did he ask you to do?

8   A.   It came up --

9            MR. CARY:  Your Honor, objection.  May we approach?

10           THE COURT:  You may.

11       (Proceedings at the bench as follows:)

12           MR. CARY:  Your Honor, we have a constructive

13   amendment of the indictment issue here.  The indictment is very

14   clear that this relates to the period after January of 2011.

15   And the government is now asking questions that I believe is

16   going to elicit testimony about something that happened before

17   January 2011.  The indictment is clear.  I have an email from

18   Mr. Keller that it's clear that it's after January 2011.  We

19   think it's improper to ask any questions about anything other

20   than the period after January 1st, 2011.  Paragraph 149 of the

21   indictment makes very clear that it's after January 2011.

22           THE COURT:  Paragraph 149?

23           MR. CARY:  149 and also this email, which we marked as

24   678 for the government.  I'm sorry.  It's actually 150, Your

25   Honor, not 149, in or about January 2011.

 1              THE COURT:  What does "CRM" stand for?

 2              MR. KELLER:  Criminal, criminal division.

 3              THE COURT:  Over at Main Justice?

 4              MR. KELLER:  Yes, sir.

 5              THE COURT:  All right.  What's your response?

 6              MR. KELLER:  I don't believe the witness is going to

 7    testify -- I don't believe the witness is going to testify to a

 8    specific time frame in terms of this request.  I don't think he

 9    has a recollection of the specific time at which the request was

10    made.

11              THE COURT:  How do you meet the defendant's objection?

12              MR. KELLER:  I believe there have already been

13    documents admitted showing that this policy went into effect in

14    January of 2011, this new policy change, which is evidence of

15    the timing, the timing of this issue.  The witness doesn't have

16    to be the sole source of the evidence as to the timing of this

17    issue.

18              THE COURT:  State your objection again.  Why are you

19    objecting?

20              MR. CARY:  Yes, Your Honor.  They have alleged very

21    specifically that there was the -- Mr. Suhl talked to Mr. Jones

22    in January 2011 or later about this issue.  And now they are

23    trying to suggest to the jury it could have happened before.

24    That's a constructive amendment of the indictment.

25              THE COURT:  Let me ask you this.

1              MR. KELLER:  The statement in the indictment is that

2      the policy changed in 2011.

3              THE COURT:  If it goes back beyond that, do you agree

4      that it's a constructive amendment of the indictment?

5              MR. KELLER:  No, Your Honor.  The indictment -- the

6      indictment alleges that the policy was changed in 2011.  It

7      doesn't state that nothing else related to that issue happened

8      before 2011.  And there's already been evidence, emails admitted

9      from employees of the defendant's company as early as 2008 on

10     this very issue.

11             THE COURT:  Overrule the objection.  Save your

12     exception.

13         (Proceedings continuing in open court as follows:)

14     BY MR. KELLER:

15     Q.   Mr. Jones, did the defendant talk to you about this RSPMI

16     radius expansion/distance expansion?

17     A.   Seems like I recall a conversation we had about it.

18     Q.   And did he ask you to do something to support the policy

19     change at the department?

20     A.   I don't remember exactly what we talked about, but I

21     remember him coming -- us talking about it and the moratorium.

22     And it would have been one of those things that I would have

23     said I will look into.

24     Q.   Did the defendant ever discuss pending legislation with

25     you?

1    A.    Yes.

2          MR. KELLER:  If we could have Government Exhibit 48

3    brought up on the screen just for the witness at this point and

4    if we could show the witness pages 2 and 3 and 4 of this

5    exhibit.

6    BY MR. KELLER:

7    Q.    Do you recognize this legislation, Mr. Jones?

8    A.    Yes.

9    Q.    And this was Bill 218?

10   A.    Senate Bill 218, yes.

11   Q.    Is this an accurate copy of the legislation?

12   A.    Yes.

13         MR. KELLER:  Your Honor, the government moves to admit

14   Exhibit 48 and then publish it to the jury.

15         MR. CARY:  No objection.

16         THE COURT:  You may.

17      (Government's Exhibit 48 received in evidence.)

18   BY MR. KELLER:

19   Q.    If we could go back to the front page of the bill, please.

20         Mr. Jones, what did this bill concern?  What did it have to

21   do with?

22   A.    Contracts for the DYS providers, Division of Youth Services

23   providers, for the benefit of the jury.

24   Q.    And did it specifically have to do with the bid process for

25   those providers?

1   A.   Yes.

2   Q.   And what was it proposing?  What was this bill proposing?

3   A.   Commonly this bill was referred to as no-bid contracts.

4   Q.   Did the defendant talk to you about this bill specifically?

5   A.   Yes.

6   Q.   Did he ask you to support the bill?

7   A.   He thought the bill was a good idea.  And he was -- I

8   believe he was in support of the bill.

9   Q.   Well, did he want you to be in support of the bill?

10  A.   I know he voiced his opinion.  And I think he asked me to,

11  you know -- this bill actually didn't have anything to do with

12  his company.  It's more of the one -- now, this one I actually

13  could impact.  I couldn't impact Medicaid.  But this was for one

14  of my divisions and not something that pertained to his

15  companies, but he liked the bill.

16  Q.   Well, would it have set a precedent for no-bid contracts

17  for providers in the industry?

18  A.   If this had passed, it possibly could have.

19  Q.   And he wanted you to support the bill?

20  A.   He was favorable for it.

21  Q.   Well, Mr. Jones, why was he talking to you about it?

22           MR. CARY:  Objection, Your Honor.  Foundation.

23           MR. KELLER:  I'll ask another question, Your Honor.

24  BY MR. KELLER:

25  Q.   What was your impression of why he was talking to you about

 1  the bill?

 2  A.   I thought that he was in favor of the bill.  I don't know

 3  if it's because whoever was lobbying for that bill asked him to

 4  help with it, or I just don't know.  But he was favorable for

 5  it, if my memory serves me correctly.

 6  Q.   Well, did you get the impression that he wanted you to

 7  support the bill?

 8  A.   Yes.

 9         MR. KELLER:  If we could bring up just for the witness

10  Government's Exhibit 45.

11  BY MR. KELLER:

12  Q.   Is this an email?

13  A.   Yes, sir.

14  Q.   And is it addressed to you?

15  A.   I'm copied on it.

16  Q.   And who is it from?

17  A.   Director Selig.

18  Q.   This was a DHS email?

19  A.   Yes, sir.

20  Q.   Is this an accurate copy of the email?

21  A.   Looks like it.

22         MR. KELLER:  Your Honor, I would move for admission of

23  Government's Exhibit 45.

24         MR. CARY:  No objection.

25         THE COURT:  Admitted.

 1            (Government's Exhibit 45 received in evidence.)

 2                 MR. KELLER:  If we could publish this for the jury.

 3     BY MR. KELLER:

 4     Q.    What's the subject of this email?  What does this email

 5     have to do with?

 6     A.    SB-218.

 7     Q.    That's the bill we just looked at regarding no-bid

 8     contracts?

 9     A.    That's correct, sir.

10     Q.    And did the director actually ask you to do something

11     regarding this bill?

12     A.    His exact words were, "I would suggest Steve visit with

13     Linebaugh because he was in the meeting with the governor's

14     office, but you two can decide who should visit with whom."

15     Q.    Are you familiar with a private provider called Mid-South

16     Health Systems?

17     A.    I've heard of them.

18     Q.    Were they one of the providers regulated by the Department

19     of Human Services?

20     A.    Yes, sir.

21                 MR. KELLER:  If we could play 8-B, what's previously

22     been admitted as Government's Exhibit 8-B.

23     BY MR. KELLER:

24     Q.    Mr. Jones, this is a call from August 3rd, 2011 -- it's

25     previously been admitted -- between you and Phillip Carter.

1    A.    Okay.

2          (Government's Exhibit 8-B played in open court.)

3              MR. KELLER:  If you could pause it there.

4    BY MR. KELLER:

5    Q.    Is the "Mid-South" that Carter is referring to in this

6    phone call the Mid-South Health Systems that we just referenced?

7    A.    Yes, sir.

8              MR. KELLER:  You can go ahead and play it.

9          (Government's Exhibit 8-B resumed in open court.)

10             MR. KELLER:  If you could pause it again.

11   BY MR. KELLER:

12   Q.    When you say, "I told you I sit in on the monitoring

13   meetings now because of him," who is him?

14   A.    I was referring to Mr. Suhl, Ted, monitoring meetings,

15   meetings from that agenda that you showed me earlier.

16   Q.    When Mr. Carter was referencing "our friend having some

17   concerns about the referral process with Mid-South," who was he

18   referring to as "our friend"?

19   A.    I think he was talking about Ted.

20   Q.    And you say that you sit in on the monitoring meetings now

21   because of him.  Why were you now sitting in on the monitoring

22   meetings because of Ted Suhl?

23   A.    I wasn't actually doing that.  I only said that -- I mean,

24   that's a weekly meeting.  I only sat in about three of them.

25   Q.    Well, why did --

1   A.   I just told Carter that.

2   Q.   Why did you tell Carter that?

3   A.   He was always trying to get me to, you know, do something

4   that would be beneficial, something that so that we could show

5   Ted we were doing something because of the money that was being

6   exchanged.

7   Q.   And did you want Carter to relay this information to the

8   defendant?

9   A.   Yes.

10         MR. KELLER:  If you could continue playing.

11       (Government's Exhibit 8-B resumed in open court.)

12         MR. KELLER:  If you could pause it again there.

13  BY MR. KELLER:

14  Q.   So the monitoring reports that you reference, are those the

15  notes that we looked at before, Government's Exhibit 32?

16  A.   Yes, sir.

17  Q.   And when you say "we ought to get back on schedule," what

18  are you referring to?

19  A.   We never had a schedule.  But we hadn't visited.  We hadn't

20  had lunch, met in quite sometime.  I think when this call took

21  place -- and that would be time periods when we didn't meet.  I

22  mean, I think over the whole period that you are investigating I

23  think we probably had about 12 meetings.  And Carter had told me

24  at one point we need to create a problem, you know, something

25  that didn't exist more so.  Mostly when we met it had more to

1    do, I thought, when Carter needed money than when Ted had a

2    problem.  But in this instance I think that we were talking

3    about something that -- Carter led me to believe that Ted raised

4    this issue and that wasn't something that he created.

5    Q.   Well, when you say "we ought to get back on schedule," are

6    you talking about scheduling another meeting?

7    A.   Yes.

8    Q.   So that you can get paid.

9    A.   Yes.

10            MR. KELLER:  You can keep playing the call.

11        (Government's Exhibit 8-B resumed in open court.)

12            MR. KELLER:  If you could pause it there.

13   BY MR. KELLER:

14   Q.   When you say "let him know that we're still trying to look

15   out on the inside," who are you talking about?  Who do you want

16   him to let know?

17   A.   Ted.

18   Q.   And when you are saying "let him know that we're still

19   trying to look out on the inside," why are you saying that to

20   Phillip Carter?  Why do you want him to tell that to Ted Suhl?

21   A.   Because of the money.

22            MR. KELLER:  You can finish the call.

23        (Government's Exhibit 8-B resumed in open court.)

24   BY MR. KELLER:

25   Q.   And that call was from August 3rd, 2011.

1      Ms. Spells, if we could just have Government's Exhibit 32

2   brought back up quickly.

3      What's the date of Government's Exhibit 32, the date of

4   those monitoring notes?

5   A.   Are you talking to me?

6   Q.   Yes, sir.

7   A.   I'm sorry.  August 1, 2011.

8   Q.   So that would have been two days before that call?

9   A.   Yes.

10  Q.   And did you actually provide these notes to Phillip Carter

11  to give to the defendant?

12  A.   I gave Phillip some notes.  Again, I don't know if it was

13  these or if it was the week before.

14  Q.   But those are the notes that you are referencing on that

15  call we just listened to.

16  A.   The agenda for the meeting.

17           MR. KELLER:  Ms. Spells, if we could have 8-DD that's

18  been previously admitted as 8-DD brought up and played.

19      And this is the September 6 call between you and Phillip

20  Carter.

21      (Government's Exhibit 8-DD played in open court.)

22           MR. KELLER:  If you could pause it there.

23  BY MR. KELLER:

24  Q.   When you say "give him enough time to make sure he has

25  everything together for us," who are you talking about?

1    A.    Mr. Suhl, Ted.

2    Q.    What's the everything that you want to give him time to get

3    together for you?

4    A.    I might have been referencing the money.

5    Q.    Well, is there anything else you can think of that you were

6    referencing?

7    A.    No.

8    Q.    Did you actually meet with the defendant and Phillip Carter

9    at Texas de Brazil shortly after this phone call?

10   A.    I can't say for sure.

11          MR. KELLER:  If we could bring up clip 1 of what's

12   previously been admitted as Government's Exhibit 12, Ms. Spells.

13          (Government's Exhibit 12, clip 1, played in open court.)

14          MR. KELLER:  And if you could pause it there.

15   BY MR. KELLER:

16   Q.    Who is the person who just walked in the door and sat down

17   at the end of the bar?

18   A.    It looks like a guy that's 30 pounds heavier than I am.

19   Q.    So that was you 30 pounds heavier?

20   A.    Yes, sir.

21   Q.    And this was from September 11th, 2011?

22   A.    That's correct.

23   Q.    So just a few days after that September 6 call that we just

24   listened to?

25   A.    Yes, sir.

1              MR. KELLER:  If we could play the second clip from

2     Government's Exhibit 12.

3          (Government's Exhibit 12, clip 2, played in open court.)

4              MR. KELLER:  And if you could pause it there.

5     BY MR. KELLER:

6     Q.   Who are the two men that just greeted you?

7     A.   Ted Suhl and Phillip Carter.

8              MR. KELLER:  If we could play the third clip from

9     Government's Exhibit 12, please, Ms. Spells.

10         (Government's Exhibit 12, clip 3, played in open court.)

11             MR. KELLER:  If you could pause it right there.

12     BY MR. KELLER:

13     Q.   Is that you and the defendant and Mr. Carter at a table at

14     Texas de Brazil?

15     A.   Yes, sir.  Right there in the center.

16             MR. KELLER:  If you could play it.

17         (Government's Exhibit 12, clip 3, resumed in open court.)

18             MR. KELLER:  If you could pause it right there.

19     BY MR. KELLER:

20     Q.   Who just left the table?

21     A.   I did.

22             MR. KELLER:  If you could go ahead and play the video.

23         (Government's Exhibit 12, clip 3, resumed in open court.)

24             MR. KELLER:  If you could pause it right there.

25     BY MR. KELLER:

1  Q.   Did you see the defendant go over to Phillip Carter as

2  shown on this video?

3  A.   You mean that day?

4  Q.   That day.

5  A.   No.

6  Q.   Did you see him hand him something out of his pocket at the

7  table that day?

8  A.   No.

9  Q.   Did the defendant ever let you see him give Phillip Carter

10 a check at any of these meetings?

11 A.   I've never seen the defendant give Phillip Carter a check.

12         MR. KELLER:   If we could play what's previously been

13 admitted as 8-EEE, Ms. Spells.

14     (Government's Exhibit 8-EEE played in open court.)

15         MR. KELLER:   I'm sorry.   If we could pause it again

16 for a second.

17 BY MR. KELLER:

18 Q.   So this has previously been admitted, 8-EEE, a call between

19 you and Phillip Carter on that same day, September 11, 2011.

20         MR. KELLER:   Play it.

21     (Government's Exhibit 8-EEE resumed in open court.)

22         MR. KELLER:   If we could pause it right there.

23 BY MR. KELLER:

24 Q.   Who is Phillip Carter referencing when he says "he's

25 adamant"?

1  A.   Ted.

2  Q.   And this is talking about an issue that you had just

3  discussed at the restaurant?

4  A.   Yes.

5  Q.   An issue relating to the defendant's business?

6  A.   Yes.

7           MR. KELLER:  If you could go ahead and play the clip.

8       (Government's Exhibit 8-EEE resumed in open court.)

9           MR. KELLER:  Ms. Spells, if we could play 9-H, what's

10  previously been admitted as 9-H.

11      (Government's Exhibit 9-H played in open court.)

12          MR. KELLER:  If you could pause it there.

13  BY MR. KELLER:

14  Q.   What's the meeting he's talking about?

15  A.   I believe he was talking about that meeting that we just

16  looked at over at Texas de Brazil.

17  Q.   With the defendant?

18  A.   Yes.

19  Q.   And what's the little package a reference to?

20  A.   Money.

21          MR. KELLER:  You can go ahead and play it.

22      (Government's Exhibit 8-EEE resumed in open court.)

23          MR. KELLER:  If you could pause it.

24  BY MR. KELLER:

25  Q.   Again, was that something that had happened before, that

1    Carter had to cash a check before giving you cash?

2    A.   I know of one or two times that he cashed a check.

3            MR. KELLER:  If we could play the rest of the call.

4        (Government's Exhibit 8-EEE resumed in open court.)

5    BY MR. KELLER:

6    Q.   Did you meet with Phillip Carter at a Cracker Barrel

7    Restaurant in the parking lot after that call?

8    A.   Yes.

9            MR. KELLER:  If you could bring up what's previously

10   been admitted as Government's Exhibit 11-S, if you could blow up

11   that picture.

12   BY MR. KELLER:

13   Q.   What's depicted in this picture, Mr. Jones?

14   A.   Phillip Carter handing me an envelope.

15   Q.   That black vehicle is your vehicle?

16   A.   Yes, was.

17   Q.   So Carter paid you that day?

18   A.   Yes.

19   Q.   How much?

20   A.   It was a thousand dollars.

21   Q.   And where did you believe that money was coming from?

22   A.   I believed that it was coming from Ted Suhl.

23   Q.   If you could play -- and that was --

24   A.   Based on what Carter said in that conversation.

25   Q.   And that was being paid to you based on that meeting that

1    you had had with the defendant and Carter at Texas de Brazil?

2    A.    Yes.

3    Q.    The one where Carter follows up with a phone call and says,

4    "He's adamant.  We've just got to know where you are on this"?

5    A.    Yes.

6    Q.    Referencing something related to the defendant's business?

7    A.    Yes.

8          MR. KELLER:  If we could play 9-I, Ms. Spells.

9          (Government's Exhibit 9-I played in open court.)

10         MR. KELLER:  If you could pause it there, Ms. Spells.

11   BY MR. KELLER:

12   Q.    Is that a reference to the Mid-South issue and the referral

13   policy that we heard about earlier?

14   A.    I believe it was.

15   Q.    And this is a recording that was made the day that Carter

16   paid you that thousand dollars.  Is that right?  Or this was a

17   conversation that you had with Carter that day when he paid you

18   the thousand dollars?

19   A.    I think so.

20         MR. KELLER:  If you could play the rest of the clip,

21   Ms. Spells.

22         (Government's Exhibit 9-I resumed in open court.)

23         MR. KELLER:  If you could pause it.

24   BY MR. KELLER:

25   Q.    When you say "trying to go around Janie," who are you

1  referring to?

2  A.    Janie Huddleston.

3  Q.    And that was the other deputy director at the department?

4  A.    Yes.

5  Q.    She was in charge of Medicaid?

6  A.    Yes.

7  Q.    Were you actually trying to go around Janie Huddleston?

8  A.    No.

9  Q.    Why were you telling Phillip Carter this?

10 A.    For the reason I stated earlier, because the money was

11 coming and this whole arrangement.

12 Q.    Because you were being paid by the defendant?

13 A.    Yes.

14        MR. KELLER:  Could you play the rest of the clip, Ms.

15 Spells.

16     (Government's Exhibit 9-I resumed in open court.)

17        MR. KELLER:  You can pause it there, Ms. Spells.

18 BY MR. KELLER:

19 Q.    What did you understand Mr. Carter to be talking about when

20 he said "I had to go up there and get that, you know what I

21 mean"?

22 A.    Well, first of all, he said my wife applied.  My wife never

23 applied for anything at Ted's companies.  So I don't know what

24 caused him to say that.  What was your question?

25 Q.    So we just heard Mr. Carter say, "I had to go up there and

1    get that, you know what I mean."  What is he referring to?

2    A.    He's talking about a check, I assume.

3    Q.    The money?

4    A.    Yes.

5    Q.    And on that issue with your wife, did the defendant suggest

6    to you at some point that he could hire your wife?

7    A.    Carter brought it up.  I don't even know -- I don't know --

8    and we had a follow-up conversation.  Ted and I had a follow-up

9    brief conversation about it.  But Carter brought it up.

10   Q.    But you did talk to the defendant about that?

11   A.    Right.

12   Q.    About him providing employment for your wife, about the

13   defendant's companies providing employment for your wife?

14   A.    I never asked him to.  She never asked him to.  But

15   Carter -- this is down, you know, toward the end of the

16   relationship.  And Carter was pressing harder than he ever had

17   before.  And I don't know if he was just trying to set, you

18   know, me up or anything.  But she never had any interest in

19   working for the company.

20   Q.    Well, the defendant mentioned to you at some point this

21   issue of his companies employing your wife.  Is that correct?

22   A.    Yes.  We talked about it.

23   Q.    So you would meet with the defendant at Texas de Brazil; is

24   that right, multiple times while you were deputy director at the

25   Department of Human Services?

1    A.    A dozen times, yes.

2    Q.    After those meetings, you would be paid cash often, as we

3    saw here in this surveillance clip.  Carter would pay you cash?

4    A.    A few of the times.

5    Q.    And because of that money, you were giving Carter and the

6    defendant the impression that you were agreeing to do things to

7    help the defendant's business?

8    A.    Yes.

9              MR. KELLER:  No further questions, Your Honor.

10                       CROSS-EXAMINATION

11   BY MR. CARY:

12   Q.    Mr. Jones, my name is Rob Cary.  And I represent Ted Suhl.

13   A.    Good morning, sir.

14   Q.    Good morning to you.  We've never met, have we?

15   A.    No, sir.

16   Q.    Mr. Keller just asked you some questions about your wife.

17   What does your wife do for a living, sir?

18   A.    She runs a health center for indigent and uninsured and

19   underinsured people over in eastern Arkansas.

20   Q.    And it's called East Arkansas Community Health Clinic or

21   something like that?

22   A.    East Arkansas Family Health Center.

23   Q.    And then she's a medical doctor.  Correct?

24   A.    That's correct.

25   Q.    And she's the chief executive officer of that organization?

```
1   A.    Yes.

2   Q.    She's very respected in the community?

3   A.    Yes.

4   Q.    A good doctor who helps a lot of people.  Correct?

5   A.    I want to be like her when I grow up.

6   Q.    And, sir, it's true, is it not, that the United States

7   government suggested that they might prosecute your wife?  Is

8   that correct?

9              MR. KELLER:  Objection, Your Honor.  May we approach?

10             THE COURT:  You may.

11        (Proceedings at the bench as follows:)

12             MR. KELLER:  I don't see the relevance of this.

13   Further, it seems extremely prejudicial for whatever limited

14   probative value it might have.

15             MR. CARY:  May I respond?

16             THE COURT:  Just a minute.

17        Overruled.

18        (Proceedings continuing in open court as follows:)

19   BY MR. CARY:

20   Q.    It's true, is it not, Mr. Jones, that the United States

21   government suggested that they were considering prosecuting your

22   wife?

23   A.    I don't know that for certain.  I do know that at least one

24   FBI agent went to her office.  And she was pretty intimidated by

25   that.
```

1  Q.   And that's one of the reasons you decided to plead guilty

2  in this case.  Correct?  Is that one of the reasons you decided

3  to plead guilty?

4  A.   Yeah.  I'm trying to figure out how you knew it.  Yes, to

5  answer your question.

6  Q.   Thank you, Mr. Jones.  Let's go back to the beginning.  You

7  are 50, 51 years old?

8  A.   I'm 51, yes, sir.

9  Q.   And you've had a long career in business.  Correct?

10 A.   Yes.

11 Q.   And a long career in public service as well.  Right?

12 A.   Yes, sir.

13 Q.   And you viewed business as your vocation.  Right?

14 A.   That's absolutely correct.

15 Q.   And public service, I've heard you say before, was your

16 advocation.  Is that correct?

17 A.   Yes.

18 Q.   And --

19 A.   You are sure we haven't met before?

20 Q.   I promise you we haven't met, sir.  Your hometown is Earle,

21 Arkansas.  Correct?

22 A.   That's where I grew up, yes.

23 Q.   And that's over in northeast Arkansas in the Delta.  Right?

24 A.   Yes, sir.

25 Q.   And it's 28 miles from Memphis?

1   A.    That's right.

2   Q.    You eventually moved to Marion, which I think you said is

3   13 miles, I heard you say, from the Texas de Brazil restaurant

4   in Memphis.  Correct?

5   A.    Yes, sir.

6   Q.    And no matter where you worked -- and there was a time you

7   said you worked in Little Rock -- but you consider northeast

8   Arkansas your home.  Correct?

9   A.    That is home.

10  Q.    And you went home on weekends pretty much every weekend.

11  Right?

12  A.    Yes, sir.

13  Q.    And you've been a member of the Earle Church of God in

14  Christ for your entire life.  Correct?

15  A.    That's correct.

16  Q.    And you believe in the church.  Right?

17  A.    Yes, sir.

18  Q.    You gave generously to the church?

19  A.    Yes, sir.

20  Q.    And Pastor John Bennett was the pastor of the Earle Church

21  of God in Christ at one point.  True?

22  A.    John was my pastor for several years.

23  Q.    And after he moved to another church, he was still the

24  superintendent of your church in Earle that you've been to your

25  whole life.  Right?

1    A.    Actually, not exactly.  We were in another district.  He

2    was superintendent of the West Memphis District.  We were in the

3    Wynne District.

4    Q.    Okay.  Thanks for that clarification.

5    A.    Sure.

6    Q.    He's a distant relative, I think you said.

7    A.    Yes.

8    Q.    You remained close over the years until he died, in 2014.

9    Right?

10   A.    John always looked out for me.

11   Q.    And I would like to ask you some questions about your

12   business career, sir.  You were in the management program at

13   Tandy Corporation after college.  Right?

14   A.    Yes.

15   Q.    And then you worked at RadioShack for a number of years?

16   A.    Yes.

17   Q.    You actually managed a RadioShack store?

18   A.    Yes.

19   Q.    You worked for a company called Metro Graphics.  Is that

20   correct?

21   A.    Yes.

22   Q.    And that was in the printing business.  Right?

23   A.    I had some ownership in that company, yes.

24   Q.    And they also did marketing?

25   A.    Yes.

1    Q.   And you worked at a company called Crittenden Publishing

2    for many years as well.

3    A.   That's correct.

4    Q.   And you were the general manager there for nine, ten years.

5    Is that right?

6    A.   Yes, sir.

7    Q.   And you've also been an investor in real estate.  Correct?

8    A.   Still am.

9    Q.   Something called Jones Developments that owns several

10   rental properties?

11   A.   Yes.

12   Q.   And you also formed a company called Apex Graphic

13   Consultants in 2007.  Right?

14   A.   Yes, sir.

15   Q.   And you consider yourself experienced in printing and

16   marketing?

17   A.   Yeah.  It's been most of my career.

18   Q.   And while doing that sort of work, you also served the

19   public.  Right?

20   A.   Yes.

21   Q.   And now I would like to shift to your public service

22   career.  You were the president of the Earle Chamber of Commerce

23   from '90 to '94?

24   A.   Yes, sir.

25   Q.   You actually founded the Earle Chamber of Commerce.  Right?

```
 1   A.    That's correct.
 2   Q.    And you were on the Earle City Council for four or five
 3   years?
 4   A.    Four years.
 5   Q.    You actually have a deputy sheriff card for Crittenden
 6   County.  Right?
 7   A.    I had one, yes.
 8   Q.    And you were the chairman of the Crittenden County
 9   Democratic Central Committee for a number of years.  True?
10   A.    That's right.
11   Q.    Secretary of the Democratic Party for the whole state of
12   Arkansas?
13   A.    Yes, sir.
14   Q.    You served on the Delta Regional Authority Board?
15   A.    Yes, sir.
16   Q.    And the Arkansas Educational Television Network Commission,
17   where you were actually the chair for a number of years.  Right?
18   A.    I did.
19             THE COURT:  Any objection to continuing this after
20   dinner, or do you want to go ahead?
21             MR. CARY:  Oh, it's up to you, Your Honor, if you want
22   to break for dinner.
23             THE COURT:  Well, I don't want to interrupt your flow
24   if you feel like --
25             MR. CARY:  No, no.  If now is dinnertime, it's
```

1    perfectly fine with me, Your Honor.

2              THE COURT:  We'll be in recess until five minutes

3    after one, ladies and gentlemen, by that clock there.

4         Don't talk about the case, anybody involved in it.  And

5    consciously avoid starting to make up your mind.

6         Let the jury stand down.  Everyone else remain like you

7    are.

8         (Jury exits courtroom.)

9              THE COURT:  The jury is out.  Any issues before we

10   break for lunch?

11             MR. CARY:  No, Your Honor.

12             MR. KELLER:  No, Your Honor.

13             THE COURT:  We're in recess.  You can be at ease.

14        (Recess at 11:47 a.m.)

15                   REPORTER'S CERTIFICATE

16        I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

17

18   /s/Elaine Hinson, RMR, CRR, CCR      Date:  July 18, 2016.
     United States Court Reporter

19

20

21

22

23

24

25

1    (Proceedings continuing in open court at 1:05 PM.)

2         THE COURT:  Good afternoon.  You may proceed.

3         MR. CARY:  Thank you.

4    BY MR. CARY:

5    Q    We were talking about your public service career and let

6    me skip ahead to the House of Representatives if I could,

7    please.  You served in the Arkansas House for six years?

8    A    Yes, sir.

9    Q    1998 through 2005?

10   A    That's correct.

11   Q    And serving in the legislature was one of the highest

12   honors of your life, right?

13   A    Absolutely.

14   Q    And while you were there, you saw nothing that was

15   illegal, correct?

16   A    No.

17   Q    And by that, you did not -- do you agree with me that you

18   saw nothing illegal while you were there in the House?

19   A    You mean things that my colleagues did?

20   Q    Or that you did.

21   A    No, I didn't do anything illegal, nor did I observe

22   anything illegal.

23   Q    Thank you, sir.  Your annual salary at the Arkansas House

24   was $14,000 a year, or that's what you were paid, or a little

25   less than that actually?

1    A    I thought it was about 12-5, but it may have gone up.   I

2    went in at 12-5, so it may have adjusted.   Not what it is

3    today.

4    Q    It was a part-time position back then?

5    A    Oh, yeah.

6    Q    And you knew you were allowed to have other business

7    positions, correct?

8    A    Of course.

9    Q    And you did, right?

10   A    Yes.

11   Q    And just a few more questions about the Arkansas House.

12   They had ordinary sessions in odd number years, correct?

13   A    Yes.

14   Q    And what's an ordinary session?

15   A    That's where what we call substantive bills are passed,

16   bills that actually do things like moving things around,

17   creating laws, and then the other session was what we call a

18   fiscal session.   That's where we dealt with primarily financial

19   matters.   Occasionally there would be something else on the

20   call, one or two others, but technically just fiscal, the

21   budget.

22   Q    In 2004, there was an extraordinary session having to do

23   with the Lakeview School District litigation.   Do you recall

24   that?

25   A    It dominated the session.

1    Q     And that's primarily what was going on in the year 2004,

2    correct?

3    A     Yes.

4    Q     You don't remember anything with respect to healthcare in

5    2004?

6    A     Nothing specific.

7    Q     And that would have ended sometime in early 2004, and for

8    most of 2004, you were not in session at all, right?

9    A     That's the way it works.

10   Q     So when you say you were in through 2005, I'm just making

11   a point that a big chunk of 2004, you were not in session?

12   A     That's correct.  Sessions generally last about two to

13   three months.

14   Q     Okay.  Thanks.  So let me ask about your time at the

15   Department of Human Services if I could.  In 2007, you became a

16   deputy director?

17   A     Yes.

18   Q     You reported to John Selig?

19   A     That's correct.

20   Q     You oversaw five divisions, correct?

21   A     That's correct.

22   Q     In your book, if you could turn in volume 2 to tab 1300,

23   and there's a presentation there I want you to thumb through

24   quickly.  Once you thumb through, I want you to pay special

25   attention to the third and fourth pages which are org charts,

1    second, third, and fourth pages.

2    A     Org charts?

3    Q     Organizational chart.

4    A     In 1300?

5    Q     Yes.

6    A     That's talking about the energy deal?

7    Q     Yes, about the energy deal, but if you look on the second

8    page, there's -- it says John Selig, director, at the top.

9    A     I see it.

10   Q     Then there's a page about Janie Huddleston?

11   A     Correct.

12   Q     Then there's a page about you?

13   A     Yes.

14   Q     Does that accurately reflect the organization of the

15   Department of Human Services when you were there?

16   A     That reflects when I left.  When I first got there, for

17   the first year or two, Janie and I traded divisions at one

18   point.  We traded divisions, I think, once.  So we swapped some

19   divisions, but that's how I left.

20          MR. CARY:  If I could offer 1300, Your Honor, for

21   the org charts and then we'll clarify what Mr. Jones is saying

22   about switched positions.  Offer for admission.

23          MR. KELLER:  No objection to the specific pages that

24   he's offered.  I don't think the rest of the exhibit is

25   relevant.

1          MR. CARY:  That's fine, Your Honor.  It can just be

2     the pages with the org charts on it and we can fix that with

3     Ms. Beard later.

4          THE COURT:  Okay.

5          (Defendant's Exhibit 1300 received in evidence.)

6     BY MR. CARY:

7     Q    So if I can have the second page of 1300, please.

8          Mr. Jones, my question is, does this reflect the

9     organization at the top of DHS when you were there?

10    A    Yes, sir.

11    Q    That was the reporting hierarchy throughout the time you

12    were there, correct?

13    A    That's correct.

14    Q    Then if we could have the next page, please.

15         And does that reflect the five divisions that Janie

16    Huddleston oversaw?

17    A    Yes, sir.

18    Q    And those five divisions are the Division of Children and

19    Family Services, right?

20    A    Yes.

21    Q    Division of Behavioral Health Services, correct?

22    A    Yes.

23    Q    Division of County Operations, correct?

24    A    Yes.

25    Q    Division of Developmental Disabilities Services, right?

1    A      Correct.

2    Q      And Division of Medical Services?

3    A      Yes.

4    Q      That was the organization when you left, right?

5    A      Yes, sir.

6    Q      Then if I could have the next page, please.

7           And those are the five divisions that you oversaw,

8    correct?

9    A      That's correct.

10   Q      Division of Youth Services?

11   A      Yes.

12   Q      What was Division of Youth Services?

13   A      That's the juvenile justice branch for the State of

14   Arkansas.  We oversaw the large juvenile justice center out at

15   Alexander and we had some community-based juvenile justice

16   providers as well.

17   Q      Those were young people in custody?

18   A      Typically being adjudicated through the courts.

19   Q      And then the Division of Volunteerism was under your

20   responsibilities?

21   A      Yes, we changed that name.  I changed it my last year or

22   two to Division of Community Service and Nonprofit Support to

23   more support what it actually did.

24   Q      And then the Division of Services for the Blind?

25   A      Yes.

1    Q      Was yours.  Division of Aging and Adult Services?

2    A      One of my favorites.

3    Q      And Division of Childcare and Early Childhood Education,

4    right?

5    A      Another favorite.  All of them were favorites actually.

6    Q      Which two then -- at one point you said one division was

7    switched between you and Ms. Huddleston?

8    A      Sure.

9    Q      What was that?

10          Could I get these side by side maybe?

11   A      I used to have Division of Children and Family Services.

12   She used to have Division of Aging and Adult Services.  I

13   wanted to work with the elderly and senior citizens.  That was

14   something I was passionate about, and she had some initiatives

15   she wanted to get going with children and family services which

16   is the adoption and foster care programs, so we just agreed to

17   switch those divisions.

18   Q      And so those were switched.  What does the Division of

19   Medical Services do?

20   A      That's typically what's commonly referred to as Medicaid.

21   Q      And that was under Ms. Huddleston's area the entire time

22   that you were at DHS, right?

23   A      That's correct.

24   Q      And you had no interest in Medicaid, correct?

25   A      We switched those other two.

1   Q      But not Medicaid, right?

2   A      Didn't want it.

3   Q      Didn't want it, and Mr. Selig would have had to have

4   agreed to a switch, right?

5   A      He approved that previous one.

6   Q      And you did not have the power to switch it either, did

7   you?

8   A      Not alone, no.

9   Q      Now, we can take those down.  When you were at the

10  Department of Human Services, you brought your business

11  background with you, correct?

12  A      That was one of the things that they found attractive

13  about bringing me on board.

14  Q      And in business, you have meetings with people, right?

15  A      Routinely.

16  Q      And you took that approach with you to DHS?

17  A      I thought it was a benefit.

18  Q      You gave your card out to people throughout the state?

19  A      Almost every day.

20  Q      You met with individual citizens of Arkansas?

21  A      Yes.

22  Q      You met with providers of services?

23  A      In fact, my assistant said I gave out my cards than any

24  of my predecessors.  What was that last question?

25  Q      You met with providers of services?

1    A      All the time.

2    Q      And you thought it was important that the public have

3    access to you, correct?

4    A      That was really my mantra.  Actually not just our

5    employees, she used -- my assistant used to get on me about

6    that as well because at speeches around the state, I said I

7    have an open door policy, you can come in any time, you don't

8    need an appointment if I'm not busy.  And I said that to

9    people, to the citizens also who paid our salaries.

10   Q      You would have met with Ted Suhl whether Phillip Carter

11   had given you money or not, correct?

12   A      Absolutely.

13   Q      If Ted Suhl had a complaint, there was nothing wrong with

14   him approaching you, correct?

15   A      No, that's part of what I did.

16   Q      And one of your job responsibilities or part of what you

17   did was to communicate with the public, right?

18   A      Yes.

19   Q      Your job was all about access, correct?

20   A      Yes.

21   Q      You were always accessible?

22   A      I tried to be.

23   Q      I want to ask you about the gift policy when you were at

24   DHS.

25   A      The what policy?

1    Q      The gift policy, if I could.

2    A      Sure.

3    Q      You had to fill out disclosure forms from time to time,

4    correct?

5    A      That's correct, annually.

6    Q      If there was a gift over $100 it had to be disclosed,

7    right?

8    A      Yes.

9    Q      So, for example, you disclosed, I'm not suggesting

10   there's anything inappropriate about this, gifts from

11   Southland, correct?

12   A      Not to me, it was to my wife.

13   Q      Okay.  A gift --

14   A      It wasn't a gift.  She's employed there, a board member.

15   Q      Some tickets to things you disclosed, do you remember

16   that?  And if you want, take a look at tab 1380 and see if

17   there's some disclosures of gifts on there.

18   A      13?

19   Q      1380.

20   A      Okay.  That you're referring to over there, those are

21   sources of income.  I don't think -- we usually didn't get too

22   many gifts.  Yeah, we didn't get gifts.

23   Q      Could you just take another look at the fifth page and

24   there's some reference there to some racing passes, some

25   tickets, movie pass?  You see that?

1    A      Where is that?

2    Q      It's on the fifth page of that document.  In fact, it's

3    called --

4              THE COURT:  You can walk up there and show him if

5    you need to.

6              THE WITNESS:  Okay.

7    BY MR. CARY:

8    Q    Does that refresh your recollection that you disclosed

9    some gifts?  I'm not suggesting there's anything at all

10   inappropriate about it, I'm just pointing out that you

11   disclosed some gifts.

12   A      Yeah.  This would be when I was in the House of

13   Representatives, not at DHS.

14   Q      Okay, I got it.  Thanks.  Fair point.

15   A      Sure.  Yeah, Southland gave out racing passes to all the

16   legislators; lunch or something from the electric co-ops one

17   time; ASU gave tickets, United Artists would give all the

18   legislators passes to movies while we're in session.

19   Q      If I could ask you to -- in fact --

20   A      You'll probably find that on all the legislators.

21   Q      If I could ask that Defendant's Exhibit 775-F be put up

22   on the screen just for the witness, please.  Could you blow up

23   the portion about gifts on page 4?

24              Mr. Jones, my question is, does this particular, this

25   language that's been put up for you, does that reflect the gift

1    policy when you were at DHS?

2    A      I believe it was.

3             MR. CARY:  Move the admission of Defendant's Exhibit

4    775-F, please, and ask that it be published for the jury.

5             MR. KELLER:  Objection as to relevance, Your Honor.

6             THE COURT:  Overruled.  Exception saved.

7         (Defendant's Exhibit 775-F received in evidence.)

8    BY MR. CARY:

9    Q      Could I have that blown up or highlighted where it says

10   an employee is not?

11        Mr. Jones, this highlighted sentence where it says an

12   employee is not prohibited from receiving an item converted to

13   show appreciation for an employee's job performance so long as

14   the value of the item does not exceed $100, does that reflect

15   what you thought the policy was at the time?

16   A      Yes.

17   Q      And indeed, under $100 did not have to be disclosed

18   either, did it?

19   A      That's correct.

20   Q      When you were there, you sometimes met with other

21   business owners about issues about DHS, correct?

22   A      It was routine.

23   Q      And sometimes they picked up the check for lunch, right?

24   A      Occasionally.

25   Q      And you believe that your boss, John Selig, sometimes had

1    his meals paid for by business people as well?

2    A     I believe so.

3    Q     And your understanding was that that was perfectly

4    appropriate as long as your meal didn't exceed $100, correct?

5    A     Absolutely.  And nothing ever came close to $100 while I

6    was at DHS.  No meal.

7    Q     Thank you.  I want to ask about the Bishop's campaign

8    that you testified about in direct examination.  Shortly after

9    you became the deputy director at DHS, Pastor Bennett contacted

10   you about your assistance in his campaign to be Bishop,

11   correct?

12   A     That's correct.  Well, actually it was before I became --

13   the first phase was before.

14   Q     When was the first phase?

15   A     It was a little bit before I got there, I can't remember

16   the exact time, but I wasn't there, because I know he met with

17   me at my office.

18   Q     This was a campaign that was ongoing for a number of

19   years, correct?

20   A     At my business office, which means that I wasn't at DHS.

21   Q     Your business office in Crittenden County?

22   A     Uh-huh.

23   Q     And the campaign for Bishop was ongoing for a number of

24   years, correct?

25   A     Well, yeah.  I almost got into that earlier.  The first

1    phase he wanted to try to convince the first Bishop who was

2    still living to split off part of the jurisdiction so he could

3    take that over, so he was messaging and strategic placement and

4    getting him ready for that and not that he would get to be that

5    exactly, but it would just position him because it's a little

6    bit more complicated to get there.  And then that Bishop died

7    and then there was an election to recommend someone to our

8    national -- inside politics -- to become Bishop, and that's

9    where -- that was the more costly phase and then we went back

10   to something similar down toward the end.

11   Q     Okay.  And he called on you because of your marketing

12   expertise, right?

13   A     And because I grew up and knew the church very well and I

14   had done some similar work for some people.

15   Q     You knew a lot of people about -- a lot about the people

16   in the Church of God in Christ?

17   A     Yes.

18   Q     And you knew how the campaign selection worked, right?

19   A     Yes.

20   Q     And you gave Pastor Bennett some advice about a mailer?

21   A     Yes.

22   Q     And you helped him get an article published in *Spirit*

23   *Magazine*, correct?

24   A     Yes.  My business partner did the layout.

25   Q     Could I have Defendant's Exhibit's 3 which is in

1   evidence?

2        Mr. Jones, that's a picture of Pastor Bennett on the

3   cover of *Spirit Magazine*, right?

4   A    Yes.

5   Q    What is *Spirit Magazine*?

6   A    It's a magazine that we published, well, did the layout

7   and design for.  It's based in Memphis, but it's mostly

8   distributed in Memphis, but some other areas as well.

9   Q    You were responsible for getting this published for

10  Pastor Bennett, right?

11  A    Helping.

12  Q    Okay.  It was your assistance helped get it published,

13  right?

14  A    Yeah, my partner did the design work on it.

15  Q    And it tells the story of his life, about his childhood,

16  right?

17  A    Yeah.  Actually I told him at that first meeting focus on

18  faith, family, finance, and future was what was the plan, that

19  was the overall plan.  His family, what he had done in the

20  ministry so far, his plans to make the district jurisdiction

21  fiscally solvent, and then what his plans were for the future.

22  Q    And to large measure, this article did that, right?

23  A    Yes.

24  Q    It was an excellent marketing piece for his campaign to

25  be Bishop, right?

1    A      Yeah.

2    Q      And this came out in the summer of 2009?

3    A      Yes.

4    Q      If I could have for the witness only Defendant's Exhibit

5    1724, please.  Do you recognize Defendant's Exhibit 1724?

6    A      Yes.

7    Q      And what is that, sir?

8    A      He was -- that's the brochure.  A couple things he did,

9    John was very innovative for a small -- he started -- our

10   church was the first church that he pastored which was a small

11   church and he brought in a food bank and other things.  I told

12   him when we were getting ready, working on the strategic plan,

13   that we should talk about that because he had brought a food

14   bank to the church and other innovative things, he had gotten

15   us involved in downtown development and here was when he got to

16   West Memphis.  That building up there was on Broadway so that

17   was something, a revenue generator for the church and down at

18   the bottom, that's where he had his Sober House ministry and

19   these were things that I said these are things that would be

20   appealing to underscore your leadership abilities and your

21   innovative thinking.

22          MR. CARY:  Your Honor, I move the admission of

23   Defendant's Exhibit 1724.

24          MR. KELLER:  Objection as to relevance and

25   cumulative.

1          THE COURT:  Overruled.  Exception saved.

2          (Defendant's Exhibit 1724 received in evidence.)

3     BY MR. CARY:

4     Q     Just ask that it be published for the jury, and could you

5     just briefly without repeating too much, can you tell us who

6     that is in the upper right-hand corner and then I'll have some

7     follow-up questions for you?

8     A     That's John in the upper right-hand corner preaching in

9     his church one day.

10    Q     There's a reference to something called Operation Pull.

11    What was Operation Pull?

12    A     Operation Pull?

13    Q     It's in the upper left-hand corner.

14    A     It was one of the outreach programs from the church.  He

15    wanted to work with youth that were incarcerated.  In fact,

16    right before he died, one of the projects that was part of the

17    financial agreement that we had that somehow got mixed up in

18    all this, he was going to start something called Red Sea

19    Ministries.  He was always thinking.  He always had ideas about

20    things he wanted to do and he wanted to reach out to the youth

21    on the south side of West Memphis because he knew that I was at

22    DHS and I worked with the youth.  And one of the things I

23    wanted to do was stop the pipeline of the young men, of the

24    children, boys and girls, that were starting off in DYS,

25    Division of Youth Services and then ending up in the prison

1    system, so he had a desire to do something about that too and

2    so that's something we wanted to work on.

3    Q    How about Sober House that's referenced in this pamphlet?

4    A    I referenced that a moment ago.  He wanted to work with

5    people who had been caught up in the throes of alcohol and drug

6    addiction because we had family members that had been touched

7    by that and he wanted to create a pathway to get their lives

8    back in order.  These were some of the things that we decided

9    to bring into the campaign.

10   Q    Did you give him advice at one point with respect to a

11   video, a campaign video?

12   A    We talked about that.

13   Q    And was one, in fact, done?

14   A    I can't remember if he ended up doing that.  At one time

15   he talked about the cost of doing it.  It may have been done, I

16   just can't --

17   Q    You don't recall as you sit here today?

18   A    No.

19   Q    If you could look in your book at tab 4 quickly and see

20   if that refreshes your recollection as to whether a video

21   actually was prepared.

22   A    Tab 4?

23   Q    Tab 4.

24   A    Of the first one?

25   Q    Yeah, of volume 1.  There are two volumes.

1    A       That's the text for it.

2    Q       And this was done on your advice?  This video was

3    prepared on your advice?

4    A       Yes.

5            MR. CARY:  Move the admission of Defendant's Exhibit

6    4, please.

7            MR. KELLER:  Same objection, Your Honor.  Relevance

8    and cumulative.

9            THE COURT:  Well, I got to look at it.

10           MR. CARY:  There is a -- I could move on and maybe

11   look at a break if you'd like, Your Honor.

12           THE COURT:  Can you just kind of very briefly tell

13   me what it is?

14           MR. CARY:  Sure.  It's a campaign video that the

15   witness has said that he was advised to help with.  I was going

16   to play a short clip given his testimony about how he worked

17   for and advised the Bishop's campaign to show what was

18   happening with this campaign.

19           THE COURT:  This is the campaign circular for

20   Bishop?

21           MR. CARY:  Yes.

22           THE COURT:  I'll admit it over objection.

23       (Defendant's Exhibit 4 received in evidence.)

24           MR. CARY:  Could I have Defendant's Exhibit 4

25   published and play maybe just the first page and three

1  quarters.

2        (Defendant's Exhibit 4 played in open court.)

3  BY MR. CARY:

4  Q     Mr. Jones, this was the advice that you gave Pastor

5  Bennett as to what to say in his campaign, right?

6  A     What to say, but that's not what I told him to do with

7  it.  He saved some money by he got a guy in his church that

8  does videos to do and I wanted to bring in a professional

9  company and go to those places and put those places in the

10 video that he had been, that he had developed.

11 Q     If he had followed your advice, it would have been a

12 little more professional look to the video, right?

13 A     Yes, sir.

14 Q     Okay.  You understood, did you not, that the Suhls

15 supported this campaign for Bishop, right?

16 A     Say it again.

17 Q     You understood that the Suhls supported the campaign

18 financially for Bishop?

19 A     Elder Bennett told me that.

20 Q     And you originally were willing to do your work for

21 Pastor Bennett *pro bono*, without charge, right?

22 A     Yes.

23 Q     But then you learned there was money from the Suhls and

24 others for the Bishop's campaign so you got paid for it, right?

25 A     Yes.

1    Q      And these meetings that you testified about at Texas de

2    Brazil, I think I wrote down you said lots of things about

3    relationships, friendship, conservative politics, his

4    conservative politics, your progressive politics, I take it; is

5    that right?

6    A      You figure it out.  Yeah, that's the way it was.

7    Q      One of the things, of course, you talked about on every

8    occasion was the Bishop campaign, right?

9    A      Pretty routinely.

10   Q      You both supported this Bishop campaign and you thought

11   it was a very good thing, right?

12   A      I thought the Bishop had a lot to offer, that John had a

13   lot to offer to the Bishop's campaign, and Ted had some real

14   close relationship, you know.  He told me that Ted let him use

15   his plane and other things.  They had a close relationship.

16   Q      I want to ask you some questions about your conversations

17   with Ted Suhl.  Other than the 2014 marketing contract, I'm

18   sorry, 2004 marketing contract, Ted Suhl did not offer to give

19   you any money, did he?

20   A      No.

21   Q      And by that I mean, it's correct that he did not offer to

22   give you any money, correct?

23   A      He did not offer to give me any money.

24   Q      And you never asked Ted Suhl for money, right?

25   A      After that contract was over, we never had any more

1    discussions about money.

2    Q    Other than that contract, you and Ted Suhl never spoke

3    about money at all, right?

4    A    That's correct.

5    Q    And it's true, is it not, that you told the government on

6    more than one occasion that you did not know for certain

7    whether any money you received from Carter came from anybody

8    other than Carter and Bennett?

9    A    I never saw them get any money from anywhere else.

10   Carter told me that the money was coming from Ted and Bennett,

11   you know, mentioned as I previously testified that Ted was one

12   of the sources.  He mentioned his brother-in-law, he mentioned

13   some of the brothers.  I think those were some of the men in

14   his church or in his district that he was superintendent over.

15   Q    Just so we're clear, these were sources for the Bishop's

16   campaign, right?

17   A    Yes.

18   Q    Couple more questions about your conversations with Ted

19   Suhl.  It is true, is it not, that he often complained about

20   Janie Huddleston?

21   A    Me?

22   Q    He did, not you.  You were clear in your testimony.

23   A    Yeah, he complained about he thought -- I got the

24   impression that he thought she was a bit heavy handed.

25   Q    And he expressed the view to you that it was at least his

1    opinion that Janie Huddleston did not like him, right?

2    A     Yes.

3    Q     Did he express the view that he thought at least, whether

4    this is true or not, whether you thought it was true or not

5    that he thought that she did not like him because he was

6    overtly Christian?

7    A     He did tell me that.

8    Q     And you thought that he understood that you and he shared

9    similar Christian values, correct?

10   A     Yes.

11   Q     You prayed before every meal, right?

12   A     He always wanted to do a corporate prayer before we ate

13   every lunch.  I pray always, but he wanted to kind of hold

14   hands and pray if that was all right.  He asked permission.

15   Q     You never drank alcohol together with Mr. Suhl, right?

16   A     No.

17   Q     He was the kind of guy, we saw that video earlier, he

18   gave you a hug.  Did he often give you a hug?

19   A     That was normal.

20   Q     He's one of these guys that hugs his friends, right?

21   A     So do I.

22   Q     Did he ever say anything to you along the lines of when

23   you would complain, I know there's nothing you can do, but

24   thanks for being a friend?

25   A     Yes, I can remember him saying something along those

1    lines.

2    Q     So I'd like to ask you about this 30-mile, 50-mile issue

3    if I could.  There was a moratorium in place for new providers,

4    new service providers for what is called RSPMI, Rehabilitative

5    Services for Persons with Mental Illness.

6    A     That's what that means.

7    Q     A lot of acronyms, a lot of letters in state government,

8    right?

9    A     Right.

10   Q     Okay.  So the RSPMI, you understood that there was a

11   moratorium put in place, right?

12   A     That's right, there was.

13   Q     That was a way to slow growth and hopefully hold down

14   costs on Medicaid to some extent?

15   A     That was the plan.

16   Q     You thought that that moratorium actually helped Ted Suhl

17   because he already had lots of sites throughout the state,

18   correct.

19   A     I thought so.

20   Q     Now, it was Dawn Zekis, I think is her name, at DHS who

21   wanted the radius expanded from 30 miles to 50 miles; is that

22   right?

23   A     That was one of Dawn's projects.

24   Q     I'm sorry?

25   A     That was one of Dawn's projects.

1   Q      She was a policy director?

2   A      At that time.  I think she's director now.  She was

3   director at some point after I left DHS.

4   Q      You, yourself, personally did not have anything to do

5   with that policy, did you?

6   A      Not at all.

7   Q      Now, on a prior occasion, Mr. Keller asked you about this

8   policy, did he not?

9   A      Yes.

10  Q      And you actually told him that you thought that the

11  department was proposing a change that would collapse the area

12  from 30 miles to 20 miles.  Do you recall that?

13  A      Sounds about right.

14  Q      And Mr. Keller had to correct you and explain to you that

15  it was actually an expansion from 30 to 50 miles, right?

16  A      It just wasn't something that I knew a lot about because

17  I had my hands full in those five divisions you saw up there.

18  Q      That wasn't your area of responsibility at all, was it?

19  A      No.

20  Q      And after he corrected you, he said, so Mr. Suhl talked

21  to you about this issue about the radius expansion, and you

22  responded yes; correct?

23  A      I'm sorry?

24  Q      In this prior occasion, after Mr. Keller corrected you in

25  the prior occasion where you gave testimony, did he correct you

1    and then ask whether Mr. Suhl was in favor of the radius

2    expansion?

3    A      You're asking me if John asked me that?

4    Q      Yes.

5    A      Yeah, we talked about that.

6    Q      And your testimony was I believe he was, correct?

7    A      Yes.

8    Q      You weren't sure that Mr. Suhl was in favor of it, right?

9    A      I wasn't 100 percent sure if it was just Dawn's idea.  I

10   just didn't know.

11   Q      And the first time you met with the government about this

12   particular issue, the 30 to 50-mile issue --

13   A      Okay.

14   Q      The radius expansion.

15   A      I'm with you.

16   Q      Okay.  We're tracking on that now?  The first time you

17   met with the government, you did not have any memory of

18   discussing it with Ted Suhl, right?

19   A      The reason I was looking puzzled, because I thought you

20   said the first time I met with the governor on that.  I never

21   met with the governor.  Yeah, it's just not something that I

22   was that familiar with.  I knew it was out there, I knew

23   something was going on with the radius, but I just didn't know

24   the infinite details on it.

25   Q      The first time you met with the United States government

1    to discuss this, you had no memory of a discussion with Ted

2    Suhl about it, right?

3    A    I just don't remember that first meeting.

4    Q    If we could look in your notebook, if you could look at

5    tab 696.

6    A    In which one?

7    Q    It will be the first one, volume 1.

8    A    Okay.

9    Q    If you go down to the second to last paragraph.

10   A    On the first page?

11   Q    The first page, yeah.  I'm sorry, it's the second page.

12   And then the last -- I ask you to read yourself, not for

13   everybody because this is not evidence, the last sentence of

14   that paragraph.

15   A    The next to the last paragraph?

16   Q    Yes.

17   A    "Jones denied --

18   Q    You just have to read it to yourself because the judge

19   has not put it into evidence yet.  So just read it to yourself

20   and I'll have a question for you.

21   A    Okay.

22   Q    Does this refresh your recollection, sir, that the first

23   time you met with the government you didn't have anything to

24   say about whether Mr. Suhl had a position on the 30 to 50-mile

25   radius issue?

1    A      Looks like it.

2    Q      And then the second time, you didn't have any

3    recollection either, did you?

4    A      Probably not.

5    Q      Okay.  Let me ask you about Senate Bill 218 which was put

6    in as Government's Exhibit 48.  Could I have that on the

7    screen, please?

8           This is a bill from -- and this is admitted in

9    evidence -- the regular session, 218, I'm sorry, January 2011,

10   right, or the regular session in 2011?

11   A      Yes.

12   Q      And it relates to DYS contractors, right?

13   A      That's correct.

14   Q      DYS was something that was in your jurisdiction, right,

15   that was Division of Youth Services?

16   A      That was one of mine, yes.

17   Q      That has to do with young people in custody or in the

18   criminal justice system, correct?

19   A      Yes.  Although I tried to change that when I got there.

20   We can talk about that if you want to.

21   Q      And Ted Suhl was not a contractor with the Department of

22   Youth Services, was he?

23   A      No.

24   Q      And it also applies, does it not, and I can show you some

25   language, in fact.  Let's go to the second page, if I could, if

1    you look at the definition section down in the lower left-hand

2    corner, would you agree with me that this applies to local

3    community providers which are nonprofit programs?

4    A     Yes.

5    Q     And the DYS contractors were all nonprofit, right?

6    A     Well, this means a private, comma, nonprofit program.

7    But, yes, to answer your question, all of our DYS contractors

8    were nonprofit.

9    Q     And I think you said on direct examination that this

10   particular bill didn't have any impact on Ted Suhl's businesses

11   at all because, A, he's not a DYS contractor and, B, he's a

12   for-profit, he ran a for-profit business, not a nonprofit

13   business.  Correct?

14   A     Yes.

15   Q     And then if I can have, just for the witness if I could

16   have Defendant's Exhibit 788, please.

17         And is this the calendar for the legislative history of

18   Senate Bill 218?

19   A     Yes.

20              MR. CARY:  Move its admission.

21              MR. KELLER:  No objection, Your Honor.

22              THE COURT:  Admitted.

23         (Defendant's Exhibit 788 received in evidence.)

24              MR. CARY:  If I could have that published, please.

25              THE COURT:  And publish you can.

1  BY MR. CARY:

2  Q      If we could have the first date blown up, please.

3         Mr. Jones, can we agree that this bill was filed on

4  February 3rd, 2011?

5  A      Yes.

6  Q      And can we agree that it was withdrawn on

7  February 21st, 2011?

8  A      Yes.

9  Q      It has an existence in the Senate, the Arkansas State

10 Senate of about 18 days, right?

11 A      Yes.

12 Q      Did not pass?

13 A      That's correct.

14 Q      You were actually opposed to it, right?

15 A      Yes.

16 Q      That's fine, you can take that down, please.

17        I want to ask you some questions about the Child Welfare

18 Agency Review Board.  You testified earlier about a

19 conversation you had with Mr. Suhl, right?

20 A      Yes, sir.

21 Q      And you never talked -- the governor at the time was

22 Governor Beebe, correct?

23 A      Yes, sir.

24 Q      You never talked to him about it, right?

25 A      No, sir.

1   Q     In fact, you knew that Governor Beebe didn't especially

2   like Ted Suhl, right?

3   A     I heard a reference in a conversation one time.

4   Q     And Mr. Suhl was Republican, right?

5   A     Yes.

6   Q     Governor Beebe was a Democrat, right?

7   A     Correct.

8   Q     You've been in politics a long time and you knew there

9   was zero chance that Governor Beebe was going to put Ted Suhl

10  on that board, right?

11  A     He appointed Republicans to boards, but I didn't think

12  that he was going to reappoint Ted Suhl.

13  Q     And, in fact, Governor Beebe appointed -- Mr. Suhl's term

14  expired in March of 2008, correct?

15  A     I don't know.

16  Q     Well, let's -- if we could have Government's 46 on the

17  screen, please.  It's for the witness, I don't think it's been

18  admitted yet.

19        Do you see Government's 46?

20  A     Yes.

21  Q     Does this orient you in time in terms of when Ted Suhl

22  was being replaced by -- was being replaced on the board?

23  A     I remember when that individual was appointed.

24  Q     And does it refresh your recollection that by June 12th

25  of 2008, you knew that somebody else was replacing Ted Suhl?

1    A      Yes.

2    Q      And who was that person, sir?

3    A      Beverly Foti.

4    Q      And we can agree, can we not, that by June 12th of 2008,

5    you knew that there was zero chance that Ted Suhl was going to

6    get reappointed?

7    A      Certainly to that position.

8    Q      And that was a four-year term, right?

9    A      Yes.  Well, I take your word for it.  I'm not sure on

10   that.

11   Q      Do you believe it was a multiyear term?

12   A      Yeah, it definitely was.  Some of them varied in terms.

13   Q      I want to ask you some questions about childcare and the

14   15th Street Church of God in Christ if I could.  Your division

15   did oversee or your responsibilities included overseeing the

16   Division of Childcare and Early Childhood Education, right?

17   A      Yes, sir.

18   Q      And the 15th Street Church of God in Christ had a

19   childcare center, correct?

20   A      Yes, they did.

21   Q      And your division paid money directly to that childcare

22   center to help the kids who were being taken care of there?

23   A      Yes.

24   Q      And there were a couple of investigations while you were

25   there, right?

1    A      Yes.

2    Q      And Tonya Russell was in charge of one of them, correct?

3    A      Yes.

4    Q      And she kept you up to date on what was happening, right?

5    A      Yes.

6    Q      But you never did anything to tip the scale in terms of

7    how that investigation turned out, right?

8    A      Actually, I think I asked her to look into something one

9    time for the day care.  Some kind of routine issue that came

10   up, I asked her or someone on her staff to look into it, and

11   because my child had attended that day care, I wanted to be

12   clear to her, treat them like you would anyone else.  And the

13   government probably checked with Tonya and they probably can

14   attest to that.

15   Q      Okay.  So it's true, is it not, that you certainly didn't

16   think there was -- you were getting paid by Pastor Bennett for

17   your work on the campaign, right?

18   A      Yes.

19   Q      And at the same time you're supervising this childcare

20   center, right?

21   A      Yes.

22   Q      But you didn't think there was anything wrong with that

23   because you didn't do anything inappropriate to assist the

24   childcare center, correct?

25   A      I did not.

1    Q    Let's talk about Phillip Carter a little bit.  During --

2    you were very involved in democratic politics, right?

3    A    Yes, sir.

4    Q    And you were the county chair for Crittenden County, I

5    think it's called the Central Committee in Crittenden County?

6    A    Yes, Democratic Party of Crittenden County, but it's

7    generally referred to as the Central Committee.

8    Q    And whatever your views are about Phillip Carter, you

9    would agree that he was very involved in politics down there,

10   correct?

11   A    Oh, yeah.

12   Q    And he would call you a lot with questions, right?

13   A    He would call me from time to time with questions about

14   politics.  I was -- a lot of the people who were younger than I

15   was wanted to try to get involved in politics.  He's not a lot

16   younger, he's about five or six years, I think, younger than I

17   am, and I tried to mentor a lot of people so it wasn't unusual

18   for people like Phillip to call and ask me how to do things,

19   how to get elected to something or how to do things.

20   Q    In the summer of 2011, there was a hotly contested

21   election that he was involved in down there, right?

22   A    Yes.

23   Q    And it involved a candidate that he supported named

24   Hudson Hallum, correct?

25   A    Yes.

1   Q      And there was somebody I think her name was Kimberly

2   Felker who Hudson Hallum ran against.  Does that name sound

3   familiar?

4   A      Yes.

5   Q      And it turned into a big investigation and lots came out

6   about it, right?

7              MR. KELLER:  Objection, Your Honor.

8              THE WITNESS:  Yes.

9              MR. CARY:  I'll move on.

10             THE COURT:  You got an objection on the floor.

11             MR. KELLER:  This relates to an issue we've

12  addressed before that the Court has addressed in a motion in

13  limine.

14             THE COURT:  Approach.

15         (Bench conference reported as follows:)

16             THE COURT:  As a matter of fact, we'll just take

17  about a 12-minute recess.  Let the jury stand out.  Everyone

18  else remain as you are.  Don't talk about the case or start

19  making up your mind.

20         (Jury exits the courtroom.)

21             THE COURT:  The jury's out.  He said he's going to

22  move on.  Do you still have an objection?

23             MR. CARY:  If I can explain what I intend to do here

24  and I think it'll actually save everybody a lot of time.  I had

25  a number of recordings I actually wanted to play for the

1    proposition, I'm not going to do it anymore, Your Honor, if I

2    get where I need to go, for the proposition that they talked

3    all the time during the summer of 2011.  If I can simply

4    establish that there were a lot of conversations about this

5    election situation and a lot of calls back and forth between

6    Mr. Jones and Mr. Carter in the summer of 2011, I'm ready to

7    move on.  I don't need to talk about the subject matter

8    anymore.

9            MR. KELLER:  Your Honor, the government doesn't have

10   an objection to that line of questioning.  In the last

11   question, Mr. Cary asked Mr. Jones specifically about an

12   investigation and that is the very investigation that led to

13   voter fraud charges.

14           THE COURT:  I'll sustain the objection to any

15   further questioning than that.

16           MR. KELLER:  Thank you, Your Honor.

17           THE COURT:  We're in recess until, what'd I say, 12

18   after?  About 12 after.  That's a short break, I'll remind you.

19   We're in recess, be at ease.

20       (Recess at 1:58 PM.)

21                    C E R T I F I C A T E
         I, Karen Baker, Official Court Reporter, do hereby certify
22   that the foregoing is a true and correct transcript of
     proceedings in the above-entitled case.

23
     /s/ Karen Baker, RMR, CRR, CCR
24   --------------------------------        Date: July 18, 2016
     United States Court Reporter
25

1           (Continuing at 2:12 p.m., jury present.)

2                THE COURT:  You may proceed.

3     BY MR. CARY:

4     Q.   Mr. Jones, I was asking about the frequency of calls from

5     Phillip Carter.

6     A.   Yes.

7     Q.   And it's true, is it not, that Phillip Carter called

8     frequently about politics during the summer of 2011?

9     A.   Yes, sir.

10    Q.   There was a lot going on; correct?

11    A.   Yes, sir.

12    Q.   And it's true that he called you frequently over the years;

13    correct?

14    A.   He did call from time to time.

15    Q.   Now, I'd like to shift gears for a second and ask about the

16    month of August in 2011, and my first question is this:  Is

17    there any state-wide meetings for the Church of God in Christ

18    that take place in August every year?

19    A.   It moves sometimes.  In fact, it just ended this past --

20    yesterday, actually.  So it was in July this year.

21    Q.   Sometime in late summer, or mid to late summer, there's a

22    state-wide meeting?

23    A.   Yes.  It's the first time I've missed one.

24    Q.   I'm sorry about that.

25         In the month of August 2011, was there a state-wide meeting

1    for the Church of God in Christ?

2    A.   It could have been, the same one that just ended yesterday.

3    Q.   And you remember in August of 2011 meeting with Phillip

4    Carter at that state-wide meeting, do you not?  And if not, I

5    can show you something to refresh your recollection.

6    A.   I just don't remember.

7    Q.   Let's look at tab 691 in book number one.

8         Once you're there, I'd like you to turn to page 5, if you

9    would, please.  It's the last full paragraph, second-to-last

10   sentence on page 5.  I'll ask you to read the last sentence.

11   Actually, the last two sentences of that paragraph.

12   A.   Would you like for me to read it aloud?

13   Q.   No.  Actually, please read it to yourself because the Court

14   has not put it into evidence.

15   A.   (Document review.)

16        Okay.

17   Q.   Does that refresh your memory, sir, that you did have a --

18   you did meet with Carter or saw something -- saw Carter at the

19   Little Rock Church of God in Christ Convention in August of

20   2011?

21   A.   Yes.

22   Q.   And do you believe that you gave something to Carter that

23   night?

24   A.   It seems as though I did.

25   Q.   But it's true, is it not, that you do not remember what it

1   is that you gave him?

2   A.    I can't say that I can remember exactly what I gave him

3   five years ago.

4   Q.    And you do not remember whether it was the monitoring

5   report or something else?

6   A.    I can't say for certain.

7   Q.    And you certainly cannot say whether Phillip Carter passed

8   on whatever it was you gave him to Ted Suhl?

9   A.    No.

10  Q.    You testified a little earlier about David Upton, and I

11  think you mentioned some political connections in Memphis?

12  A.    Yes.

13  Q.    And I think I heard you mention the Ford family, which are

14  a prominent Democratic --

15  A.    Yes.

16  Q.    -- family in Memphis.  And you were a supporter of the Ford

17  family and, in particular, Harold Ford Jr. of Tennessee?

18  A.    And they supported me as well.

19  Q.    And so was David Upton?

20  A.    Yes.

21  Q.    And that's one of the reasons you guys knew each other;

22  right?

23  A.    Yes.

24  Q.    And it's true, is it not, that you know a lot of people in

25  Memphis?

1    A.    Most of my clients were in Memphis.

2    Q.    So let me take you then to the September 11 dinner at the

3    Texas de Brazil.  I think I heard you say on direct examination

4    that that's one of your favorite restaurants?

5    A.    Yes.

6    Q.    And it's one of the most popular restaurants in Memphis;

7    right?

8    A.    It's very popular.

9    Q.    It's got a pretty large seating area; right?

10   A.    I think there's an upper level and then there's a first

11   floor.

12   Q.    Right.  In fact, there's a salad bar, which is an unlimited

13   salad bar that's kind of the focus of the first floor; correct?

14   A.    You know the place.

15   Q.    And then there's a balcony on the second floor where

16   everybody looks down on the first floor; right?

17   A.    Yes.

18   Q.    And it's in kind of a neat area right across from the

19   famous Peabody Hotel; right?

20   A.    I think I ate there right before I went to Leavenworth.

21   Q.    And it's not too far from the ballpark; correct?

22   A.    Yes, just right around the corner.

23   Q.    And it's a few blocks from world famous Beale Street;

24   right?

25   A.    Yes.

1  Q.   And you certainly didn't go there to escape notice to have

2  dinner with Ted Suhl; right?

3  A.   I routinely see people there from Arkansas.  Because it's,

4  you know, West Memphis area, Marion, Memphis, all there

5  together.

6  Q.   West Memphis, after all, is just right across the river

7  from Memphis?

8  A.   Right across.  It's just like North Little Rock to Little

9  Rock.

10 Q.   And it's true, is it not, that you don't have a memory of

11 what was discussed at the Texas de Brazil that night; correct?

12 A.   Which night?

13 Q.   September 11, 2011.

14 A.   I don't know what we talked about without a refresher.

15 Q.   Okay.  Let's try.  Tab 692 in your book, page 3.

16      Once again, it's the last full paragraph on page 3, and

17 then it's the second -- it's the fourth line.  It's actually the

18 second sentence.  I'd ask you to read that to yourself, please.

19 A.   The second sentence?

20 Q.   Yeah.  And it begins with, "Jones confirmed."

21 A.   Okay.  (Document review.)

22      Yes, sir.

23 Q.   Does that refresh your recollection, sir, that as of August

24 2014, you didn't remember specifically what you talked about

25 with Mr. Suhl that night?

1    A.    In August of 2014, something that I talked about in 2011?

2    Q.    Correct.  I know it seems a little odd, but --

3    A.    I would have probably not remembered all the details of

4    that conversation.

5    Q.    And you don't remember details today either; right?

6    A.    I don't remember the details of that conversation in 2011.

7    Q.    So after that meeting, Mr. Carter called you and asked you

8    to roll something over in your head; correct?

9    A.    I've heard one of the recordings where he said that to me.

10   Q.    And after that particular recording, Mr. Carter did not

11   give you any money that day or the next day; correct?

12   A.    To my knowledge, that's correct.

13   Q.    And he didn't give you any money the week after that?

14   A.    Right.

15   Q.    Or the week after that?

16   A.    It wasn't until that Cracker Barrel parking lot thing.  I

17   don't know what the time span was.

18   Q.    Okay.  That was the Sunday after Thanksgiving in 2011;

19   correct?  Don't remember?

20   A.    The date exactly, no.

21   Q.    He called you before, and we heard that recording, and said

22   he had a little package for you; correct?

23   A.    Yes, yes.

24   Q.    And then he shows up at the -- wants to meet you at the

25   Cracker Barrel.  And I want to know, did he tell you either at

1    the Cracker Barrel or before that that it had been months and he

2    had not spoken to Ted Suhl?

3    A.    Did he tell me that?

4    Q.    Yeah.

5    A.    I don't recall.

6    Q.    And did he tell you that the money he was about to give you

7    was coming from the FBI?

8    A.    He did not tell me that.

9    Q.    Did he tell you that of the $2,000 check that Ted Suhl gave

10   to the 15th Street Church of God in Christ, that a thousand

11   dollars stayed with the church?

12   A.    No.

13   Q.    Did he tell you that he took money out of that contribution

14   for himself?

15   A.    No, he did not.

16   Q.    Did he warn you that the FBI was taking pictures of you?

17   A.    No, he did not.

18   Q.    Phillip Carter placed a call to you again on -- in late

19   January of 2012; correct?

20   A.    It's possible.

21   Q.    Did he place a call to you later that was, in fact, a setup

22   for you to meet with the FBI?

23   A.    Yes.

24   Q.    And they surprised you; right?

25   A.    Yes.

1   Q.   They took you over to the Comfort Suites?

2   A.   Yes.

3   Q.   It was the shock of your life, wasn't it?

4   A.   That's a fair characterization.

5   Q.   It was intimidating?

6   A.   Very.

7   Q.   It was scary?

8   A.   Yes.

9   Q.   They showed you four checks that were written to you from

10  the 15th Street Church of God in Christ; right?

11  A.   Yes.

12  Q.   They put those up on a PowerPoint presentation on a

13  computer screen?

14  A.   A laptop.

15  Q.   And you asked if they could be enlarged because you wanted

16  to see if those were your signatures; right?

17  A.   I knew that it wasn't my signature.  I just wanted to see

18  it, the signature.

19  Q.   You told them it was not your signature; right?

20  A.   Yes.  I'd never seen those checks before.

21  Q.   And you were so scared, you said you'd like to help; right?

22  You told them you'd like to help on that occasion?

23  A.   Yeah.  If my memory serves me correctly, they said that

24  they were looking into some of Ted's activities, you know, and I

25  could leave at any time, I think is what they said.

1   Q.   Okay.  And they did not arrest you; right?

2   A.   No.

3   Q.   But it was intimidating and scary?

4   A.   They had guns on.

5   Q.   Yeah.

6   A.   I didn't.

7   Q.   And it was clear to you that Ted Suhl was the person they

8   were after; right?

9   A.   That's what I was led to believe, but at some point I asked

10  another question, down toward the end, I think.

11  Q.   And you actually offered the agents that you could use your

12  position as the deputy director to inspect Suhl's activities, or

13  Suhl's facilities; right?

14  A.   I thought I told them that we had looked into him and

15  hadn't -- into his agency and didn't find anything that wasn't

16  routine, you know, just kind of normal.  It's been a while.

17  Q.   Did you offer to try to use your position to help them get

18  Ted Suhl?

19  A.   Yeah.  Yes.

20  Q.   And after that terrible day, you met with a lawyer; right?

21  A.   Yes.

22  Q.   And did a lawyer tell you to go speak with Pastor Bennett?

23  A.   No, he didn't tell me to.

24  Q.   Let me ask you this then:  Did you go visit Pastor Bennett?

25  A.   Yes.

1  Q.    Within a few days afterwards, you went to see Pastor

2  Bennett?

3  A.    I think it was two days later.

4  Q.    And Pastor Bennett basically denied involvement in anything

5  improper; right?

6  A.    He said, "We haven't done anything illegal."

7  Q.    And he said Ted Suhl had been giving money to the church as

8  donations and for vans for years; correct?

9  A.    He's told me that a few times.

10  Q.    That was in 2012; correct?

11  A.    Yes.

12  Q.    And you made the decision to plead guilty in the fall of

13  2014; right?

14  A.    Yes.

15  Q.    That was after Pastor Bennett died; correct?

16  A.    Yes.  I actually thought the whole case had gone away.  I

17  hadn't heard anything for -- I had actually -- excuse me.  I had

18  actually resigned from DHS.  I hadn't heard anything else about

19  this, and I was -- well, I was recruited to go work for a

20  wonderful nonprofit that does development in the Delta, the job

21  of my life, lifetime job, because you had a chance to build

22  communities and change lives.  I hadn't heard anything else

23  about it.  I honestly thought it had just gone away.

24  Q.    And Pastor Bennett, Pastor John Bennett, died on June 24,

25  2014; correct?

1    A.    That's about right.

2    Q.    And after he died, the case came back to life; right?

3    A.    Yes.

4    Q.    And my final question is, you never directed one cent of

5    business to any of the Suhls' businesses, did you?

6    A.    I -- and I've told, you know, the government this, that I

7    supervised five divisions.  Two of those divisions, if I wanted

8    to do something to help Ted, I could have found a legal way to

9    direct business to his -- or create opportunities for his

10   business in either one of those two divisions.  But everything

11   that we do at DHS, you just can't just give away money like

12   that.  It's got to go through legislative review and all sorts

13   of things.  And if I wanted to do something, there were two

14   divisions over in my half of the house that could have been

15   helpful to him.  But the answer to your question is no.

16           MR. CARY:  Thank you, Mr. Jones.

17           THE COURT:  Redirect?

18           MR. KELLER:  Yes, your Honor.

19                    REDIRECT EXAMINATION

20   BY MR. KELLER:

21   Q.    Mr. Jones, you spent quite a bit of time talking with

22   Mr. Cary about Pastor Bennett's bishop campaign.  Do you

23   remember that?

24   A.    Yes, sir.

25   Q.    You talked about the article you had placed in a magazine

1   as part of the campaign?

2   A.   I didn't physically place it in there, but we did design

3   work on it.  Yes.

4   Q.   Do you remember talking to Mr. Cary about that article on

5   cross-examination?

6   A.   Yes.

7   Q.   Do you remember talking about the video of the pastor's

8   campaign?

9   A.   Yes.

10  Q.   I want to show you a transcript of what's previously been

11  admitted as Government's Exhibit 8-B.  This is the call between

12  you and Phillip Carter on August 3, 2011.

13       In the highlighted portion, Phillip Carter says, "Our

14  friend got some concerns about the way some of the referral

15  process is going in northeast Arkansas."

16            MR. CARY:  Objection, your Honor.  Scope.

17            THE COURT:  Overruled, exception saved.

18  BY MR. KELLER:

19  Q.   Again, Mr. Jones, the quote is:  "Our friend got some

20  concerns about the way some of the referral process is going in

21  northeast Arkansas, Mid-South."

22       That wasn't about Pastor Bennett's bishop campaign, was it?

23  A.   Not at all.

24  Q.   And when you said lower, the paragraph where monitor

25  meetings was highlighted, "Yeah, and I've actually been --"

1          MR. KELLER:  Can I have this published to the jury,

2    please.

3    BY MR. KELLER:

4    Q.   So in the monitor meeting paragraph where you say, "Yeah,

5    and I've actually been -- I actually intended to call you a

6    couple weeks ago, because some stuff, you know, I told you I sit

7    in on the monitor meetings now because of him."  That didn't

8    have anything to do with the bishop campaign, did it?

9    A.   No.

10   Q.   When you say lower on the page in the same conversation:

11   "And I got the new monitoring reports yesterday and I just

12   had -- Monday, and I haven't read them yet, but I was going to

13   say, tell you you might -- we ought to, to get back on

14   schedule."  That didn't have anything to do with the bishop

15   campaign; right?

16   A.   No.

17   Q.   And in the call that's been admitted as Government's

18   Exhibit 8-DD, and it's been played for you on direct, it's a

19   call between you and Phillip Carter September 6, 2011, when you

20   tell Carter, "Give them enough time to make sure he's got

21   everything together for us," nothing to do with the bishop

22   campaign; right?

23   A.   No.

24   Q.   And a call that's been admitted as 9-H from November 23,

25   2011, between you and Phillip Carter, when Carter says:  "Good,

1   listen, are you going to be in town?  Cause I got that little

2   package that I owed you from that last meeting."  That's got

3   nothing to do with the bishop campaign, does it?

4   A.   No, I don't believe so.

5   Q.   No, that's got to do with money from a meeting with Ted

6   Suhl; isn't that right?

7   A.   Yes.

8   Q.   Mr. Jones, you testified on cross-examination with Mr. Cary

9   that you met with a lot of providers when you were at the

10  Department of Human Services.  Do you remember that testimony?

11  A.   That was routine for me to meet with providers.

12  Q.   And you said someone told you that you handed out more

13  business cards than anybody else in the history of the

14  department, or something like that.  Is that right?

15  A.   Yes.

16  Q.   You didn't get cash payments when you met with other

17  providers, did you?

18  A.   Never.

19  Q.   But you got cash payments after you met with Ted Suhl;

20  right?

21  A.   That was -- yes.

22  Q.   You talked about the different divisions that were at the

23  Department of Human Services and the divisions that Janie

24  Huddleston oversaw versus the divisions that you oversaw.  Do

25  you remember that testimony?

1    A.   Yes, sir.

2    Q.   And you testified that at some point, you and Janie

3    switched divisions.  Do you remember that?

4    A.   Yes, sir.  Yes, sir.

5    Q.   One of the things the defendant asked you to do was to take

6    over Medicaid, which was one of Janie's divisions, the Division

7    of Medical Services; isn't that right?

8    A.   Yes.

9    Q.   And you told him you'd look into it?

10   A.   I can't remember the exact words, but normally I said

11   something -- I'll think about it, I'd see what I could do, or

12   I'd look into it.  Something along those lines.

13   Q.   Because you always wanted to give him the impression that

14   you were agreeing to help him out so that you could continue to

15   get paid; isn't that right?

16   A.   Yes.

17   Q.   Mr. Cary also asked you about the RSPMI issue, and I

18   believe you testified that you didn't have anything to do with

19   that issue.  Do you remember that testimony?

20   A.   Yes.

21   Q.   But the defendant did talk to you about that issue, the

22   radius expansion for RSPMI; isn't that right?

23   A.   We had discussions about that, I believe.

24   Q.   And he was in favor of expanding the radius?

25   A.   Yeah.  Well, I've kind of gone back and forth because I

1  just couldn't remember the details of our conversations that Ted

2  and I had, but he was in favor of whatever his position was.

3  Q.    And you told him you'd look into that, too; correct?

4  A.    Yes, sir.

5  Q.    Mr. Jones, you talked about those annual reports that you

6  filed sometimes when you were employed by the State of Arkansas?

7  A.    Uh-huh.

8  Q.    Ethical reports having to do with gifts that you'd received

9  or outside employment, money that you'd received, things like

10 that?

11 A.    Yes, sir.

12 Q.    And you talked about a regulation, or Mr. Cary showed you a

13 regulation that said you could accept gifts as long as they were

14 under a hundred dollars or something like that.  Do you remember

15 that?

16 A.    That's right.

17 Q.    That regulation didn't allow you to accept bribe payments,

18 did it?

19 A.    That regulation absolutely does not allow you to accept

20 bribe payments.

21 Q.    And you never declared the cash payments that you got after

22 meeting with the defendant on those disclosure forms, did you?

23 A.    They would have been captured in my business.

24 Q.    You declared all the cash payments that you got from the

25 defendant on your ethical annual disclosures?  Is that what your

1   testimony is here today?

2   A.   I am -- the money that -- I counted -- and I've said this

3   over and over again.  I counted -- I considered that to be John

4   paying me for the work that he was -- that I was doing for him,

5   through him.  The bonus was that Ted got to meet with me and

6   talk about whatever his concerns were.  I can give you my CPA's

7   name if you want, if it would be helpful.

8   Q.   Your CPA handled your annual ethical disclosures that you

9   signed?

10  A.   No, to my tax returns.

11  Q.   I'm talking about your ethical disclosures.  You didn't

12  disclose thousands of dollars in bribe payments from the

13  defendant on your annual ethical disclosures, did you?

14  A.   Again, I did not consider them to be bribe payments when I

15  was receiving them, and they were -- I considered them payment

16  for the work that I was doing for John's campaign.

17  Q.   So it's your testimony here today, after all the calls that

18  we've heard where you're talking about Phillip Carter and the

19  issues related to the defendant's business, that every payment

20  you received after a meeting with the defendant at Texas de

21  Brazil, that that was from Pastor Bennett for his bishop

22  campaign?  That's what you're telling this jury here today?

23  A.   What I'm saying is what I said in the beginning.  This

24  arrangement was started with John asking me if I would assist

25  him with his bishop's campaign.  He gave me the first payment.

 1   I don't even know where Ted was during that time period with

 2   regards to having supported him.

 3       After that, somehow or another, Phillip found his way into

 4   what was going on, and then it became what it -- what we are

 5   here -- what has brought us here today.  If John had just, you

 6   know, paid me through his campaign account or through his

 7   personal account, I don't think we'd be here today, but --

 8           THE COURT:  Wait a minute.  Just let him ask --

 9       Ask the question again, if you will, please.

10   BY MR. KELLER:

11   Q.   The money that you received after all of the meetings with

12   the defendant, not the first time where you met with Pastor

13   Bennett alone, the money that you received after the meetings

14   with the defendant, the meetings that were set up through

15   Phillip Carter, is it your testimony today to this jury that

16   that money was for Pastor Bennett's bishop campaign?

17   A.   That's the way I perceived it.

18   Q.   Despite the fact that you've just testified that that issue

19   with Mid-South had nothing to do with the bishop campaign?

20   A.   It did not.

21   Q.   And when Carter called you and told you you had a little

22   package he owed you from the last meeting, that had nothing to

23   do with the bishop campaign?

24   A.   I never did anything for Ted.  I wasn't working for Ted.  I

25   was working for John.

1  Q.   But Ted had you on his payroll, didn't he?

2  A.   He had John on his payroll.

3  Q.   Well, he wasn't meeting with John; he was meeting with you.

4  Wasn't he?

5  A.   I'm sure he met with John as well, but he did meet with me

6  and he did talk about issues going on at the department.

7  Q.   And you were the public official at the department that had

8  control over those issues; isn't that right?

9  A.   Who never took an official act.

10 Q.   No, but you sure let him believe that you were going to

11 help him out, didn't you?

12 A.   Sure.

13 Q.   Because you wanted that money to keep coming in, didn't

14 you?

15 A.   Yes.

16         MR. KELLER:  No further questions, your Honor.

17         MR. CARY:  Nothing further.

18         THE COURT:  Jury questions?

19     All right.  We have a jury question.  Would the bailiff get

20 it, please, and will the lawyers approach.

21     [Bench conference reported as follows:]

22         THE COURT:  We have two questions.

23     The first is:  For the record, are agencies, agency

24 agendas, subject to an FOI request or has an FOI request ever

25 been made for similar information?  Monitoring reports,

1  inspections, et cetera.

2      I'm now going to hand the question to the lawyers and let

3  them read it and pass it on to each other.

4      All right.  What about the first question, are agency

5  agendas subject to the FOI request?  What about the first

6  question?

7          MR. KELLER:  You've already ruled on a motion in

8  limine that information about FOIA is not relevant to this case.

9          MS. BELL:  Unless the defendant can show that he knew

10  of it --

11          THE COURT REPORTER:  I'm sorry.  I cannot hear you.

12          MS. BELL:  I said, it's not relevant unless the

13  defendant can show that he knew at the time that it was subject

14  to it.

15          MR. CARY:  It's an excellent question, your Honor.

16          THE COURT:  I suspect that is your position.  Let the

17  record reflect that I made that comment with a grin on my face.

18      Are the monthly monitoring notes that were provided Phillip

19  Carter available to the public?

20          MS. BELL:  Same objection to that question.

21          MR. CARY:  And, once again, we think that's an

22  excellent question.

23          THE COURT:  I'm not going to ask it.  Objection noted.

24      [Continuing in open court:]

25          THE COURT:  Next witness.

1           MR. KELLER:  Your Honor, the government calls

2    Katherine Black.

3           **KATHERINE BLACK, GOVERNMENT'S WITNESS, DULY SWORN**

4                          DIRECT EXAMINATION

5    BY MR. KELLER:

6    Q.   Ms. Black, can you state your name and spell your name for

7    the record, please.

8    A.   Yes, sir.  My name is Katherine, K-a-t-h-e-r-i-n-e, Black,

9    B-l-a-c-k.

10   Q.   Ms. Black, where do you currently work?

11   A.   I work for the FBI.

12   Q.   And what do you do there?

13   A.   I'm a forensic accountant.

14   Q.   How long from you been a forensic accountant for the FBI?

15   A.   Approximately five and a half years.

16   Q.   Have you been in Little Rock for that whole time?

17   A.   I have.

18   Q.   Have you worked in any other position with the FBI?

19   A.   I have not.

20   Q.   As part of your responsibilities as a forensic accountant,

21   were you involved with the investigation of the defendant, Ted

22   Suhl?

23   A.   I was.

24   Q.   Did you review and analyze records in this case as part of

25   that investigation?

1  A.    Yes, sir, I did.

2  Q.    What kinds of records did you review?

3  A.    I reviewed bank records, tax return records, phone records,

4  as well as credit card records.

5  Q.    Whose phone records did you review?

6  A.    I reviewed Mr. Carter's and Mr. Jones's.

7  Q.    And did you analyze those records for contact with certain

8  other people?

9  A.    Yes, sir, I did.

10  Q.    And who were those other people that you were analyzing the

11  contact for?

12  A.    I looked for contact between Mr. Carter and Mr. Jones and

13  Mr. Carter and Mr. Suhl.

14  Q.    What was the time period that you focused on in your

15  analysis?

16  A.    Primarily 2007 through 2011.

17  Q.    And over that same time period, did you also review

18  American Express statements related to the defendant's accounts?

19  A.    Yes, sir, I did.

20  Q.    And I believe you mentioned bank records.  Among the bank

21  records that you reviewed, did you review records of one of the

22  defendant's companies, Millenia?

23  A.    Yes, sir, I did.

24  Q.    Do you remember what bank Millenia had an account at?

25  A.    At the time it was RBC Bank.

1    Q.    At the time the activity occurred that you were focused on?

2    A.    Yes, sir.

3    Q.    And did you also review bank records associated with the

4    15th Street Church of God in Christ?

5    A.    Yes, sir, I did.

6    Q.    And did that include accounts from Regions Bank related to

7    a childcare development center that was associated with the

8    church?

9    A.    It did.

10   Q.    And then what about an account related to the church

11   itself, an operating fund?

12   A.    Yes, sir.

13   Q.    And what about accounts for Pastor Bennett, personal

14   accounts?

15   A.    Yes, sir.

16   Q.    In reviewing the phone records and the bank accounts for

17   the defendant's company Millenia and the American Express

18   accounts for the defendant and the church bank records, did you

19   see any patterns emerge?

20   A.    I did.

21   Q.    And what pattern?

22   A.    I identified clusters that contained phone calls between

23   Mr. Carter and Mr. Suhl, Mr. Carter and Mr. Jones, as well as a

24   check from Mr. Suhl's company Millenia to the 15th Street Church

25   of God in Christ and the negotiation of that check through one

1    of the church accounts or by Pastor Bennett.

2    Q.    And what was the general order in which that activity

3    occurred?

4           MR. CARY:  Your Honor, I have an objection.  And may

5    we approach?

6           THE COURT:  You may.

7        [Bench conference reported as follows:]

8           MR. CARY:  Your Honor, this is starting to sound like

9    undisclosed expert testimony.  It's also cumulative.  It's the

10   same thing that Agent Spainhour testified to to start the case.

11          THE COURT:  What's the first part of your objection?

12          MR. CARY:  Undisclosed expert testimony is what it

13   sounds like to my ear.  The records speak for themselves.

14   They've been summarized by Agent Spainhour.  It also appears to

15   be cumulative.

16          MR. KELLER:  Laying a foundation for some of the

17   exhibits that we're going to offer through this witness that

18   were not offered through Special Agent Spainhour.

19          MR. CARY:  May I ask what those are?

20          MR. KELLER:  You've got the exhibits in your exhibit

21   binder.  I believe it's 56, 59, 57, 57-A, 58-A, B, and C, I

22   believe.

23          MR. CARY:  The bar graphs?  The bar graphs?

24          MR. KELLER:  The bar graphs are some of those, yes.

25          MR. CARY:  I don't even know what you're talking about

1    otherwise.

2           THE COURT:  Why don't y'all go over there and look at

3    them, and we'll come back to the bench.

4       [Continuing in open court:]

5           THE COURT:  They're going to examine something.  You

6    might want to stretch your legs, if you want to.  You don't have

7    to.

8       [Bench conference reported as follows:]

9           MR. CARY:  So I now understand what they're doing.  It

10   still sounds like there may be some expert opinions that are

11   going to come out here, but I think he should be moving on and

12   not reaching conclusions but simply saying what it is she

13   summarized and putting in the summary exhibits.

14          THE COURT:  Overruled, exception saved.

15      [Continuing in open court:]

16          MR. KELLER:  If we could show the witness Government's

17   Exhibit 21, please, what's previously been admitted as

18   Government's Exhibit 21, and have this published to the jury.

19   BY MR. KELLER:

20   Q.   Ms. Black, did you create a summary of these clusters of

21   activity that you just testified about?

22   A.   I did.

23   Q.   Showing you what's been previously admitted as Government's

24   Exhibit 21, is this a portion of the overall summary that you

25   created?

1  A.    It is.

2  Q.    Have you reviewed this portion of the summary to ensure

3  that it still accurately reflects the underlying records?

4  A.    I have.

5  Q.    And does it?

6  A.    It does.

7  Q.    So I was asking you before we stopped and took up an issue

8  at sidebar, what's the general order in which the activity in

9  the clusters occurred?  Can you explain that to the jury using

10 Exhibit 21 as an example?

11 A.    Yes, sir.

12         MR. CARY:  Your Honor, objection.

13         THE COURT:  Overruled.

14 BY MR. KELLER:

15 Q.    Yes, please proceed.

16 A.    In this instance, the first date is June 19, 2008.

17         THE COURT:  Just a minute.  My Ouija board has quit.

18    (Brief off-the-record discussion regarding the Court's

19 realtime display.)

20         THE COURT:  You may proceed.

21 BY MR. KELLER:

22 Q.    So, Ms. Black, using Government's Exhibit 21 as an example,

23 can you explain to the jury the order in which the activity

24 occurred in these clusters that you identified?

25 A.    In this cluster, it started June 19, 2008.  We had phone

1    calls between Mr. Carter and Mr. Jones and Mr. Carter and

2    Mr. Suhl.  The following day there's a check dated from

3    Mr. Suhl's company Millenia.  A couple days later we do see the

4    charge on Mr. Suhl's credit card to Texas de Brazil.  And the

5    following day, the Millenia check is negotiated through a 15th

6    Street Church -- pardon me.  A 15th Street bank account.

7    Q.    And did you see that pattern repeated over and over in the

8    records that you reviewed in this case?

9    A.    Yes, sir.

10   Q.    How many times did you see that pattern repeated?

11   A.    12.

12   Q.    And in each of those 12 instances, was there a check from

13   the defendant's company Millenia made out to the 15th Street

14   Church of God in Christ?

15   A.    Yes, sir, there was.

16         MR. KELLER:  If we could bring up for the witness only

17   Government's Exhibit 56.

18   BY MR. KELLER:

19   Q.    Ms. Black, do you recognize Government's Exhibit 56?

20   A.    I don't have anything on my screen.

21         MR. KELLER:  If we could have that provided just for

22   the witness only at this point.

23         THE COURTROOM DEPUTY:  Do you have it now?

24         THE WITNESS:  I have it now, yes, ma'am.

25   BY MR. KELLER:

1    Q.   Ms. Black, do you recognize what's been marked as

2    Government's Exhibit 56?

3    A.   I do.

4    Q.   And what is it?

5    A.   It's a chart of checks from Millenia to the 15th Street

6    Church of God in Christ.

7    Q.   And is this a reformatted version of a chart that you

8    originally created when you were analyzing the records?

9    A.   It is.

10   Q.   Have you reviewed this chart to ensure that it accurately

11   reflects the underlying records?

12   A.   I have.

13        MR. KELLER:  Your Honor, I move for the admission of

14   Government's Exhibit 56.

15        MR. CARY:  No objection.

16        THE COURT:  Admitted.

17      (Government's Exhibit 56 received in evidence.)

18        MR. KELLER:  If we can publish it for the jury.

19        THE COURT:  You may.

20   BY MR. KELLER:

21   Q.   Ms. Black, how many checks were written from the

22   defendant's company Millenia to the 15th Street Church of God in

23   Christ between September 2007 and September 2011?

24   A.   14.

25   Q.   Does this chart show all of those checks?

1    A.    It does.

2    Q.    How many out of those 14 checks did not fit the pattern of

3    calls, check to the church, charge at Texas de Brazil, and then

4    check negotiated at the church?

5    A.    One.

6    Q.    So only one out of 14 did not fit that pattern?

7    A.    Yes, sir.

8    Q.    What was missing from the pattern for that February 20,

9    2009, check that is not included in the highlighted portion of

10   the chart?

11   A.    There was not a charge at Texas de Brazil.

12   Q.    Was there phone activity between Phillip Carter and Steven

13   Jones around the time of that check?

14   A.    Yes, sir, there was.

15   Q.    Was there phone activity between Phillip Carter and the

16   defendant around the time of that check?

17   A.    Yes, sir, there was.

18   Q.    Do you know exactly what that check was for?

19   A.    I do not.

20   Q.    Do you know if it was for Steven Jones?

21   A.    I do not.

22   Q.    And was that check included in the bribery scheme that was

23   charged against the defendant?

24   A.    It was not.

25              MR. KELLER:  If we could bring up for the witness and

1    for the jury what's previously been admitted as Government

2    Exhibit 55.

3    BY MR. KELLER:

4    Q.    Ms. Black, do you recognize what this document is?

5    A.    I do.

6    Q.    And what is it?

7    A.    It's a QuickBooks report, a vendor QuickReport for Millenia

8    Health Care.

9    Q.    All the checks that we just saw on the summary chart that

10   you created, are all those checks contained in this QuickBooks

11   report?

12   A.    They are.

13   Q.    And do all those checks fall below the highlighted portion

14   of the report?

15   A.    They do.

16   Q.    So all the checks that are at the top in the highlighted

17   portion of the report, do all those checks predate the bribery

18   scheme that was charged in this case?

19   A.    They do.

20   Q.    Do you know what those earlier checks were for?

21   A.    I do not.

22   Q.    You don't know if they were for Steven Jones?

23   A.    I do not.

24   Q.    And was the defendant charged with any of those checks as

25   part of the bribery scheme?

1    A.   He was not.

2    Q.   For all of the other checks that were listed -- that are

3    listed on that chart, except for the ones that have been voided

4    and except for the one that you identified, the February 2009

5    check, for all the other checks, did they fit that pattern of

6    coming just before a charge on the defendant's credit card at

7    Texas de Brazil?

8    A.   They did.

9    Q.   And did they fit that pattern of coming in close succession

10   to phone activity between the defendant and Phillip Carter and

11   Phillip Carter and Steven Jones?

12   A.   They did.

13   Q.   Did you identify any other payments from the defendant's

14   companies over this time period, from December 2007 to September

15   2011?

16   A.   I did.

17   Q.   How many other payments?

18   A.   One.

19   Q.   What company was that payment from?

20   A.   That was from Arkansas Counseling Associates.

21            MR. KELLER:  If we could show the witness, please,

22   Government's Exhibit 53.

23            THE COURT:  Witness only?

24            MR. KELLER:  Just the witness, your Honor.

25   BY MR. KELLER:

1    Q.   Ms. Black, do you recognize Government's Exhibit 53?

2    A.   I do.

3         MR. KELLER:  Your Honor, I move to admit Government's

4    Exhibit 53 pursuant to a stipulation.

5         MR. CARY:  No objection.

6         THE COURT:  Admitted.

7       (Government's Exhibit 53 received in evidence.)

8         MR. KELLER:  And request that it be published to the

9    jury.

10        THE COURT:  Granted.

11   BY MR. KELLER:

12   Q.   Ms. Black, what is Government's Exhibit 53?

13   A.   This is a transportation agreement between 15th Street

14   Church of God in Christ and Arkansas Counseling Associates.

15        MR. KELLER:  And if we could show page 4 of this

16   exhibit, please.

17   BY MR. KELLER:

18   Q.   Ms. Black, what is page 4 of the exhibit?

19   A.   This is an invoice from the 15th Street Church of God in

20   Christ for transportation services.

21        MR. KELLER:  And if we could show page 6 of the

22   exhibit.

23   BY MR. KELLER:

24   Q.   Is that another invoice?

25   A.   Yes, sir, it is.

1    Q.    And page 8.  Another invoice?

2    A.    Yes, sir.

3    Q.    In your review of records in this case, did you uncover a

4    number of invoices from the 15th Street Church of God in Christ

5    to the defendant's company Arkansas Counseling Associates for

6    transportation services?

7    A.    Yes, sir.

8            MR. KELLER:  If we could show page 18 of this exhibit,

9    please.

10   BY MR. KELLER:

11   Q.    Is this another invoice related to transportation services

12   from the 15th Street Church of God in Christ to the Arkansas

13   Counseling Associates?

14   A.    Yes, sir, it is.

15   Q.    And what is the date of this invoice?

16   A.    It is -- the due date is July 15, 2010.

17   Q.    And that one other check that you identified, the only

18   other check -- outside of those Millenia checks that we've

19   already talked about, the only other check from the defendant's

20   company to the 15th Street Church of God in Christ over this

21   time period, did that check coincide with this invoice with a

22   due date of July 15, 2010?

23   A.    It did.

24           MR. KELLER:  If we could bring up what's previously

25   been admitted as Government's Exhibit 54.

1   BY MR. KELLER:

2   Q.   Ms. Black, do you recognize this document?

3   A.   I do.

4   Q.   And what is it?

5   A.   It's a vendor QuickReport for Arkansas Counseling

6   Associates.

7   Q.   And does this show checks from Arkansas Counseling

8   Associates to the 15th Street Church of God in Christ?

9   A.   It does.

10  Q.   And based on your review of the records, did these checks

11  relate to the van or transportation contracts that we just

12  referenced?

13  A.   They appeared to, yes.

14       MR. KELLER:  And if we could go to the last page of

15  this.

16  BY MR. KELLER:

17  Q.   Well, Ms. Black, the first check listed on this QuickReport

18  is March 17, 2003; is that right?

19  A.   That is correct.

20  Q.   And then do the checks proceed in chronological order?

21  A.   Yes, sir, they do.

22       MR. KELLER:  If we could go to page 3 of this exhibit,

23  please.

24  BY MR. KELLER:

25  Q.   Do all of these checks except for the very last one, the

1    very last line of the exhibit, do all of the checks, again,

2    predate the bribery scheme that was charged in this case?

3    A.    They do.

4    Q.    And for that last check that is during the bribery scheme

5    that was charged in this case, was that related to the van

6    contract that we just saw in the other exhibit?

7    A.    It was.

8    Q.    You referenced the clusters earlier involving phone calls,

9    a check from the defendant's company, a charge on his American

10   Express card at Texas de Brazil, and then church bank records

11   showing the negotiation of the check from the defendant's

12   company.  Did you review the defendant's American Express

13   records or the American Express records related to the defendant

14   for all charges that were made at Texas de Brazil?

15   A.    I did.

16          MR. KELLER:  If we could bring up Government Exhibit

17   57 for the witness only, please.  And if we could blow up the

18   chart there.

19   BY MR. KELLER:

20   Q.    Ms. Black, did you create a summary of all of the charges

21   on the defendant's American Express on various American Express

22   cards from December 2007 to September 2011, charges that

23   occurred at Texas de Brazil?

24   A.    Yes.

25   Q.    And did you create a summary of all those charges?

1   A.   Yes, I did.

2   Q.   And is Government Exhibit 57 a reformatted version of the

3   summary that you created?

4   A.   It is.

5   Q.   Have you checked to ensure that Government Exhibit 57

6   accurately reflects the underlying records?

7   A.   I have.

8            MR. KELLER:  Move for admission of Government Exhibit

9   57.

10           MR. CARY:  No objection.

11           THE COURT:  Admitted.

12       (Government's Exhibit 57 received in evidence.)

13           MR. KELLER:  If we could please publish it to the

14   jury.

15           THE COURT:  You may.

16   BY MR. KELLER:

17   Q.   Ms. Black, what are the highlighted lines on Government's

18   Exhibit 57?

19   A.   Those are the charges that coincide with our clusters.

20   Q.   And those are the charges that were included in the charged

21   bribery scheme?

22   A.   They were.

23   Q.   For the nonhighlighted charges, looking specifically at

24   some of the larger dollar amount charges, do you know what those

25   charges were for, the charges that are over $2,000?

1   A.   Those are for a holiday party thrown by Mr. Suhl's company.

2   Q.   Do you know who that holiday party was thrown for?

3   A.   I believe it was for his employees.

4   Q.   What are the dates of those holiday party transactions or

5   those holiday party charges?

6   A.   The first is January 29, 2008.  The next is January 19,

7   2009.  January 22, 2010.  And January 21, 2011.

8   Q.   Was the defendant charged with any of those transactions in

9   this scheme?

10  A.   He was not.

11          MR. KELLER:  If we could show just for the witness

12  only Government Exhibit 57-A.  And if we could enlarge the chart

13  for the witness.

14  BY MR. KELLER:

15  Q.   Is this a chart reflecting all of those charges but

16  removing the large holiday party charges?

17  A.   It is.

18  Q.   And does this chart also show the day of the week on which

19  each of those American Express charges was made?

20  A.   It does.

21  Q.   Have you reviewed this chart to ensure that it accurately

22  reflects the underlying records?

23  A.   I have.

24          MR. KELLER:  Your Honor, move to admit Government

25  Exhibit 57-A.

1          MR. CARY:  No objection.

2          THE COURT:  Admitted.

3      (Government's Exhibit 57-A received in evidence.)

4          MR. KELLER:  If we could publish it to the jury.

5          THE COURT:  You may.

6  BY MR. KELLER:

7  Q.    Ms. Black, on what day of the week did the charges at Texas

8  de Brazil on the defendant's credit cards most often occur?

9  A.    Sunday.

10  Q.    And out of 12 Texas de Brazil meetings -- or out of 12

11  Texas de Brazil charges that are highlighted on this chart, how

12  many of them occurred on Sunday?

13  A.    Ten.

14  Q.    Looking toward the bottom of the chart, there's a

15  highlighted line on September 7, 2010.  What day did that charge

16  take place?

17  A.    Tuesday.

18  Q.    Did anything else happen in the cluster of activity that

19  you identified on that exact same date?

20  A.    I believe there was also a check from the defendant's

21  company that day.

22  Q.    And did that Tuesday fall around a holiday?

23  A.    It did.

24  Q.    And which holiday?

25  A.    Labor Day 2010.

1   Q.   And on what date did Labor Day 2010 fall?

2   A.   September 6.

3   Q.   For the other highlighted date that is not a Sunday up on

4   July 5, 2008, what day of the week did that charge occur?

5   A.   Saturday.

6   Q.   And did that charge occur near a holiday?

7   A.   Yes, sir, it did.

8   Q.   And which holiday was that?

9   A.   July 4.

10  Q.   I asked you earlier about phone records.  Did you analyze

11  thousands of pages of phone records to see on what day of the

12  week the defendant most often had contact with Phillip Carter?

13  A.   I did.

14  Q.   Did you create a summary reflecting the defendant's call

15  volume -- I'm sorry, did you create a summary to reflect -- have

16  you reviewed a summary reflecting Phillip Carter's call volume

17  with the defendant based on the day of the week?

18  A.   I have.

19          MR. KELLER:  If we could show Government's Exhibit

20  58-A to the witness only, please.

21  BY MR. KELLER:

22  Q.   Ms. Black, what is Government's Exhibit 58-A?

23  A.   It is the day of the week chart between Mr. Suhl and

24  Mr. Carter.

25  Q.   And have you reviewed this chart to ensure that it

1  accurately reflects the underlying call data?

2  A.   I have.

3          MR. KELLER:  Your Honor, I move for the admission of

4  Government's Exhibit 58-A.

5          MR. CARY:  No objection.

6          THE COURT:  Admitted.

7      (Government's Exhibit 58-A received in evidence.)

8          MR. KELLER:  If we could publish to the jury.

9          THE COURT:  You may.

10  BY MR. KELLER:

11  Q.   Ms. Black, on which day of the week did Phillip Carter most

12  often call the defendant, Ted Suhl?

13  A.   Sunday.

14  Q.   Similarly, did you analyze phone records to determine which

15  day of the week Carter most often called Steven Jones?

16  A.   I did.

17          MR. KELLER:  If we could show for the witness only

18  Government's Exhibit 58-B.

19          THE COURT:  58-B?

20          MR. KELLER:  58-B, your Honor.

21  BY MR. KELLER:

22  Q.   And does this chart reflect the activity between -- the

23  phone activity between Phillip Carter and Steven Jones, again

24  based on the day of the week?

25  A.   Yes, sir.

1   Q.   Have you reviewed this chart to ensure that it accurately

2   reflects the underlying call data?

3   A.   I have.

4          MR. KELLER:  Your Honor, I'd move for the admission of

5   Government's Exhibit 58-B.

6          MR. CARY:  No objection.

7          THE COURT:  Admitted.

8      (Government's Exhibit 58-B received in evidence.)

9          MR. KELLER:  If we can publish to the jury.

10         THE COURT:  You may.

11  BY MR. KELLER:

12  Q.   On what day of the week did Phillip Carter most frequently

13  have phone contact with Steven Jones?

14  A.   Sunday.

15  Q.   In general, did you review all of Phillip Carter's phone

16  calls to determine on which day of the week he most often made

17  calls, just in general?

18  A.   I did.

19         MR. KELLER:  If we could show for the witness only

20  Government's Exhibit 58-C.

21  BY MR. KELLER:

22  Q.   And is this a chart reflecting his overall call volume,

23  Phillip Carter's overall call volume?

24  A.   It is.

25  Q.   Have you reviewed this to ensure that it accurately

1   reflects the underlying records?

2   A.   I have.

3            MR. KELLER:  Move for admission of Government's

4   Exhibit 58-C, your Honor.

5            MR. CARY:  No objection.

6            THE COURT:  Admitted.

7        (Government's Exhibit 58-C received in evidence.)

8            MR. KELLER:  May I publish this to the jury?

9            THE COURT:  You may.

10  BY MR. KELLER:

11  Q.   Ms. Black, on what day of the week did Carter have the

12  least amount of phone contact overall?

13  A.   Sunday.

14  Q.   But Sunday was the day that he had the most contact with

15  the defendant?

16  A.   Yes, sir.

17  Q.   And the most contact with Steven Jones?

18  A.   Yes, sir.

19  Q.   And Sunday was the day that almost all of those charges at

20  Texas de Brazil occurred?

21  A.   Yes, sir.

22  Q.   Ms. Black, did you also review bank accounts for some of

23  the defendant's companies?  Trinity, Arkansas Counseling

24  Associates, Millenia, Triennia, and -- well, Maxus, which is

25  also Arkansas Counseling Associates?

1    A.    Yes, sir, I did.

2    Q.    And for what period?

3    A.    Roughly 2007 through 2011.

4    Q.    Is Trinity an Arkansas company?

5    A.    Yes, sir, it is.

6    Q.    Is it for profit?

7    A.    Yes, sir.

8    Q.    What about ACA?

9    A.    It is an Arkansas company as well.

10   Q.    Also for profit?

11   A.    Yes, sir.

12   Q.    And what about Millenia?  Is that an Arkansas company?

13   A.    No, sir, it's not.

14   Q.    Where is that company registered?

15   A.    Florida.

16   Q.    And what about Triennia?

17   A.    It is also a Florida-registered business.

18   Q.    Did those bank records reveal a pattern as to how the

19   defendant moved money through these companies?

20   A.    It did.

21   Q.    And what was that pattern?

22   A.    I saw payments going from Trinity and ACA Maxus to

23   Millenia, and then Millenia would send money to Triennia or make

24   payments to Triennia.

25   Q.    And then where would that money from Triennia go?

1    A.    Ted Suhl.

2            MR. KELLER:  If we could show the witness Government

3    Exhibit 59, the witness only.  And if we could enlarge that

4    chart for the witness.

5    BY MR. KELLER:

6    Q.    Is Government's Exhibit 59, again, a reformatted version of

7    a summary chart you created showing the bank activity you just

8    referenced?

9    A.    It is.

10   Q.    Have you reviewed Government's Exhibit 59 to ensure that it

11   accurately reflects the underlying data?

12   A.    I have.

13           MR. KELLER:  Your Honor, I move for the admission of

14   Government's Exhibit 59.

15           MR. CARY:  Just note my previous objection, your

16   Honor.

17           THE COURT:  It's noted, overruled.  Exception saved.

18   Admitted.

19       (Government's Exhibit 59 received in evidence.)

20           MR. KELLER:  If we could publish this to the jury.

21   BY MR. KELLER:

22   Q.    So looking at this chart, Ms. Black, from 2007 to 2010 --

23           THE COURT:  Let's hold it right there.  We're going to

24   be in recess for 15 minutes.

25       Ladies and gentlemen, don't talk about the case, and what

1    is that other thing?  Don't start making up your mind.

2         Let the jury stand out.  Everyone else remain as you are.

3         (Jury exited the courtroom.)

4            THE COURT:  The jury is out.  We're in recess.  You

5    can be at ease.

6         (Recess at 3:11 p.m.)

7                    REPORTER'S CERTIFICATE

8         I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

9

10                              Date:  July 18, 2016
     /s/ Christa R. Jacimore, RDR, CRR, CCR
11       United States Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Continuing at 3:40 p.m., jury present.)

2         THE COURT:  I think that fire was outside.

3    You may continue.

4                  CONTINUED DIRECT EXAMINATION

5    BY MR. KELLER:

6    Q.   Ms. Black, we're looking at Government's Exhibit 59.  It's

7    just been admitted.  So in 2007, how much money went from the

8    defendant's Arkansas companies, Trinity Behavioral Health and

9    Arkansas Counseling Associates, to the defendant's Florida

10   company Millenia?

11   A.   $6,500,000.

12   Q.   And in 2008?

13   A.   $7,025,000.

14   Q.   2009?

15   A.   $4,290,000.

16   Q.   And 2010?

17   A.   $5,695,000.

18   Q.   And in each of those years, did the defendant's Florida

19   company Millenia transfer millions of dollars to the defendant's

20   other Florida company, Triennia?

21   A.   Yes, sir.

22   Q.   And in each of those years, where did millions of dollars

23   from Triennia end up?

24   A.   In Mr. Suhl's W-2 and K-1.

25         MR. KELLER:  No further questions, Your Honor.

1          MR. CARY:  No questions.

2          THE COURT:  Jury questions?

3     You may stand down.

4     May this witness be excused?

5          MR. KELLER:  Yes, Your Honor.

6          THE COURT:  You're excused.  Thank you.

7          THE WITNESS:  Thank you, sir.

8          THE COURT:  Next witness?

9          MR. KELLER:  Your Honor, at this time, the government

10    rests.

11         THE COURT:  Ladies and gentlemen, in view of that,

12    I've got to ask you to step outside again.  Don't talk about the

13    case.  Don't start making up your mind.

14    Let the jury stand out.  Everyone else remain seated.

15    (Whereupon, the jury exited the courtroom and proceedings

16    continued in open court as follows:)

17         THE COURT:  Jury's out.  I assume that the defense

18    moves for a judgment as a matter of law on the basic ground that

19    there's not enough evidence that a juror could convict the

20    defendant on any issue, any charge in the case.  Is that

21    correct?

22         MR. CARY:  Yes, Your Honor.  Mr. Latcovich would like

23    to address some other issues as well.

24         THE COURT:  I'm going to overrule that general one,

25    deny that general one, but I'll hear from you more specifically.

1    Your exception is saved to my ruling.

2            MR. LATCOVICH:  Thank you, Your Honor.  Simon

3    Latcovich on behalf of Mr. Ted Suhl.

4            THE COURT:  Yes, sir.

5            MR. LATCOVICH:  You've already stolen my thunder from

6    my first line to preserve all of my objections on sufficiency

7    grounds.  And then, frankly, Your Honor, given today's testimony

8    from Mr. Jones, I'm not sure where to start, but I think let's

9    just go ahead and dive in.  And we'll start here with, one, we

10   think --

11           THE COURT:  You just let it rip.

12           MR. LATCOVICH:  We think the evidence, Your Honor,

13   here is insufficient to support any theory of bribery and that

14   Mr. Suhl should be acquitted on all counts.

15       As you know, in the pretrial proceedings, Your Honor, the

16   government called this a, quote, simple bribery scheme.  We

17   would respectfully submit, Your Honor, that the evidence -- that

18   may have been a bit of an oversimplification.  The essence of

19   any bribery case is a quid pro quo.  So let's start with the

20   quid, Your Honor, and the record evidence about the quid.

21       First, the alleged bribes here were checks written to a

22   church.  But there were tens of thousands of dollars of other

23   checks written to the same church that were not bribes.

24       Next, Jones testified today that he did not consider any

25   cash that he received to be bribe payments.  He thought they

1   were payments from Pastor Bennett's bishop campaign.  Moreover,

2   Jones never spoke to Mr. Suhl, ever, about money.  And we heard

3   that testimony from Agent Spainhour, and we heard it from

4   Mr. Jones again today.

5        And Carter, amazingly enough, claimed that he and Pastor

6   Bennett actually kept money on many of the occasions.  So there

7   was actually no quid whatsoever in those circumstances.

8        So that leaves us with this situation, Your Honor.  How do

9   these donations to a church transform somehow into bribes?

10  Enter Phillip Carter.  There's a problem with this, Your Honor.

11  After today, the only thing the government witnesses seem to

12  agree on is that Phil Carter is a hustler.  Jones said he's a,

13  quote, con man and a hustler.  Jones said that Pastor Bennett

14  told him that Carter was hustling money from Ted.  And amazingly

15  enough, Your Honor, Carter himself told the jury, "I'm a

16  hustler."

17       So we have an issue here where most of the quid isn't, in

18  fact, quid and that which the government says is quid is only

19  quid because Phillip Carter says it is.  No one else.  So we've

20  got that problem with the quid side.

21       Let's turn to the quo side, Your Honor, or the lack

22  thereof.  Steven Jones did nothing for any of Mr. Suhl's

23  companies.  Nothing.  He was adamant about that.  In fact, he

24  went out of his way to say that he could have, but he did not.

25  And there's no disputing that.  The government hasn't presented

1    any evidence that he did.  And so although we must view the

2    evidence in the light most favorable to the government at this

3    stage, Your Honor, we believe that no reasonable juror could

4    find the necessary combination of the following.

5         Here's what a jury would have to find, Your Honor.  That

6    the donations were bribe payments despite the history of

7    donations to the same church.  Two:  That these donations were

8    bribe payments despite the bribe recipient saying, "I didn't

9    think they were bribe payments."  Three:  That the donations

10   were bribe payments despite the fact that Carter and Bennett

11   kept the money and never told the supposed briber, never told

12   Mr. Suhl they were keeping the money.  Four:  That donations

13   were bribe payments despite the fact that Jones never talked to

14   Mr. Suhl about money.  Five:  That Carter's not a hustler

15   creating meetings for his own financial gain despite everyone in

16   this case, including Mr. Carter, saying that Carter's a hustler.

17   Six:  That Mr. Suhl would ask for something thirteen times and

18   get nothing.  Seven:  That Mr. Suhl would continue to pay

19   thirteen times despite never getting anything.

20        There's just no reasonable way to get from the quid to the

21   quo to a bribery conviction in this case, Your Honor, and we

22   think the Court should acquit on all counts because of that.

23             THE COURT:  As a matter of law?

24             MR. LATCOVICH:  As a matter of law, Your Honor.  We

25   don't think the evidence is sufficient to reach the jury here.

1  I think we've heard multiple stories from multiple government

2  witnesses, and we just don't think they're there.

3      Next, Your Honor, briefly, we think that Suhl's entitled to

4  an acquittal, Mr. Suhl is entitled to an acquittal because the

5  government has not offered sufficient evidence of official acts.

6  We believe the crimes alleged here require official acts, and

7  *McDonnell* says there are two components to that:  Matter of

8  controversy and some sort of exercise of government power.

9      And we think the evidence has shown, one, Suhl didn't

10  actually ask for any official actions; and even if somehow the

11  Court considered that he did ask for an official action, Jones

12  stated repeatedly that at best he agreed to look into things for

13  him.  And at this point in the evidence, Your Honor, you can't

14  separate that agreement from the ask, and we think that there's

15  just -- and I can walk through each of the -- I'll do it

16  briefly -- each of the official acts.

17      The Child Welfare Review Board.  Carter said there was

18  never an act, it was hypothetical.  "What are my chances?"  He

19  said Governor Beebe was never going to put Mr. Suhl on the

20  board.  There was no ask there, Your Honor.

21      The provider site radius expansion.  Your Honor, one of the

22  biggest red herrings in this case, and I want to explain it,

23  because the way the government has put in the evidence I think

24  is very interesting.  Mr. Carter called Chip Barnes, drunk, on

25  January 22, 2011, saying:  Mr. Suhl's complaining about the

1  radius expansion.  There's legislation that's going to expand it

2  to 50 miles, and he wants this.  Couldn't have better evidence

3  of Carter coming up with an issue, making up something to get a

4  meeting.  You know why?  Three weeks before, new regulations had

5  already gone into effect that expanded the regulation.  There

6  couldn't have been a request from Mr. Suhl.  Mr. Suhl would be

7  requesting something that had already happened.  The

8  government's playing fast and loose with the dates here, Your

9  Honor.  They're not asking Jones's conversations, about dates of

10  these conversations, because they know the evidence doesn't line

11  up.

12       There is no reasonable inference on the RSPMI.  I'd love to

13  hear any argument to the contrary.  Senate Bill 218 doesn't

14  apply to Mr. Suhl's companies, period, full stop, no dispute.

15  It applied to nonprofits.  This idea about the regional

16  competitor, Mid-South, we've heard so much about Mid-South.

17  I'll point you to the government's exhibit, the first exhibit

18  they played in this case.  Ted Suhl, quote, We're not asking for

19  anything special, end quote.  End of story about that being a

20  request for an official act.

21       And the monitoring notes, Your Honor, we could argue about

22  the legal issue about whether providing information is an

23  official act or not, but I think it's unnecessary at this point

24  for this reason.  Jones testified that he had some sort of

25  monitoring agenda -- he can't remember which one -- he'd give it

1    to Carter.  He never gave it to Ted Suhl.  Carter's never seen

2    it before, he knows nothing about it.  He never gave it to Ted

3    Suhl.  So there is no evidence that Mr. Suhl somehow got this

4    report.

5          Your Honor, the evidence has come in so mixed on all of

6    this, but one thing has been consistent.  The government has

7    never disputed that looking into something is not an official

8    act after *McDonnell*.  So I don't think the evidence supports the

9    idea that our client even asked about anything.  At worst, you

10   hear him complaining to Mr. Jones.  They fought Mr. Jones, tooth

11   and nail, trying to get him to say that Ted Suhl is asking him

12   for things.  And all they really got was, Yeah, he would

13   complain to me about issues, and I would tell him I'd look into

14   things.  That, Your Honor, we would submit is not sufficient

15   after *McDonnell*.  And, again, there should be an acquittal on

16   all counts.

17         Particularly, next, Your Honor, I'd like to turn to 666, 18

18   U.S.C. 666.  We think he's entitled to an acquittal on the

19   counts here for this reason.  As we discussed before, 18 U.S.C.

20   666 requires the alleged bribe payment be made, quote, in

21   connection with any business transaction or series of

22   transactions.  And that has to be worth $5,000 in a one-year

23   period.  We had a lot of pretrial discussion about this, Your

24   Honor.  And the government's response was:  Trust us, Your

25   Honor, the indictment gives us notice.  We'll prove the

1    connection at trial.  Well, rather than focus on any one

2    particular business transaction, Your Honor, the government is

3    now saying it's all of Mr. Suhl's business.  That's not what the

4    statute says.  That's not what they've alleged.  At the same

5    time, in order to get that evidence in, they've told you, Your

6    Honor, Well, we're not alleging it's all illegitimate.  We're

7    not saying all this Medicaid money is illegitimate.  Well, if

8    it's not illegitimate, it's not in connection with.  You can't

9    have it both ways.  If it goes to his motive and it's not

10   illegitimate, then it is not in connection with.  And I think a

11   simple analogy here, Your Honor, if you'll humor me for a

12   second, this simple analogy exposes the weakness of the

13   position.

14        Imagine, Your Honor, that I was foolish enough to show up

15   at your farm and try to bribe you for a few of those freshly

16   laid eggs that we've been discussing over the last week.  The

17   government can't charge me for bribery in connection with your

18   entire farm.  It doesn't make sense.  But that's exactly what's

19   happened here.  We've heard little bits of testimony about some

20   little actions here and there.  Jones never testified that Suhl

21   said:  Take care of my business.  Protect my business.  Protect

22   everything I do.  Protect all my Medicaid payments.  He

23   couldn't.  He wasn't even in charge of Medicaid.

24        So here, Your Honor, we think we've got a diversion of what

25   was alleged in the indictment, I should say a constructive

1   amendment from what was alleged in the indictment.  But there is

2   no evidence that Mr. Suhl paid anything in connection with the

3   entirety of his business.  Now, we think for that reason, Your

4   Honor -- I mean, they could have asked Mr. Jones:  Did Suhl tell

5   you to protect his business?  Did he say Medicaid is critical to

6   me, I need you to look out for me for everything that goes on in

7   my business?  They could have asked him.  They had him here

8   under a cooperation agreement.  They didn't ask him because it

9   didn't happen.  And we think, Your Honor, that, you know, we

10  raised this issue pretrial, and we were told this is a case

11  about eggs.  We got to here, and we're told it's a case about a

12  farm.  But the evidence doesn't support the farm, Your Honor.

13  And we think, frankly, that we're entitled to an acquittal on

14  Count 5.

15         Turning briefly to our third argument, Your Honor, and that

16  is -- or, actually, I guess it's our fourth argument, and that

17  is that the government has constructively amended the

18  indictment.  And this relates to both the official acts argument

19  we discussed and the in connection with.  Frankly, I'm trying to

20  come up with a way to describe it.  This is the best I can do,

21  Your Honor.  This is a heads-we-win/tails-the-government-loses

22  argument.  If you disagree with me on the first couple of

23  arguments about official acts or in connection with, then we've

24  got a problem, because the only case left for the government is

25  a case that's different than what's alleged in the indictment.

1    And that ends up -- that puts us in a world of constructive

2    amendment and Mr. Suhl is entitled to an acquittal.  And

3    constructive amendment, just to remind, frankly, myself, is an

4    impermissible broadening of the elements alleged in the

5    indictment.  And the danger here is it will let this jury

6    convict on a theory that the grand jury didn't indict on.

7          Let's start with the latter one first, and that is the 666

8    in connection with the entirety of his business.  The indictment

9    doesn't allege that Mr. Suhl paid bribes to protect all of his

10   business.  Instead, it has a specific section that talks about

11   official acts.  None of those official acts reach the entirety

12   of his business.  They just don't.  And so for that simple

13   reason alone, we think to the extent you disagree that in

14   connection with the entirety of Mr. Suhl's business somehow

15   works, it's a constructive amendment from what was indicted.

16   This is exactly why we raised the issue pretrial, Your Honor.

17         As opposed to official acts, the indictment repeats over

18   and over again that Jones, quote, agreed to look into things.

19   Mr. Suhl supposedly, according to the indictment, agreed to give

20   money to Jones based on this agreement, although I'm not sure

21   the evidence at trial has supported that.  Here, Your Honor,

22   we've got a change in the theory, and I'm sure it's in response

23   to the unanimous decision by the Supreme Court in *United States*

24   *v. Robert McDonnell.*

25         Now, the government argues, Well, Mr. Suhl gave money to

1    Mr. Jones expecting Mr. Jones to do something more, to do

2    something more than what he agreed to do.  In other words,

3    they're breaking up the allegations in the indictment between

4    the ask and the agreement.  The indictment doesn't do that.  It

5    doesn't de-link Suhl's intent from Jones's intent.  It doesn't

6    allege that Suhl wanted more than what Jones could give him.

7    And we think this clearly broadens the elements of Counts 2

8    through 5 because of this agreement.

9         And I think the best case we found on this, Your Honor --

10   and I've got multiple cases.  I'm only going to talk about one,

11   in the interest of time.  But if the Court wants, I can always

12   provide more authority.  And it's *United States v. Narog*,

13   N-a-r-o-g, 372 F.3d 1243, Eleventh Circuit, 2004.

14              THE COURT:  Give that citation again.

15              MR. LATCOVICH:  Yes, Your Honor.  It's 372 F.3d 1243.

16   And that's an Eleventh Circuit case from 2004.  And there the

17   indictment alleged possession of a chemical and that, quote, the

18   listed chemical would be used to manufacture a controlled

19   substance, comma, that is methamphetamine, end quote.  And the

20   jury had a problem with that.  They said, Well, we knew he had

21   the chemical.  But they wrote to the Court and said:  Does it

22   have to be methamphetamine?  And the Court thought about it and

23   said, No, it does not.  Jury convicts.  It goes to the Eleventh

24   Circuit, and the government argues, just like they're going to

25   argue here, that Jones agreed to a surplusage.  It doesn't

1    matter.  The government said the same thing.  They said:  You

2    know, that is methamphetamine.  It doesn't matter.  We didn't

3    have to put that in the indictment.  And the Eleventh Circuit

4    said no.  You made your bed.  You decided that the indictment

5    was going to allege, quote, that is methamphetamine, therefore,

6    that's what you have to prove.  It's the same thing here, Your

7    Honor.  That language that Jones agreed to look into something,

8    it's not surplusage; it's a key part of the agreement.  And for

9    the same reason the Eleventh Circuit said that was a

10   constructive amendment there, we think that's controlling here.

11        So, you know, in summary, we don't believe the evidence is

12   sufficient to support any official acts.  But if that's wrong,

13   focusing merely on Mr. Suhl's supposed ask and ignoring the

14   agreement alleged in the indictment is a constructive amendment

15   that requires judgment for Mr. Suhl.

16        Finally, Your Honor, I would like to briefly renew two

17   motions that we made pretrial.  The first is the prejudicial

18   delay based on Pastor Bennett's unavailability.  We've heard

19   Pastor Bennett's name over and over in this case.  The

20   government opened by putting Pastor Bennett at the center of the

21   conspiracy, said you're going to hear him on the phone, you're

22   going to hear Carter on the phone setting up the cashing of the

23   checks.

24        With Agent Spainhour, I counted Pastor Bennett's name was

25   used more than a hundred times during his testimony.  Carter was

1    on the stand for 25 minutes one afternoon.  I got to about 25

2    times his name was mentioned.  Frankly, Your Honor, I gave up

3    after the first day.  I think we can all agree we've heard quite

4    a lot from Pastor Bennett here.  You've heard the tapes.  You

5    heard Pastor Bennett say over and over these were donations.

6    But what the government did, Your Honor, is they increased the

7    prejudice at trial because they had Carter put words in Pastor

8    Bennett's mouth, that the donations weren't, in fact, donations,

9    or, excuse me, that the donations were donations -- line from

10   Pastor Bennett -- was part of some prearranged scheme that they

11   would say if they ever got discovered.  Had Pastor Bennett been

12   here, or, frankly, even been interviewed by anyone sitting at

13   that table (pointing) in the two and a half years they had to

14   interview him before he died, all he could have said was:  I

15   meant what I said.  Donations are donations.  But here we've got

16   Carter saying:  What Pastor Bennett said meant exactly the

17   opposite.  They tried to take favorable evidence and make it

18   part of the scheme.  They've increased the prejudice.  There's

19   no doubt about the delay, Your Honor.

20        And so really the only remaining issue is whether the

21   government has acted intentionally, as that term is understood

22   in the preindictment delay.  And we don't think that it means

23   necessarily to gain a strategic advantage.  I'm not going to

24   repeat all the arguments that --

25             THE COURT:  The time delay motion is denied again.

1            MR. LATCOVICH:  Okay.  And then the last thing, Your

2    Honor, is we would respectfully renew our motion to dismiss the

3    indictment because of *United States v. McDonnell*.  We believe

4    that, again, it doesn't allege official acts.

5            THE COURT:  Motion denied, exception saved.

6            MR. LATCOVICH:  Great.  In conclusion, Your Honor, we

7    discussed many of the same issues today we discussed pretrial.

8    The defense lost on those issues pretrial.  But we lost because

9    the government claimed to give us proper notice and that our

10   arguments were better served when the facts come in.  And, well,

11   the government had its chance, the facts have come in, Your

12   Honor, and we don't think there's sufficient evidence to get

13   this case to a jury; and, accordingly, Mr. Suhl requests an

14   acquittal on all counts.

15       Thank you, Your Honor.

16           THE COURT:  Well, your points are well made, very well

17   articulated.  Let's see if the prosecution wants to throw in the

18   towel.

19           MR. LATCOVICH:  Fingers crossed, Your Honor.

20           THE COURT:  What about Mr. Jones's statement that at

21   times during the testimony these were all related to -- all

22   these payments were related to the campaign for bishop?

23           MS. BELL:  Your Honor, Mr. Jones then, on redirect,

24   when asked about specific issues, such as the Mid-South issue or

25   the monitoring notes, agreed with the prosecution that, no,

1   these were not about the campaign for bishop.  Further,

2   Mr. Carter has testified about the things that the defendant

3   asked for.  And if it's coming down to a credibility

4   determination between Mr. Jones and Mr. Carter, then we are

5   outside of the realm of a judgment of acquittal and it is left

6   to the jury to decide who to believe.  And that theme runs

7   throughout the entirety of what the defense is asking for.  They

8   want this Court to pick certain pieces of evidence that are

9   favorable to the defense and remove this from the jury when it's

10  up to the jury to decide the credibility of what and who to

11  believe in this case.  Specifically, when they talked about the

12  lack of quid, that there were multiple checks that were

13  donations, that is the defendant's interpretation of the

14  evidence, but there was evidence through Mr. Carter and through

15  Mr. Jones that the money and the checks were bribe payments and

16  that --

17          THE COURT:  Wasn't Mr. Jones's testimony inconsistent

18  at times during his testimony?

19          MS. BELL:  Even within itself, yes, Your Honor.

20          THE COURT:  Okay.  Is that for me to determine or the

21  jury?

22          MS. BELL:  That would be for the jury to determine,

23  what of Mr. Jones's testimony to believe.

24          THE COURT:  Go ahead.

25          MS. BELL:  Along the same lines, the defense is saying

1   there was no quo, that Mr. Jones didn't do anything.  But as we

2   briefed numerous times through the pretrial motions, Your Honor,

3   the defendant is not the public official, and therefore what the

4   public official ultimately did is not an element of this case.

5   It is what the defendant asked for and the defendant's intent

6   and therefore would oppose the defense motion for acquittal.

7        That goes along with their third point on official acts.

8   The defense is trying to say that -- actually, considering the

9   evidence that did come in, that the defendant did ask on a

10  recording in 2011 for Jones to put a stop to a referral process.

11  Given the fact that both Mr. Jones and Mr. Carter agreed that

12  the defendant asked Mr. Jones to take over Medicaid and that

13  both agreed that the defendant made a request about the child

14  welfare board and the radius expansion, there's more than enough

15  evidence for the jury to decide whether or not official acts

16  were taken.

17       Specifically, Mr. Latcovich talked about the 30-mile radius

18  and said that by the time one of the recordings came in, the

19  legislation was already going to pass.  But, again, that ignores

20  the entirety of the evidence, including emails from the

21  defendant's own lobbyist, slash, lawyer in Joel Landreneau that

22  stretched back two years before then, asking ADHS to take to

23  change in policy.  The entirety of the evidence shows the

24  defendant was making concerted effort over numerous years to get

25  all of these official acts taken.  And, again, that's the

1    province of the jury to decide what happened in this case.

2         The defendant then said that the government's Count 5 under

3    666 was not met.  And I believe they're trying to say that there

4    was nothing, no connection or business of $5,000 or more, which

5    plainly ignores the evidence.  In 2011, July, the defendant is

6    caught on a recording asking for Steven Jones to put a stop to

7    the referral process in Northeast Arkansas that was sending all

8    of the referral process to Mid-South.  Then Anita Castleberry,

9    an employee from DHS, came in and said she had pulled the

10   information from 2011 that showed that Mid-South was receiving

11   through these referrals Medicaid money of $10 million per year.

12   That clearly is above the threshold of the $5,000 that is at

13   issue.  That was the defendant's own ask, his own request to put

14   a stop to this specific policy, and that one policy alone was

15   worth over $10 million.  There were no magic words that the

16   government had to elicit from Jones himself when the defendant

17   is already caught on tape making this request, and DHS can

18   provide the value amount, the number that's associated with it.

19        And finally, Your Honor, the defense is talking about

20   constructive amendment of the indictment because the defense

21   believes that the government has suddenly alleged all of the

22   Medicaid money is at issue in this case.  But as I just said,

23   his request in 2011 referenced this Northeast Arkansas referral

24   policy that was worth $10 million.

25        And then, finally, on the constructive amendment argument,

1    the defendant once again is trying to confuse the intent that

2    the defendant was required to have, his intent to influence

3    Steven Jones to take official action, with the agreement of

4    Jones to look into it.  And the agreement of Jones to look into

5    it is an element of the conspiracy, Count 1, not Counts 2

6    through 5.  So, yes, an agreement was necessary in Count 1 for

7    Jones -- it wasn't even necessary for Jones to say he'll look

8    into it, but some agreement was necessary, and that is what is

9    charged.  All of those paragraphs the defendant is complaining

10   about in which the government in the indictment says Jones

11   agrees to look into it, those are all in the conspiracy section.

12   And, yes, they are incorporated by reference later.  But the

13   agreement is an element of conspiracy, as I know the Court is

14   aware.  But the defendant's intent in Counts 2 through 5 was the

15   intent to influence Steven Jones, not Steven Jones's intent.

16        Thank you, Your Honor.

17             THE COURT:  You want rebuttal?

18             MR. LATCOVICH:  Briefly, Your Honor.

19             THE COURT:  What was that last word?

20             MR. LATCOVICH:  Briefly, Your Honor.

21             THE COURT:  Okay.

22             MR. LATCOVICH:  Unless you'd like me to go longer, but

23   I suspect I know the answer to that question.

24        Your Honor, first of all, we're not asking -- well, I will

25   say this.  This is one of the few times in my career that I've

1    ever in response to a Rule 29 motion had a government attorney

2    come up and say:  Don't believe our only witness.  It's for

3    somebody else to make credibility determinations.  But that's

4    what I just heard from the government, that we shouldn't believe

5    Mr. Jones.

6        I don't think we're asking the Court to make credibility

7    determinations.  There are certain facts that are undisputed:

8    That checks were written to the church.  Money was taken by

9    Carter and Pastor Bennett and never made it to Jones.  Jones

10   never talked to Suhl about money.  Those types of things,

11   uncontroverted.  And we think when there is no reasonable

12   inference that a jury can make, given all the other confusion

13   out there, that would let a jury convict beyond a reasonable

14   doubt.  We think, Your Honor, you start with the uncontroverted

15   facts, and then you get to the confusion and the conflicting

16   testimony from the government's own witnesses, and we don't see

17   how a reasonable jury could find all the elements beyond a

18   reasonable doubt.

19       As far as the official acts, I did forget -- and it's my

20   omission, Your Honor -- about the idea that Steven Jones was

21   asked to take over Medicaid.  That's just not an official act.

22   Frankly, it's absurd.  An official act, according to *McDonnell*,

23   is something that can be brought before -- it's a matter, issue,

24   or controversy, something that can be brought before the

25   government, like litigation, like a regulation.  I mean, asking

1    Jones to take over Medicaid, something that he couldn't do, you

2    might as well ask Jones to be governor.  It doesn't make sense.

3    It's not an official act.  Frankly, we're surprised that we're

4    still hearing about it post *McDonnell.*  But given the government

5    still thinks something is there, we'll go with it.

6         As far as the radius issue, Your Honor, I just heard

7    government counsel say forget about 2012; this 50-mile radius

8    issue, forget about 2012.  We've got an email from one of

9    Mr. Suhl's employees that says he was raising this issue years

10   earlier.  Your Honor, this is a flat-out constructive amendment.

11   We asked the government specifically about this issue before

12   trial.  And counsel wrote us an email that said -- and this was

13   a request about the radius issue.  Quote:  In response to your

14   request for more detailed information regarding the allegation

15   of paragraph 150 in the indictment, those allegations relate to

16   the general time frame of January 2011 through September 2011

17   and encompass both the September 2011 meeting with Jones and

18   Carter and any relevant conversations with Carter that preceded

19   the meeting.  End quote.  Your Honor, it's frankly outrageous

20   that now, once they realized that the radius issue had been

21   fixed and this was just a drunk Carter bragging, they've now

22   gone back two years on their own word.  It is a constructive

23   amendment.

24        As far as 666, Your Honor, we heard about exclusive

25   referrals from Mid-South.  No one in this courtroom heard one

1    bit of testimony about how much that exclusive referral policy

2    was available to Mid-South.  That nice woman from ADHS testified

3    about the total amount of Medicaid money received by Mid-South.

4    I didn't hear anything about an exclusive referral policy.  I

5    have no idea how much they got in exclusive referrals.  The

6    government can't just value it using that.  It's too

7    speculative.  We don't know out of that $10 million what was

8    that.  The other thing is, then assuming it wasn't an exclusive

9    referral, Mr. Suhl would have to compete for it.  Again, we've

10   just heard another change in theory, which is inconsistent with

11   their proposed jury instructions, it's inconsistent with their

12   theory of the case, and it's certainly inconsistent with

13   anything we heard in the indictment.  I mean, the third time is

14   not the charm here, Your Honor.

15        Finally, on agreement, Your Honor, now we hear, Well,

16   forget about the agreement.  That's really just part of the

17   conspiracy claim.  It's not.  They drafted the indictment.  The

18   indictment specifically incorporates throughout, Your Honor, and

19   certainly describes those allegations.  The government chose to

20   use the language of agreement, they did it pre-*McDonnell*, and

21   they can't escape the effects of *McDonnell* now.

22        Thank you.

23             THE COURT:  The defense's motions are denied, point by

24   point, exception saved.

25        Who will be your first witness?

1           MR. ROMAIN:  Your Honor, the defense calls Rhonda

2   Pearson.

3           THE COURT:  Let's bring the jury back.  If you'll face

4   the deputy and be sworn.

5        **RHONDA PEARSON, DEFENDANT'S WITNESS, DULY SWORN**

6           THE COURT:  Over here is the witness chair.  Be

7   careful.  When we get the jury in here and you start answering

8   questions, speak right into the mike, if you will, please,

9   ma'am.

10      Please rise while the jury enters.

11      (Whereupon, the jury entered the courtroom and proceedings

12  continued in open court as follows:)

13          THE COURT:  If the lawyers will come up, briefly.

14      (Bench conference reported as follows:)

15          THE COURT:  How many witnesses do you expect?

16          MR. ROMAIN:  Today?

17          THE COURT:  Total?

18          MR. CARY:  Roughly ten, Your Honor.  Many of them will

19  be short.

20          THE COURT:  How long do you anticipate your case will

21  last, roughly, in hours?

22          MR. CARY:  In hours?  Six hours.

23          THE COURT:  Is there any reason to go past 4:45 today?

24          MR. CARY:  No, there's not.

25          THE COURT:  You agree?

1              MR. KELLER:  That's fine, Your Honor.

2              THE COURT:  I was prepared to keep them till five,

3    5:30, but I don't believe it's necessary with your expected

4    evidence.  Thank you.

5         (Whereupon, proceedings continued in open court as

6    follows:)

7              THE COURT:  We'll probably recess this afternoon,

8    members of the jury, about 4:45.  We're not going to go as late

9    as I said we might.

10        You may proceed.

11                        DIRECT EXAMINATION

12   BY MR. ROMAIN:

13   Q.   Good afternoon, ma'am.  Would you please state your name

14   for the record.

15   A.   Rhonda Pearson.

16   Q.   Ms. Pearson, are you currently employed?

17   A.   Yes, I am.

18   Q.   And where are you employed?

19   A.   Trinity Behavioral Health.

20   Q.   How long have you been employed at Trinity Behavioral

21   Health?

22   A.   Fifteen years.

23   Q.   And between the time -- well, first of all, what is your

24   current title?

25   A.   I'm a clinical director.  I'm also a psychotherapist.

1  Q.   And between 2007 and 2011, what was your position at that

2  time?

3  A.   I was the admissions director and a psychotherapist.

4  Q.   And you said you've been employed at Trinity for 15 years?

5  A.   Yes.

6  Q.   Have you held any other positions at Trinity?

7  A.   Yes.

8  Q.   Could you tell me what they are?

9  A.   I was a case manager there as well.

10 Q.   And can you tell me what you did, what the scope of your

11 responsibilities were as a case manager?

12 A.   Yes, I can.  As a case manager, I supported treatment on

13 the patients that were assigned to me, knowing what was in the

14 treatment plan and what the therapists were working on, and

15 making sure that the patients' needs were being met in terms of

16 if they needed anything from their parents, if they were

17 practicing or utilizing the different treatment interventions

18 that they were working on.

19 Q.   Thank you.  Is being a case manager the same as being a

20 utilization manager?

21 A.   No.

22 Q.   Did you also hold the position of utilization manager?

23 A.   Yes, but not until I became admissions director.  I did

24 work in utilization, but I wasn't the utilization manager at

25 that time.

1    Q.    And have you had any involvement in Medicaid certification

2    at Trinity Behavioral Health?

3    A.    Well, in doing utilization and being the utilization

4    manager, I certainly did.  We would gather information from

5    different areas of treatment and collectively condense that into

6    a readable report to submit to Medicaid for certification.

7    Q.    Okay.  Thank you.  Now, have you done any work with

8    Arkansas Counseling Associates?

9    A.    Yes, I have.

10   Q.    And can you describe that work, please?

11   A.    Yes.  I have done some psychotherapy for Arkansas

12   Counseling.  Also, I have done new-hire trainings for the

13   therapists and for the mental health paraprofessionals.

14   Q.    Thank you.  Would you describe, very briefly and in general

15   terms, the process for admissions to Trinity Behavioral Health?

16   A.    Sure.  They come in by referral from a number of sources.

17   It could be from parents or from the court system, maybe from

18   their physician that they're being treated by or their therapist

19   that they're currently seeing in outpatient.

20   Q.    And what is the range of ages of the young people who are

21   at Trinity?

22   A.    We're licensed to take children ages six to 17, although

23   some may stay longer if they haven't completed treatment.

24   Q.    Thank you.  And very briefly and in general terms, would

25   you please describe the scope of services that Trinity offers?

1   A.    Sure.  Our kiddos get up in the morning and they have a few

2   chores they do, make their beds, vacuum, that sort of thing, and

3   then they head down to the cafeteria for breakfast.  And after

4   breakfast, they start classes at school.  We have a fully

5   accredited school, so starts about 9:05 in the morning.  Our

6   high school students, they're going to change classes every

7   hour, just like they would at their home high school.  Our

8   junior high kiddos, they're going to be in the same classroom

9   for part of the day, but there would be some elective classes

10  that they would leave to attend and in a different room.  And

11  our elementary students, they would stay in the same classroom

12  much of the day, except for PE, library, things of that nature.

13  Of course, they would go up to the cafeteria for lunch and then

14  finish the day in school.  After school, they have structured

15  activities, sports, recreation, those sort of things.

16        We also have an equine program, which is with our horses,

17  and that functions as a class during the school day.  So they

18  would go down and learn to care for the animals and learn to

19  ride the animals.  We also use our equine program as recreation.

20  Sometimes all of the children will get to ride in decided

21  groups, and some of the children who were doing really well and

22  kind of earned that extra privilege would also get some horse

23  time, go on trail rides, that sort of thing.

24        After those structured activities, they would go down to

25  the cafeteria for dinner.  And when they finish with that, they

1   would go back to their houses and they would each begin a

2   routine, or, excuse me, a rotation of taking showers each day,

3   and then go to bed in the evening.  Much like just the way they

4   would function at home.

5   Q.   Thank you, Ms. Pearson.  And the young people at Trinity,

6   do they typically have some mental or behavioral issues?

7   A.   Yes.

8   Q.   And is Trinity operational today?

9   A.   Yes, it is.

10  Q.   And how many young people are at Trinity now?

11  A.   We have two currently.

12  Q.   Is Trinity receiving any Medicaid reimbursements for the

13  two young people there now?

14  A.   No.

15  Q.   What is the capacity at Trinity Behavioral Health?

16  A.   We have 120 beds.

17  Q.   And during the time that you've been there, has Trinity

18  ever been at capacity?

19        MR. KELLER:  Objection, Your Honor.  Relevance as to

20  this line of questioning.

21        THE COURT:  I'm going to overrule it temporarily.

22   Let's move on.

23        MR. ROMAIN:  It will be very quick, Your Honor.

24  BY MR. ROMAIN:

25  Q.   Has Trinity ever been at capacity at 120 young people in

1    the time you've been there?

2    A.    No.

3    Q.    And what is the maximum number of young people who have

4    been there since you have been working there?

5    A.    One hundred six.

6    Q.    Is there a specific reason for that?

7              MR. KELLER:  Objection, Your Honor.  Relevance as to

8    especially this last point and this line of questioning.

9              THE COURT:  What is the relevance?

10             MR. ROMAIN:  Your Honor, may we approach?

11             MR. KELLER:  May we approach, Your Honor?

12             THE COURT:  Beg your pardon?

13             MR. ROMAIN:  May we approach, Your Honor?

14             THE COURT:  Yes.

15        (Bench conference reported as follows:)

16             MR. ROMAIN:  Your Honor, I'm simply trying to

17   establish how many young people are at Trinity.  The government

18   has made a huge deal about the millions and millions of dollars

19   that are coming there, and I think we're entitled to establish

20   how many people are actually there, which is not at maximum

21   capacity.

22             THE COURT:  Sounds reasonable.

23             MR. ROMAIN:  I have two or three questions left on

24   this.

25             THE COURT:  You're about to win.

1        MR. ROMAIN:  Thank you.

2        MR. KELLER:  Your Honor, the only point that I'm

3  trying to keep out, it sounded to me like they were trying to

4  make the point there was some reason why the number of people at

5  the facility has dropped significantly.

6        THE COURT:  I'm going to overrule your objection.

7      (Whereupon, proceedings continued in open court as

8  follows:)

9  BY MR. ROMAIN:

10  Q.   Ms. Pearson, you said that the maximum number of young

11  people who have actually been at Trinity during the time you've

12  been there has been 106.  Is that right?

13  A.   Yes.

14  Q.   And is there a reason for that?

15  A.   Well, I have been given sort of a target maximum that we

16  try to achieve.

17  Q.   And who gave you that target?

18  A.   Ted Suhl.

19  Q.   And what was the reason that you were given?

20  A.   Well, he explained to me that the closer you get to maximum

21  capacity, the lower your quality of care, and we want to provide

22  excellent services to our kids.

23  Q.   Ms. Pearson, can you tell me the average number of young

24  people at Trinity between the years of 2008 to 2011?

25  A.   Well, we stayed pretty close to that target number.  But it

1    fluctuates a little bit.  So we may have been down by two or

2    three, but we stayed pretty close to it.

3    Q.    For the entire period from 2008 to 2011?

4    A.    Yes.

5    Q.    You know Ted Suhl?

6    A.    Yes.

7    Q.    And how do you know him?

8    A.    He's my boss.

9    Q.    And do you know of his reputation in the community?

10   A.    Yes.

11   Q.    Do you know of his reputation for generosity to Christian

12   causes?

13   A.    Yes, I do.

14   Q.    And what is his reputation for generosity to Christian

15   causes?

16   A.    His reputation is that he's very generous to Christian

17   causes.

18   Q.    Thank you, Ms. Pearson.

19            MR. ROMAIN:  I'll pass the witness, Your Honor.

20                         CROSS-EXAMINATION

21   BY MR. KELLER:

22   Q.    Good afternoon, Ms. Pearson.  Just a question or two about

23   the capacity and your involvement with Medicaid.  You said

24   between 2008 and 2011, on average, there are roughly 106 minors

25   or youth children being hosted at The Lord's Ranch or Trinity

1   Behavioral Health?

2   A.    No, sir.  I said that the maximum number of patients that

3   we had was 106 but that we were given a target number.

4   Q.    So maybe I misunderstood your testimony.  I thought you

5   said you stayed pretty close to that target number of 106?

6   A.    It hasn't always been 106.  Sometimes it was 102.

7   Q.    Well, okay.  Was the number of children consistently around

8   a hundred between 2008 and 2011?

9   A.    We stayed within two to three of the target number,

10  whatever that was at the time.

11  Q.    Well, what was the range of the target number then?

12  A.    Well, just depended on when you're talking about.

13  Q.    Well, from 2008 to 2011, so far you've given us 106 was the

14  target number at one point.  Right?

15  A.    The maximum our target number ever was was 106.

16  Q.    So 106 was a target number at one point.  Correct?

17  A.    Yes, uh-huh.

18  Q.    And 102 was a target number at one point.  Right?

19  A.    Uh-huh.

20  Q.    So what was the lowest target number you had over that time

21  period, 2008 to 2011?

22  A.    I cannot recall.

23  Q.    Weren't you the one in charge of trying to meet the targets

24  that the defendant Ted Suhl gave you?

25  A.    Yes.

1  Q.   But your testimony here today is that you don't remember

2  how low that target number got?

3  A.   Well, you're talking about a three-year period.

4  Q.   But you didn't have any trouble remaining 102.  Right?

5  A.   But that was just an example.  Uh-huh.

6  Q.   For the children that were at Trinity, were you being

7  reimbursed by Medicaid for most of those children?

8  A.   For a number of them, yes.

9  Q.   For a majority of them?

10  A.   Yes.

11         MR. KELLER:  No further questions, Your Honor.

12         MR. ROMAIN:  No further questions, Your Honor.

13         THE COURT:  Jury questions?

14      You may stand down.

15      May this witness be excused?

16         MR. ROMAIN:  Yes, Your Honor.

17         THE COURT:  You're free to go about your business.

18  Thank you.

19      Next witness?

20         MR. ROMAIN:  Your Honor, the defense calls Tina Smith.

21         THE COURT:  Tina Smith?

22         MR. ROMAIN:  Yes, Your Honor.

23         **TINA SMITH, DEFENDANT'S WITNESS, DULY SWORN**

24         THE COURT:  Come around here to the witness stand,

25  please, and I'll ask you to speak right into the mike, if you

1    will.

2              THE WITNESS:  Yes, sir.

3                        DIRECT EXAMINATION

4    BY MR. ROMAIN:

5    Q.   Good afternoon, ma'am.  Would you please state your name

6    for the record.

7    A.   Tina Smith.

8    Q.   Ms. Smith, do you know Ted Suhl?

9    A.   Yes.

10   Q.   And how long have you known him?

11   A.   Since 1987.

12   Q.   And how did you get to know him?

13   A.   He and Dad came to remove me from a penitentiary in

14   Illinois.

15   Q.   And then what happened?

16   A.   Sent me to the ranch.

17   Q.   Is that The Lord's Ranch?

18   A.   Yes, sir.

19   Q.   So you were a resident at The Lord's Ranch?

20   A.   Yes, sir.

21   Q.   And how long were you a resident there?

22   A.   From '87 until '92.

23   Q.   And during that time at The Lord's Ranch, did you have an

24   opportunity to observe Ted Suhl?

25   A.   Yes, sir.

1  Q.   And have you remained in close contact with Mr. Suhl since
2  1992?
3  A.   Yes, sir.
4  Q.   Do you have an opinion about Mr. Suhl's generosity to
5  Christian causes?
6  A.   Yes.
7  Q.   And what is your opinion about Mr. Suhl's generosity to
8  Christian causes?
9  A.   That he gives because he's a good Christian.  He gives to
10  several churches, homeless people that when we would go out to
11  minister and we would see out on the streets, he would give
12  money or buy food for them or give them some kind of a shelter.
13  And I would ask, you know, "Why do we do this?"  And he said,
14  "It's because that's what Christians do."
15  Q.   Thank you, Ms. Smith.
16          MR. ROMAIN:  I'll pass the witness, Your Honor.
17          THE COURT:  Cross?
18                    CROSS-EXAMINATION
19  BY MR. KELLER:
20  Q.   Ms. Smith, you've been in the courtroom for part of this
21  trial, observing the trial.  Is that right?
22  A.   No.  I came the first day on Thursday, but I wasn't here
23  long, maybe about an hour or so, and then I was removed.
24  Q.   And so you watched testimony for that hour?
25  A.   Yes.

1  Q.   Were you aware of the Court's order excluding witnesses,

2  potential witnesses from the courtroom during this trial?

3  A.   No, I wasn't aware at the time that I would have been

4  testifying.  I was just here showing my support.

5  Q.   So defense counsel didn't tell you at that point when you

6  showed up that there was an order excluding witnesses from the

7  courtroom?

8  A.   Yes, they did at that point, once I was to testify.

9  Q.   After you had been here watching testimony?

10  A.   Well, I don't think they knew who I was at the time.  I

11  don't think they knew visually who I was.  I just came straight

12  in.  I wasn't with them.  I just came in from the airport and

13  walked into the courtroom, and then that's when I was notified

14  that I couldn't be in the courtroom, once they figured out who I

15  was.

16          MR. KELLER:  No further questions, Your Honor.

17          MR. ROMAIN:  No further questions, Your Honor.

18          THE COURT:  No jury questions?

19     You may stand down.  You're free to go, if you want to.

20          THE WITNESS:  Thank you, sir.

21          THE COURT:  Next witness?

22          MR. CARY:  Defense calls Greg Young.

23          **GREG YOUNG, DEFENDANT'S WITNESS, DULY SWORN**

24                     DIRECT EXAMINATION

25  BY MR. CARY:

1    Q.    Mr. Young, could you state and spell your name for the

2    record, please.

3    A.    Gregory T. Young; G-r-e-g-o-r-y, T, Y-o-u-n-g.

4    Q.    Mr. Young, what do you do for a living?

5    A.    I'm a CPA.

6    Q.    Do you have your own firm?

7    A.    Yes, I do.

8    Q.    And do you have a relationship with Arkansas Counseling

9    Associates?

10   A.    Yes, sir.

11   Q.    And what is that relationship?

12   A.    We did their payroll function.

13          MR. CARY:  I'd like to pull up on the screen, if I

14   could, please, Defendant's Exhibit 1675, for the witness only.

15   BY MR CARY:

16   Q.    Do you see that document, sir?

17   A.    Yes.

18          MR. CARY:  Could you blow it up just a little bit for

19   him?

20          THE WITNESS:  Yes, please.

21   BY MR. CARY:

22   Q.    What is Defendant's Exhibit 1675?

23   A.    That shows all the transactions of advances and advance

24   paybacks to Ms. Carter.

25   Q.    Was it kept in the ordinary course of business?

1    A.    Yes.

2    Q.    Was it part of the regular business process of your CPA

3    firm?

4    A.    Yes, sir.

5    Q.    And do you believe it to be accurate?

6    A.    Yes, sir.

7             MR. CARY:  I'd move the admission of Defendant's

8    Exhibit 1675.

9             MS. BELL:  No objection, Your Honor.

10            THE COURT:  Admitted.

11            MR. CARY:  I'd ask it be published to the jury.

12            THE COURT:  It can be.

13       (Defendant Exhibit 1675 received in evidence.)

14   BY MR. CARY:

15   Q.    And, sir, could you walk us through this document and

16   explain what it shows?

17   A.    It just shows the detail, by date, of any advances made to

18   Ms. Carter and then any paybacks of those advances via payroll

19   withholdings.

20   Q.    And there are a number of times at the top of the page

21   where it says "advances."  Do you see that?

22   A.    Yes.

23   Q.    And then what does that reflect?

24   A.    Those were actually journal entries that -- we were in the

25   process of changing systems, and so things had to be manually

1    done at that point, as opposed to later on, when beginning in

2    '09, it looks like, they were -- the transactions were recorded

3    directly from the payroll system as opposed to manually outside

4    the payroll system.

5    Q.    That was an automatic payroll system?

6    A.    Yes, yes.

7    Q.    And there are a number of negative entries, or entries in

8    the far right-hand side that has a negative number, what does

9    that reflect?

10   A.    That's paybacks.

11   Q.    And on the far right it's got balance.  Do you see that?

12   A.    Yes.

13   Q.    And what does that reflect?

14   A.    That just reflects the balance of any outstanding advances

15   to Ms. Carter.

16             MR. CARY:  Can we go all the way down to the lower

17   right-hand corner, please?

18   BY MR. CARY:

19   Q.    What's the balance at the end of that, sir?

20   A.    Zero.

21   Q.    And what does that tell you about the advances and payroll

22   deductions?

23   A.    That tells me that all the advances that were made were

24   repaid.

25   Q.    Thank you, sir.

1          MR. CARY:  No further questions.

2                     CROSS-EXAMINATION

3   BY MS. BELL:

4   Q.    Good afternoon, sir.

5   A.    Hi.

6   Q.    So I take it from this chart that you just testified to

7   that Leatrice Carter was in fact an employee of Arkansas

8   Counseling Associates?

9   A.    Yes.  As far as we knew, yes.

10  Q.    And you say as far as you know, and is that because your

11  information is coming only from the system that you reviewed?

12  A.    I'm not sure -- I'm not sure I understand the question.  I

13  mean, we had no -- we didn't hire or fire anybody.  So if we got

14  information that somebody was on the payroll, then we -- they

15  ran through the system.

16  Q.    And therefore it was not your job to go out and make sure

17  that Leatrice Carter was doing any work.  Correct?

18  A.    That's correct.

19  Q.    And it was not your job to make sure that when she said she

20  was working 40 hours that she in fact worked a full 40-hour

21  week.  Right?

22  A.    That's correct.

23  Q.    And it wasn't your job to guarantee that the owners of

24  Arkansas Counseling Associates allowed her to take a full-time

25  pay check without actually doing full-time work.  Correct?

1  A.    I'm not sure I understand that question.  What?

2  Q.    It wouldn't be your job to audit the owner of Arkansas

3  Counseling Associates to make sure that when they let someone on

4  the payroll at a full 40-hour workweek that in fact they were

5  requiring 40 hours' worth of work?

6  A.    That's correct.

7  Q.    Thank you, sir.

8          MS. BELL:  No more questions.

9          MR. CARY:  No further questions.

10         THE COURT:  Jury questions?

11     You may stand down, sir.  You're free to go.

12     Next witness?  How long will your next witness be?

13         MR. CARY:  Our next planned witness actually was

14  having trouble with the heat during the fire alarm, so it would

15  probably be a lengthier witness.

16         THE COURT:  All right.  We'll just break until

17  tomorrow.

18     We'll start at 9 o'clock in the morning, ladies and

19  gentlemen.  Drive home safely.  Get a good supper and a good

20  night's sleep, a good breakfast.  Drive back safely.  Meanwhile,

21  don't talk about the case and don't start making up your mind.

22  Consciously avoid it.

23     Let the jury stand down.  Everyone else remain seated.

24     (Whereupon, the jury exited the courtroom and proceedings

25  continued in open court as follows:)

1          THE COURT:  The jury's out.  We'll start back at

2   nine in the morning.  If either side has anything they want me

3   to take up before we bring the jury back in, email my law clerk,

4   my lawyer by 8:35 and tell us what it's about.

5       Anything else?

6          MR. KELLER:  Yes, Your Honor.  Based on where we're at

7   in the trial, I was wondering how much time the Court plans on

8   giving each side for closing?

9          THE COURT:  What do you want, five, ten minutes?  How

10  much do you want?

11         MR. KELLER:  Forty-five minutes.

12         THE COURT:  Twenty-five?

13         MR. KELLER:  Forty-five minutes.

14         THE COURT:  Forty-five.  How much does the defense

15  want?

16         MR. CARY:  One hour.

17         THE COURT:  I'll give you 45 minutes each.  How much

18  do you want for rebuttal?

19         MR. KELLER:  Fifteen minutes, Your Honor.

20         THE COURT:  All right.  You want to be warned with

21  five minutes remaining in each argument?

22         MR. KELLER:  Yes, Your Honor.

23         THE COURT:  All right.  You want to be warned how much

24  ahead of your 45 minutes?  Five or ten minutes?

25         MR. CARY:  Yes, Your Honor.

1          THE COURT:  Which one?

2          MR. CARY:  Oh, ten minutes.

3          THE COURT:  All right.  If you get to the end of your

4   45 minutes and you feel like you're going to swell up and burst

5   if you don't get to make another point or two, let me know and I

6   might give you a little extension, but don't count on it.

7          MR. CARY:  Thank you, Your Honor.

8          THE COURT:  Anything else?

9          MR. CARY:  Just to clarify, their 45 minutes is 45

10  minutes for their opening, closing, and rebuttal.  Correct?

11         THE COURT:  Thirty minutes on opening and 15 minutes

12  on closing.

13      I'd like for you all, at least one of you all from each

14  side to meet with my lawyer again, see if we can pare down the

15  instructions a little more before we have our formal jury

16  instruction conference.

17         MR. KELLER:  Your Honor, one more issue on closings.

18  I believe each side has ordered daily transcripts in the case.

19  Does the Court allow the parties to display those daily

20  transcripts to the jury during closing argument?

21         THE COURT:  Yes.  Anything else?

22         MR. KELLER:  No, Your Honor.

23         THE COURT:  All right.  We are in recess.  You can be

24  at ease.  We'll start with the jury at nine in the morning.

25      (Overnight recess at 4:43 p.m.)

1          C E R T I F I C A T E

2          I, Eugenie M. Power, Official Court Reporter, do hereby

3     certify that the foregoing is a true and correct transcript of

4     proceedings in the above-entitled case.

5     /s/ Eugenie M. Power, RMR, CRR, CCR        Date:  July 18, 2016
      United States Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25