1              IN THE UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF ARKANSAS
2                      WESTERN DIVISION

3    UNITED STATES OF AMERICA,

4                    Plaintiff,        No. 4:15CR00300-01 BRW

5         v.                           July 20, 2016
                                       Little Rock, Arkansas
6    THEODORE E. SUHL,                 9:14 a.m.

7                    Defendant.

8              **TRANSCRIPT OF TRIAL - VOLUME 6**
                BEFORE THE HONORABLE BILL WILSON,
9            UNITED STATES DISTRICT JUDGE, and a jury

10   APPEARANCES:

11   On Behalf of the Government:

12       MR. JOHN D. KELLER, Trial Attorney
         MS. LAUREN BELL, Trial Attorney
13       MS. AMANDA R. VAUGHN, Trial Attorney
         U.S. Department of Justice - Public Integrity Section
14       1400 New York Avenue, N.W., Suite 1200
         Washington, D.C.  20530
15
     On Behalf of the Defendant:
16
         MR. ROBERT M. CARY, Attorney at Law
17       MR. ALEX GISCARD ROMAIN, Attorney at Law
         MR. SIMON A. LATCOVICH, Attorney at Law
18       MR. THOMAS LANGDON HARRIS, Attorney at Law
         Williams & Connolly, LLP
19       725 Twelfth Street, N.W.
         Washington, D.C.  20005-5901
20
         MR. CHARLES A. BANKS, Attorney at Law
21       Banks Law Firm, PLLC
         Post Office Box 251310
22       Little Rock, Arkansas  72225-1310

23   Defendant Present.

24       Proceedings reported by machine stenography and displayed
     in realtime; transcript prepared utilizing computer-aided
25   transcription.

                    Eugenie M. Power, RMR, CRR, CCR
                       United States Court Reporter

1          **I N D E X - (Volume 6 - July 20, 2016)**

2

3

4     COURT'S INSTRUCTIONS...................................... 869

5

6     GOVERNMENT'S CLOSING ARGUMENT............................. 901

7

      DEFENDANT'S CLOSING ARGUMENT............................. 921

8

9     GOVERNMENT'S REBUTTAL ARGUMENT........................... 948

10

11    JURY VERDICT............................................. 976

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Continuing at 9:14 a.m., jury present.)

2          THE COURT:  Good morning.  Be seated.  I assume your

3    hearts and minds are still pure, unless somebody raises their

4    hand.

5          I apologize.  The delay is caused solely by me.  I live 35

6    miles out west, and when you leave just an adequate time to get

7    here, there's always going to be traffic problems.  I should

8    have left earlier, and I apologize.  I hate to have you cooling

9    your heels waiting.

10         All right.  You have the instructions before you.  I want

11   to give you the instructions.  I'll read them.  You can mark on

12   your instructions while I'm giving you the instructions and

13   during the closing arguments of the lawyers, and you can take

14   them to the jury room and at that time you can compare notes

15   you've made on your other notes and on the instructions.  The

16   only thing -- I'm going to write "Court's Copy" on mine.  Don't

17   mark on mine, with the exception of the verdict forms.  Use my

18   verdict forms.  I'll try to remind you of that again when you

19   reach a verdict on each point.

20         Is there anything we need to attend to before I start

21   giving the instructions, from the prosecution or the defense?

22              MR. KELLER:  No, Your Honor.

23              MR. CARY:  No, Your Honor.

24              THE COURT:  All right.

25         To the extent that you have not already done so, I'll ask

1    you not to get ahead of me in reading these instructions.

2        Members of the jury, the instructions I gave you at the

3    beginning of the trial and during the trial remain in effect.

4    I'll now give you some additional instructions.

5        You must, of course, continue to follow the instructions I

6    gave you earlier, as well as those I give you now.  You must not

7    single out some instructions and ignore others, because all are

8    important.  This is true even though some of those I gave you

9    earlier are not repeated here.

10       The instructions I'm about to give you are in writing and

11   will be available to you in the jury room.  I emphasize,

12   however, that this does not mean they're more important than my

13   earlier instructions.  Again, all instructions, whenever given

14   and whether in writing or not, must be followed.

15       Turn now to number 2.

16       It is your duty to find from the evidence what the facts

17   are.  You will then apply the law, as I give it to you, to those

18   facts.  You must follow my instructions on the law, even if you

19   thought the law was different or should be different.

20       Do not allow sympathy or prejudice to influence you.  The

21   law demands of you a -- the law demands of you a just verdict,

22   unaffected by anything except the evidence, your common sense,

23   and the law as I give it to you.

24       All right.  I'm going to give you the instruction I gave

25   you earlier.

1       I have mentioned the word "evidence."  The evidence in this

2   case consists of the testimony of the witnesses, the documents,

3   and other things received as exhibits.

4       You may use reason and common sense to draw deductions or

5   conclusions from the facts that have been established by the

6   evidence in the case.

7       Some things are not evidence, and I'll go over those again

8   with you right now:

9       Statements, arguments, questions, and comments by the

10  lawyers representing the parties in this case are not evidence.

11      You'll hear closing arguments right after these

12  instructions.  That's a summary of what the lawyers think of the

13  evidence.  They're not evidence, but that does not mean that

14  they're not important, so you give them careful attention

15  throughout this trial, and I'd ask you to continue to do that

16  through the lawyers' closing arguments, from both sides.

17      Objections are not evidence.  Lawyers have a right to

18  object and sometimes a duty to object when they believe

19  something is improper.  You should not be influenced by an

20  objection.  If I sustained an objection to a question, you must

21  ignore the question and must not try to guess what the answer

22  might have been.

23      Any testimony that I struck from the record or told you to

24  disregard is not evidence and must not be considered.

25      I don't recall striking any, but if I did, don't consider

1    it.

2         Anything you saw or heard about this case outside the

3    courtroom is not evidence.

4         Finally, if you were instructed that some evidence was

5    received for a limited purpose only, you must follow that

6    instruction.

7         I don't remember having any for a limited purpose, but if

8    we did, you've got to follow that instruction.

9         Number 4.

10        In deciding what the facts are, you may have to decide what

11   testimony you believe and what testimony you do not believe.

12   You may believe all of what a witness said, or only part of it,

13   or none of it.

14        In deciding what testimony to believe, consider the

15   witness's intelligence, the opportunity the witness had to see

16   or hear things testified about, the witness's memory, any

17   motives that a witness may have for testifying in a certain way,

18   the manner of the witness while testifying, whether the witness

19   said something different at an earlier time, the general

20   reasonableness of the testimony, and the extent to which the

21   testimony is consistent with any evidence that you believe.

22        In deciding whether or not to believe a witness, keep in

23   mind that people sometimes hear or see things differently and

24   sometimes forget things.  You need to consider therefore whether

25   a contradiction is an innocent misrecollection or a lapse of

1  memory or an intentional falsehood, and that may depend on

2  whether it has to do with an important fact or only a small

3  detail.

4      You should judge the testimony of Mr. Suhl in the same

5  manner as you judge the testimony of any other witness.

6      All right.  Let's go to No. 5, which is the reasonable

7  doubt instruction.

8      Reasonable doubt is doubt based upon reason and common

9  sense and not doubt based on speculation.  A reasonable doubt

10 may arise from careful and impartial consideration of all the

11 evidence, or from a lack of evidence.  Proof beyond a reasonable

12 doubt is proof of such a convincing character that a reasonable

13 person, after careful consideration, would not hesitate to rely

14 and act upon that proof in life's most important decisions.

15 Proof beyond a reasonable doubt is proof that leaves you firmly

16 convinced of Mr. Suhl's guilt.  Proof beyond a reasonable doubt,

17 however, does not mean proof beyond all possible doubt.

18     Number 6.

19     You have heard evidence that Mr. Phillip Carter and

20 Mr. Steven Jones made plea agreements with the prosecution.

21 Their testimony was received in evidence and may be considered

22 by you.  You may give their testimony such weight as you think

23 it deserves.  Whether or not their testimony may have been

24 influenced by the plea agreement is for you to determine.

25     Mr. Carter and Mr. Jones entered into plea agreements,

1    which provide that in return for their assistance, the

2    prosecution may file a motion for reduction of their sentences.

3    A judge has no power to reduce a sentence for substantial

4    assistance unless the prosecution, acting through the United

5    States Attorney or Justice Department lawyer, files such a

6    motion.  If such a motion for reduction of sentence for

7    substantial assistance is filed by the prosecution, then it is

8    up to the judge to decide whether to reduce the sentence at all,

9    and if so, how much to reduce it.

10         Their guilty pleas cannot be considered by you as any

11   evidence of Mr. Suhl's guilt.  Their guilty pleas can be

12   considered by you only for the purpose of determining how much,

13   if at all, to rely upon their testimony.

14         You have heard evidence that Mr. Jones and Mr. Carter were

15   previously convicted of crimes.  You may use that evidence only

16   to help you decide whether to believe their testimony and how

17   much weight to give it.

18         Number 8.

19         You have heard recordings of conversations.  These

20   conversations were legally recorded, and you may consider the

21   recordings just like any other evidence.

22         As you have also seen, there was a transcript of the

23   recordings you heard.  That transcript also undertakes to

24   identify the speakers engaged in the conversation.

25         The transcript was for the limited purpose of helping you

1   follow the conversation as you listened to the recording, and

2   also to help you keep track of the speakers.  Differences

3   between what you heard in the recording and read in the

4   transcript may be caused by such things as the inflection in a

5   speaker's voice.  It is what you heard, however, and not what

6   you read that is the evidence.

7        Whether the transcript correctly or incorrectly reflects

8   the conversation or the identity of the speakers is entirely for

9   you to decide based upon what you heard on the recording and

10  what you have heard here about the preparation of the transcript

11  and upon your own examination of the transcript in relation to

12  what you heard on the recording.  If you decided that the

13  transcript was in any respect incorrect or unreliable, you

14  should disregard it to that extent.

15       Number 9, on page 9.

16       Certain charts and summaries have been shown to you in

17  order to help explain the facts disclosed by the books, records,

18  or other underlying evidence in the case.  Those charts or

19  summaries are used for convenience.  They are not themselves

20  evidence or proof of any facts.  If they do not correctly

21  reflect the facts shown by the evidence in the case, you should

22  disregard these charts and summaries and determine the facts

23  from the books, records, or other underlying evidence.

24       Other summaries were admitted in evidence.  You may use

25  those summaries as evidence, even though the underlying

1    documents and records are not here.  However, the accuracy of

2    those summaries has been challenged.  It is for you to decide

3    how much weight, if any, you will give to them.  In making that

4    decision, you should consider all of the testimony you heard

5    about the way they were prepared.

6        All right.  Let's go to Closing Instruction No. 10, which

7    starts on page 10.

8        The indictment in this case charges Mr. Suhl as follows:

9        Count 1, conspiracy to commit federal funds bribery, honest

10   services wire fraud, or both.

11       Counts 2, 3, and 4, honest services wire fraud.

12       Count 5, bribery of an agent of a program receiving federal

13   funds.

14       Count 6, interstate travel in aid of a bribe.

15       Mr. Suhl has pled not guilty to each of those charges.

16       The indictment is, as I've told you earlier, is simply the

17   document that formally charges Mr. Suhl with the crimes for

18   which he is on trial.  The indictment is not evidence.  At the

19   beginning of the trial, I instructed you that you must presume

20   Mr. Suhl to be innocent.  Thus, he began the trial with a clean

21   slate, with no evidence against him.

22       The presumption of innocence alone is sufficient to find

23   Mr. Suhl not guilty and can be overcome only if the prosecution

24   proved during the trial, beyond a reasonable doubt, each element

25   of the crime charged.

1       Keep in mind that each count charges a separate crime.  You

2   must consider each count separately and return a separate

3   verdict for each count.

4       There is no burden upon a defendant to prove that he or she

5   is innocent.  Instead, the burden of proof remains on the

6   prosecution throughout the trial.

7       Let's go to No. 11, which begins on page 11.

8       It is a crime for two or more people to agree to commit a

9   crime.  A conspiracy is a kind of criminal partnership, an

10  agreement of two or more people to join together to accomplish

11  some unlawful purpose.  The crime of conspiracy to commit

12  federal funds bribery, honest services wire fraud, or both, as

13  charged in Count 1 of the indictment, has four elements, which

14  are:

15      One, on or before April 2007, two or more people reached an

16  agreement to commit the crimes of federal funds bribery, honest

17  services wire fraud, or both.

18      Two, Mr. Suhl voluntarily and intentionally joined in the

19  agreement, either at the time it was first reached or at some

20  later time while it was still in effect.

21      Three, at the time Mr. Suhl joined in the agreement, he

22  knew the purpose of the agreement.

23      And, four, while the agreement was in effect, a person or

24  persons who had joined the conspiracy -- who had joined in the

25  agreement knowingly did one or more acts for the purpose of

1    carrying out or carrying forward the agreement.

2        Instruction Nos. 14 and 16 that we'll get to in a minute

3    further explain these elements.

4        If all of the elements of Count 1 have been proved beyond a

5    reasonable doubt, then you must find Mr. Suhl guilty of the

6    crime charged under Count 1.  Otherwise, you must find Mr. Suhl

7    not guilty of the crime charged in Count 1.

8        We'll now go to Instruction No. 12, which commences on page

9    12.

10       Element one requires that two or more people reached an

11   agreement to commit the crime of honest services wire fraud,

12   federal funds bribery, or both.

13       The indictment charges a conspiracy to commit honest

14   services wire fraud, federal funds bribery, or both.  For you to

15   find that the prosecution has proved a conspiracy, you must

16   unanimously find that there was an agreement to act for at least

17   one of these purposes.  You must unanimously agree which purpose

18   or purposes (honest services wire fraud, federal funds bribery,

19   or both) motivated the members of the agreement to act.  If you

20   are unable to unanimously agree on at least one of these

21   purposes, you cannot find Mr. Suhl guilty of conspiracy.

22       The agreement between two or more people to commit the

23   crime of honest services wire fraud, federal funds bribery, or

24   both does not need to be a formal agreement or be in writing.  A

25   verbal or oral understanding can be sufficient to establish an

1    agreement.

2         It does not matter whether the crime of honest services

3    wire fraud, federal funds bribery, or both were actually

4    committed or whether the alleged participants in agreement

5    actually succeeded in accomplishing their unlawful plan.

6         This agreement may last a long time or a short time.  The

7    members of an agreement do not have to join in it at the same

8    time.  You may find that someone joined the agreement even if

9    you find that person did not know all of the details of the

10   agreement.

11        A person may be a member of an agreement even if the person

12   does not know all of the other members of the agreement or the

13   person agreed to play only a minor part in the agreement.

14        All right.  Let's go to page 13 and talk about element two.

15        Element two requires that Mr. Suhl voluntarily and

16   intentionally joined in the agreement.

17        If you have determined that two or more people reached an

18   agreement to commit honest services wire fraud, federal funds

19   bribery, or both, you must decide whether Mr. Suhl voluntarily

20   and intentionally joined this agreement, either at that time --

21   either at the time it was first formed or at some later time

22   while it was still in effect.

23        Earlier, in deciding whether two or more people reached an

24   agreement to commit the crime of honest services wire fraud,

25   federal funds bribery, or both, you should consider the acts and

1    statements of each person alleged to be a part of the agreement.

2    Now, in deciding whether Mr. Suhl joined the agreement, you may

3    consider only the acts and statements of Mr. Suhl.

4         A person joins an agreement to commit honest services wire

5    fraud, federal funds bribery, or both by voluntarily and

6    intentionally participating in the unlawful plan with the intent

7    to further the crime of honest services wire fraud, federal

8    funds bribery, or both.  It is not necessary for you to find

9    that Mr. Suhl knew all of the details of the unlawful plan.

10         It is not necessary for you to find that Mr. Suhl reached

11   an agreement with every person you determine was a participant

12   in the crime [sic].

13         Evidence that a person was present at the scene of an

14   event, or acted in the same way as others, or associated with

15   others, does not alone prove that the person joined a

16   conspiracy.  A person who has no knowledge of a conspiracy but

17   who happens to act in a way that advances the purpose of the

18   conspiracy does not thereby become a member.  A person's mere

19   knowledge of the existence of a conspiracy, or mere knowledge

20   that an objective of a conspiracy was being considered or

21   attempted, or mere approval of the conspiracy, is not enough to

22   prove that that person joined in a conspiracy.

23         Let's go to page 14.

24         To help you decide whether Mr. Suhl agreed to commit the

25   crime of honest services wire fraud, federal funds bribery, or

both, you should consider the elements of those crimes, which are set forth in Instructions 14 and 16.  Keep in mind, Count 1 only charges a conspiracy to commit honest services wire fraud, federal funds bribery, or both, and does not charge that those offenses were committed or completed.

The third element:

Element three requires that Mr. Suhl knew the purpose of the agreement at the time Mr. Suhl joined the agreement.

A person knows the purpose of the agreement if he is aware of the agreement and does not participate in it through ignorance, mistake, carelessness, negligence, or accident.  It is seldom, if ever, possible to determine directly what was in Mr. Suhl's mind.  Thus, Mr. Suhl's knowledge of the agreement and its purpose can be proved like anything else, from reasonable conclusions drawn from the evidence.

It is not enough that Mr. Suhl, Mr. Jones, and Mr. Carter discussed matters of common interest, acted in similar ways, or perhaps helped one another.  Mr. Suhl must have known of the existence and purpose of the agreement.  Without such knowledge, he cannot be guilty of conspiracy, even if his acts furthered the conspiracy.

Let's go now to element four:

Element four requires that one of the persons who joined the agreement took some act for the purpose of carrying out or carrying forward the agreement.

1        Mr. Suhl does not have to personally commit an act in

2   furtherance of the agreement, know about it, or witness it.  It

3   makes no difference which of the participants in the agreement

4   did the act.  This is because a conspiracy is a kind of

5   partnership so that under the law each member is an agent or

6   partner of another member and each member is bound by or

7   responsible for the acts of every other member done to further

8   their scheme.

9        To act in furtherance of an agreement does not have to be

10  an unlawful act.  The act may be perfectly innocent in itself.

11       It is not necessary that the prosecution prove that more

12  than one act was done in furtherance of the agreement.  It is

13  sufficient if the prosecution proves one such act; but in that

14  event, in order to return a verdict of guilty, you must all

15  agree which act was done.

16       Let's go to No. 13, which appears at page 16.

17       If you determine that an agreement existed and Mr. Suhl

18  joined in the agreement, then the acts and statements knowingly

19  done or made by a member of the agreement during the existence

20  of the agreement and in furtherance of it may be considered by

21  you as evidence pertaining to Mr. Suhl, even though the acts and

22  statements were done or made in the absence of and without the

23  knowledge of Mr. Suhl.  This includes acts done or statements

24  made before Mr. Suhl joined the agreement, because a person who

25  knowingly, voluntarily, and intentionally joins an existing

1    conspiracy becomes responsible for all of the conduct of the

2    co-conspirators from the beginning of the conspiracy.

3          Closing Instruction No. 14, which appears at page 17,

4    starts at page 17.

5          It is a crime to use bribery in a fraud scheme that

6    deprives the public of its right to the honest services of a

7    public official, as charged in Counts 2, 3, and 4 of the

8    indictment.  This crime has four elements, which are:

9          One, Mr. Suhl voluntarily and intentionally participated in

10   a scheme to defraud the public of its right to the honest

11   services of Steven Jones through bribery.  The scheme to defraud

12   is described as follows:  From in or about April 2007 through in

13   or about February of 2012, Mr. Suhl made several payments or

14   offered payments with the intent that Mr. Jones, who in his

15   capacity as the deputy director of the Arkansas Department of

16   Human Services, would take official actions that would benefit

17   Mr. Suhl and his businesses.

18         Two, Mr. Suhl did so with the intent to defraud.

19         Three, the scheme to defraud involved a material false

20   representation or concealment of fact.

21         And, four, Mr. Suhl used, or caused to be used, wire

22   communications in interstate commerce, here a bank wire, in

23   furtherance of, or in an attempt to carry out, some essential

24   step in the scheme.

25         If all of the elements of Count 2, 3, or 4 have been proved

1     beyond a reasonable doubt, then you must find Mr. Suhl guilty of

2     that specific count.  Otherwise, you must find Mr. Suhl not

3     guilty of the specific count.

4         Although Mr. Suhl is not a public official and does not owe

5     a duty of honest services to the public, the law prohibits him

6     from devising or participating in a scheme to defraud the public

7     of its right to Mr. Jones's honest services.

8         Page 18, same instruction.

9         It is not necessary that Mr. Jones had the power to, or

10    intended to, or did perform the official acts for which he was

11    promised or which he agreed to receive something of value.

12    Further, it is not a defense that the offer of giving of

13    anything of value to Mr. Jones was to influence an official act

14    that is actually lawful, desirable, or even beneficial to the

15    public.  The prosecution need not prove that the scheme to

16    defraud actually succeeded.  It is sufficient if Mr. Suhl knew

17    that the money was offered with the intent to induce the

18    performance of an official act by Mr. Jones.

19        The phrase "scheme to defraud" as used in this instruction

20    means any plan or course of action intended to deceive or cheat

21    another out of the right to honest services where a bribe is

22    paid with the intent that Mr. Jones take official actions or an

23    official act.  The bribery scheme may involve a, quote, stream

24    of benefits, end of quote, offered or paid in exchange for some

25    official action, even if no specific action is identified at the

1   time the bribe is paid.

2        To act with intent to defraud means to act knowingly and

3   with the intent to deceive someone for the purpose of causing

4   some loss of the right to honest services.

5        A false representation or a concealment of fact is material

6   if it has a natural tendency to influence, or is capable of

7   influencing, the decision of a reasonable person in deciding

8   whether to engage or not to engage in a particular transaction.

9   However, whether the false representation or concealment of fact

10  was material does not depend on whether the person was actually

11  deceived.

12       Each separate use of an interstate wire facility in

13  furtherance of the scheme to defraud constitutes a separate

14  offense.

15       It is not necessary that the use of an interstate wire

16  facility by the participants themselves be contemplated or that

17  Mr. Suhl actually use an interstate wire facility or

18  specifically intended that an interstate wire facility be used.

19  It is sufficient if an interstate wire facility was in fact used

20  to carry out the scheme and the use of an interstate wire

21  facility by someone was reasonably foreseeable.

22            JUROR NO. 1:  Judge, can I ask a question?

23            THE COURT:  Yes.

24            JUROR NO. 1:  Can you define an interstate wire

25  facility?

1         THE COURT:  Let's see if I do it in the rest of the

2    instructions.

3         JUROR NO. 1:  okay.

4         THE COURT:  The wire fraud counts of the indictment

5    charge that Mr. Suhl, Mr. Jones, and Mr. Carter devised or

6    participated in a scheme.  The prosecution need not prove,

7    however, that Mr. Suhl, Mr. Jones, and Mr. Carter met together

8    to formulate the scheme charged, or that there was a formal

9    agreement among them, in order for them to be held jointly

10   responsible for the operation of the scheme and the use of an

11   interstate wire facility for the purpose of accomplishing the

12   scheme.  It is sufficient if only one person conceives the

13   scheme and the others knowingly, voluntarily, and intentionally

14   join in and participate in some way in the operation of the

15   scheme in order for such others to be held jointly responsible.

16        Closing Instruction No. 15:

17        Counts 2, 3, and 4 require the prosecution to prove beyond

18   a reasonable doubt that Mr. Suhl gave Steven Jones something of

19   value with the intent to influence an official act.

20        An official act is a decision or action on a question,

21   matter, cause, suit, proceeding, or controversy, which may at

22   any time be pending, or which may by law be brought before any

23   public official, in the public official's official capacity, or

24   in the official's place of trust.  The question, matter, cause,

25   suit, proceeding, or controversy must be specific and focused

1   and involve a formal exercise of governmental power that is

2   similar in nature to a lawsuit before a court, a determination

3   before an agency, or a hearing before a committee.

4        To qualify as an official act, the public official must

5   make a decision or take an action on that question, matter,

6   cause, suit, proceeding, or controversy, or agree to do so.

7   That decision or action may include using his official position

8   to exert pressure on another official to perform an "official

9   act," or to advise another official, knowing or intending that

10  such advice will form the basis for an "official act" by another

11  official.

12       Setting up a meeting, talking to another official, taking

13  telephone calls, meeting with someone, or organizing an event

14  (or agreeing to do so), without more, does not fit that

15  definition of "official act."

16       You may consider all the evidence in this case, including

17  the nature of the transaction, to determine whether Mr. Suhl

18  intended or solicited an exchange of money for official acts.

19       Let's go to No. 16.

20       The crime of bribery of an agent of a program receiving

21  funds, as charged in Count 5 of the indictment, has four

22  elements, which are:

23       One, Steven Jones was an agent of ADHS, an agency of the

24  State of Arkansas.

25       Two, Mr. Suhl corruptly gave, offered, or agreed to give

1    money to Steven Jones in connection with some business,

2    transaction, or series of transactions of ADHS; that is, ADHS's

3    oversight of Mr. Suhl's businesses and its Medicaid

4    reimbursements to his businesses.

5        Three, ADHS's oversight and reimbursement of Mr. Suhl's

6    businesses involved $5,000 or more for each calendar year in

7    2010 and 2011.

8        And, four, ADHS received more than $10,000 in benefits in

9    2010 and more than 10,000 in benefits in 2011 under a federal

10   program involving a grant, subsidy, loan, guarantee, insurance,

11   or some other form of federal assistance.

12       If all of the elements of Count 5 have been proved beyond a

13   reasonable doubt, then you must find Mr. Suhl guilty of the

14   crime charged under Count 5.  Otherwise, you must find Mr. Suhl

15   not guilty of the crime charged in Count 5.

16       It is sufficient for the prosecution to allege intent to

17   influence a general course of conduct instead of linking a

18   particular payment to any particular action.

19       As used in this instruction, the term "agent" means a

20   person authorized to act on behalf of the ADHS and includes an

21   employee, director, office manager, or representative.

22       A person acts corruptly when that person acts with the

23   intent that something of value be given or offered to influence

24   an agent of the state in connection with the agent's official

25   duties.  A valid purpose that partially motivates a transaction

1    does not insulate participants in an unlawful transaction from

2    criminal liability.

3         Number 17.

4         The crime of interstate travel in aid of bribery, as

5    charged in Count 6 of the indictment, has four elements, which

6    are:

7         Mr. Suhl traveled from Arkansas to Tennessee on or about

8    September 11, 2011.

9         Two, Mr. Suhl traveled with the intent to promote or carry

10   on the activity of bribing Steven Jones as alleged in Count 5.

11        Three, the bribery described in Count 5 was illegal under

12   the laws of the United States.

13        And, four, after the interstate travel, Mr. Suhl knowingly

14   and deliberately did an act, or attempted to do an act, in order

15   to promote, manage, establish, or carry on the bribery described

16   in Count 5.

17        If all of the elements of Count 6 have been proved beyond a

18   reasonable doubt, then you must find Mr. Suhl guilty of the

19   crime charged under Count 6.  Otherwise, you must find Mr. Suhl

20   not guilty of the crime charged in Count 6.

21        Number 18 on page 23.

22        That concludes the part of my instructions explaining the

23   elements of the various charges.  Now I'll explain Mr. Suhl's

24   position.

25        Mr. Suhl's position is as follows:  All of the checks that

1   he gave to the 15th Street Church of God in Christ were

2   charitable donations in support of the church's ministry.

3       Number 19 on page 24.

4       One of the issues in this case is whether Mr. Suhl acted in

5   good faith.  Good faith is a complete defense to all of the

6   charges in the indictment if Mr. Suhl did not act with the

7   necessary intent to bribe Steven Jones, which is an element of

8   all the charges.  The essence of the good-faith defense is that

9   one who acts with honest intentions cannot be convicted of a

10  crime requiring fraudulent intent.

11      The phrase "good faith" includes, among other things, an

12  opinion or belief honestly held, even if the opinion is in error

13  or the belief is mistaken.  However, even though a defendant

14  honestly held a certain opinion or belief, a defendant does not

15  act in good faith if he also knowingly made false or fraudulent

16  representations or promises, or otherwise acted with the intent

17  to defraud or deceive another.  Proof of fraudulent intent

18  requires more than proof that a defendant only made a mistake in

19  judgment or management, or was careless.

20      The prosecution has the burden of proving beyond a

21  reasonable doubt that Mr. Suhl acted with the intent -- with the

22  intention to bribe Mr. Steven Jones.  Evidence that Mr. Suhl

23  acted in good faith may be considered by you, together with all

24  the other evidence in the case, in determining whether or not

25  Mr. Suhl acted with the necessary intent.

1       I turn now to the last instruction.

2       In conducting your deliberations and returning your

3  verdict, there are certain rules you must follow.  I will list

4  those rules for you now.

5       First, when you go to the jury room, you must select one of

6  your members as your presiding juror.  That person will preside

7  over your discussions and speak for you here in court.

8       Second, it is your duty, as jurors, to discuss this case

9  with one another in the jury room.  You should try to reach an

10  agreement if you can do so without violence to individual

11  judgment, because a verdict, whether guilty or not guilty, must

12  be unanimous.

13       Each of you must make your own conscientious decision, but

14  only after you have considered all the evidence, discussed it

15  fully with your fellow jurors, and listened to the view of your

16  fellow jurors.

17       Do not be afraid to change your opinion if the discussion

18  persuades you that you should.  But do not come to a decision

19  simply because other jurors think it is right, or simply to

20  reach a verdict.  Remember at all times, you're not partisans,

21  you're judges, judges of the facts.  Your sole interest -- your

22  sole interest is to seek the truth from the evidence in this

23  case.

24       Third, if Mr. Suhl is found guilty, the sentence to be

25  imposed is my responsibility.  You may not consider punishment

1  in any way in deciding whether the prosecution has proved its

2  case beyond a reasonable doubt.

3       Fourth, if you need to communicate with me during your

4  deliberations, you may send a note to me through the bailiff,

5  signed by one or more jurors.  And I will respond as soon as

6  possible either in writing or orally here in open court.

7  Remember that you should not tell anyone, including me, how your

8  votes stand numerically.

9       Do you have those notes?

10          LAW CLERK:  They're on the end.

11          THE COURT:  Those notes are right there (pointing).

12  That's where you date them and time them, write a question out.

13  Any juror can write a question out, send it to me by the

14  bailiff.  I'll either answer it in writing and send a note back

15  or tell you that I can't answer it, or I might refer you to an

16  instruction or might have you back out here in court to give you

17  other instructions.  But you'll have those forms with you in the

18  jury room so you can send a communication to me.

19       Let me say again, remember that you should not tell anyone,

20  including me, how your notes stand numerically if we come back

21  at some point before you finally reach your verdicts.

22       Fifth, your verdict must be based solely on the evidence

23  and on the law which I have given to you in my instructions.

24  And the verdict, whether not guilty or guilty, must be unanimous

25  on each count.  Let me emphasize this:  Nothing I have said or

1   done is intended to suggest what your verdict should be.  That

2   is entirely for you to decide.

3       Sixth, the verdict forms are simply the written notices of

4   the decisions that you reach in this case.  Take a moment now

5   and look over these verdicts which start on the next page there.

6   Just get your sea legs.

7       Will the lawyers approach while they're looking over it.

8       (Bench conference reported as follows:)

9           THE COURT:  What is your suggestion as to what I

10  should do about the juror's question?

11          MR. CARY:  I think we need to put it off and treat it

12  like a jury note and have a discussion about it outside their

13  presence about what the law is on that.

14          THE COURT:  In other words, what I'm thinking about

15  doing is taking a short break after I finish the instructions

16  and discuss it out here in open court.

17          MR. KELLER:  That's fine, Your Honor.

18          MR. CARY:  That's fine, Your Honor.  Yes, sir.

19      (Whereupon, proceedings continued in open court as

20  follows:)

21          THE COURT:  Let's go back to the instructions now.

22      Of course, you'll take those forms to the jury room, the

23  verdict forms, and when each of you has agreed on the verdicts,

24  your foreperson, or the presiding juror, that should be, will

25  fill in the form, sign and date it, and advise the bailiff that

1    you're returning to the courtroom.

2        Finally, remember also that the question before you can

3    never be:  Will the prosecution win or lose the case?  The

4    prosecution always wins when justice is done, whether the

5    verdict is guilty or not guilty.

6        Ladies and gentlemen, before closing arguments, we're going

7    to take a ten-minute break.  We'll try to start back at five

8    minutes after ten.  Don't start talking about the case yet.

9    Don't start making up your mind yet.

10       Let the jury stand out.  Everyone else remain seated.

11       (Whereupon, the jury exited the courtroom and proceedings

12   continued in open court as follows:)

13           THE COURT:  The jury's out.  Would the lawyers who are

14   going to speak to the issue of [Juror No. 1]'s question come

15   forward, up to the lectern.

16       What was the question?

17           MR. KELLER:  I believe the question was, Your Honor,

18   if the Court could define a facility of interstate commerce.

19           THE COURT:  You agree with that?

20           MR. LATCOVICH:  Yes, Your Honor.

21           THE COURT:  All right.  Is it in the instruction?

22           MR. KELLER:  The definition is not in the instruction.

23           THE COURT:  Do you have a proposal of how we answer

24   that, if we do?

25           MR. KELLER:  Your Honor, looking at the wire fraud

1  statute, I believe we can instruct the jury that a facility of

2  interstate commerce includes any wire, radio, or television

3  communication in interstate or foreign commerce, or any

4  writings, signs, signals, pictures, or sounds in interstate or

5  foreign commerce.

6             THE COURT:  What are you reading from?

7             MR. KELLER:  18 U.S.C. 1343, Your Honor.  It's the

8  wire fraud statute.

9             THE COURT:  All right.  What says the defense?  I'm

10  going to give a definition of some sort, so --

11             MR. LATCOVICH:  Your Honor, I think the issue the

12  juror raised is what is an interstate wire facility, and I think

13  the definition that we just heard was at least one potential

14  definition of an interstate wire, not an interstate wire

15  facility.  I think this is the standard instruction, Your Honor,

16  and I think this is best addressed by closing argument, if the

17  government wants to argue what an interstate wire facility is.

18             THE COURT:  What instruction are you suggesting?

19             MR. LATCOVICH:  I'm suggesting we stick with the

20  instruction that's been given, Your Honor.

21             THE COURT:  The instructions that have been given?

22             MR. LATCOVICH:  Yes, Your Honor.

23             THE COURT:  What one are you referring to that has

24  been given that covers this?  What instruction?

25             MR. LATCOVICH:  Instruction 14, Your Honor.

1      THE COURT:  All right.  I'm going to go over to 14 and

2  take a look at it.

3      MR. LATCOVICH:  I don't think there's a particular

4  definition of interstate wire facility, but not every term in

5  these jury instructions is defined, Your Honor.

6      THE COURT:  No.  But we have a question by a juror of

7  what it is, and I need to tell them what the law is on it.  What

8  is your objection to what the prosecution read?

9      MR. LATCOVICH:  It's not the definition of an

10  interstate wire facility.

11      THE COURT:  What is it?

12      MR. LATCOVICH:  It's the definition of an interstate

13  -- at best, it's the definition of an interstate wire.

14      THE COURT:  What does the prosecution say about that?

15      MR. KELLER:  Your Honor, I'm reading from Instruction

16  14 now on page 19 of the instructions, at the top --

17      THE COURT:  All right.  Wait just a minute.  Let me

18  get there.  All right.

19      MR. KELLER:  So the instruction reads, starting at the

20  bottom of 18, actually -- I'm sorry, Your Honor -- "It is not

21  necessary" --

22      THE COURT:  Bottom of what?

23      MR. KELLER:  The bottom of 18.  The bottom of 18, and

24  then it carries over to the top of 19.  "It is not necessary

25  that the use of an interstate wire facility by the participants

1    themselves be contemplated or that Mr. Suhl actually use an

2    interstate wire facility or specifically intended that an

3    interstate wire facility be used.  It is sufficient if an

4    interstate wire facility was in fact used to carry out the

5    scheme and the use of an interstate wire facility by someone was

6    reasonably foreseeable."

7         Your Honor, it is the government's position that in that

8    instruction, which I believe is where the juror raised his hand

9    and asked a question, that that instruction would be legally

10   correct and not misleading if the word "facility" was removed in

11   each of those references.  The references here in this paragraph

12   are clearly to the interstate wire itself.  It is not talking

13   about a facility from which wires are sent.  It's not like

14   saying the defendant had to go to the interstate wire store and

15   send an interstate wire.  It's referencing the interstate wire

16   itself.  And for that reason I think referencing back to the

17   definition that I read from the statute would be appropriate.

18        THE COURT:  What if I just took out the "facility" and

19   reread that and told them to strike "facility" and leave it at

20   that?

21        MR. KELLER:  I would have no objection to that either,

22   Your Honor.

23        MR. LATCOVICH:  Just to be clear, Your Honor, are you

24   -- we're talking about the paragraph that begins on the bottom

25   of page 18?

 1          THE COURT:  That's correct.  Take the word "facility"

 2   out of that sentence.

 3          MR. LATCOVICH:  I'm taking a second to go back to the

 4   statute, Your Honor.

 5       (Mr. Latcovich reviews document.)

 6          THE COURT:  I could say a wire transfer or check by

 7   wire, but that might be too specific.

 8          MR. LATCOVICH:  We would agree that that would be too

 9   specific, Your Honor.

10          THE COURT:  Thought you would.

11          MR. LATCOVICH:  Your Honor, I think omitting

12   "facility" would work.

13          THE COURT:  All right.  Whoa.  Just a minute here.

14   I'm looking at Eighth Circuit Model Jury Instructions, page 399:

15   Deprivation of the Intangible Right of Honest Services.  "Four,

16   the defendant used, or caused to be used, [the mail] [a private

17   interstate carrier] [a commercial interstate carrier] [an

18   interstate wire facility (identify the specific wire facility,

19   that is, telephone, email, et cetera)]..."

20       All right.  You all take a look at this.

21       Mr. Morgan, would you hand this to the lawyers?  Look at

22   the yellow highlighted part.

23          MR. KELLER:  Your Honor, I did just review that.  So

24   earlier in the instruction, on page 17 of Instruction No. 14 --

25          THE COURT:  Wait.  Let me get with you.  Page 17 --

1    you say page 17?

2            MR. KELLER:  Yes, Your Honor, page 17.

3            THE COURT:  Where on page 17?

4            MR. KELLER:  In the paragraph that starts with the

5    italicized word "Four," number four.

6            THE COURT:  Yeah.

7            MR. KELLER:  So in that regard, the instruction reads:

8    "Mr. Suhl used, or caused to be used, wire communications in

9    interstate commerce, here a bank wire."  So I believe that

10   addresses the specific issue that the Court just referred the

11   parties to in the model instruction where it says, "Identify the

12   specific wire facility, i.e., telephone, email, et cetera."

13   Here we identified a bank wire.  I think based on that, Your

14   Honor, the Court could instruct the juror that the interstate

15   wire facility alleged in this case was a bank wire and just

16   leave it at that.

17           THE COURT:  Why not tell them to read what he asked

18   the question about and say turn now to page 17 and read

19   paragraph four?

20           MR. KELLER:  I would have no objection to that either,

21   Your Honor.

22           THE COURT:  What says the defense?

23           MR. LATCOVICH:  I'm sorry, Your Honor.  Is this in

24   lieu of editing the paragraph that begins on the bottom of page

25   18?

1          THE COURT:  Yes.

2          MR. LATCOVICH:  And instead you just want to point the

3     juror back to the particular element that says "Four"?  Is that

4     what you're saying?

5          MR. KELLER:  Yes.

6          MR. LATCOVICH:  Yes.  No objection, Your Honor.

7          THE COURT:  All right.  Do you all want to take a

8     three- or four-minute break?

9          MR. KELLER:  I wouldn't mind that, Your Honor.  Yes.

10         THE COURT:  We'll start back at probably 12 after, or

11    something like that.  Tell the jury we're working, that we're a

12    little late.

13         MR. CARY:  Your Honor, we would like to put on record,

14    before we break, that we renew our objections to --

15         THE COURT:  You say you want to go on the record?

16         MR. CARY:  I just want to renew our objections to the

17    charge, to note our previous objections, that's all, so we don't

18    have to do it in front of the jury.

19         THE COURT:  The overall charge, you mean?

20         MR. CARY:  Yes.

21         THE COURT:  All of your objections to the charge?

22         MR. CARY:  Just preserve them.

23         THE COURT:  Overruled.  The ruling's the same.

24    Exception saved.

25         MR. CARY:  Thank you, Your Honor.

1     (Recess from 10:08 a.m. until 10:13 a.m.; jury not

2  present.)

3          THE COURT:  Before we bring the jury back, I want to

4  talk to you about the next break.  Normally, I would not have

5  taken a break now and I would have taken a break at the end of

6  the prosecution's first argument.  I'll either do it that way or

7  I could do it 30 minutes into the defense's closing argument.

8  That would give you a 15-minute break to collect your thoughts.

9  But at the same time, I don't want to interrupt you with a break

10 if you don't want it done.

11         MR. CARY:  Your Honor, that would be acceptable.

12 Thank you.

13         THE COURT:  That would be what?

14         MR. CARY:  That would be fine.

15         THE COURT:  You would like to have a break at 30

16 minutes?

17         MR. CARY:  Yes.

18         THE COURT:  We'll take our next break after the

19 defense's first 30 minutes.  All right.

20     We'll be in recess one minute while we get the jury back

21 in.  It might take longer than that.

22     (Recess from 10:15 a.m. until 10:17 a.m.; jury present.)

23         THE COURT:  With respect to the question that [Juror

24 No. 1] raised, I believe that was what I read on pages 18 and

25 19.  Quote:  It is not necessary that the use of an interstate

1    wire facility by the participants themselves be contemplated or

2    that Mr. Suhl actually use an interstate wire facility or

3    specifically intended that an interstate wire facility be used.

4    It is sufficient if an interstate wire facility was used in fact

5    -- was in fact used to carry out the scheme and the use of

6    interstate wire facility by someone was reasonably foreseeable.

7            That's what raised your question, was it not?

8            If you will, turn to page 17 of the instructions, paragraph

9    four.  Page 17 of the instructions, paragraph four.

10           Quote:  Mr. Suhl used, or caused to be used, wire

11   communications in interstate commerce, here a bank wire, in

12   furtherance of, or in an attempt to carry out, some essential

13   step in the scheme.

14           I hope that answers your questions.

15           JUROR NO. 1:  Okay.

16           THE COURT:  All right.  We'll now have closing

17   argument.  We'll start with the prosecution.  And give the

18   lawyers your careful attention, please.

19           MS. VAUGHN:  Those pictures on your screens are

20   pictures of a man making a bribe payment.  They're pictures of

21   that man (pointing), the defendant, Ted Suhl, making a bribe

22   payment.

23           (Audio clip 8-A played in open court.)

24           MS. VAUGHN:  That was a recording of a man asking for

25   official acts.  That was a recording of that man (pointing), the

1   defendant, Ted Suhl, asking for official acts.

2        There is really only one question that you have to decide

3   in this case, one simple question.  Judge Wilson just instructed

4   you on the elements of all these crimes, but if you answer this

5   question, all the rest of those elements will fall into place.

6   And that question is this:  The Millenia checks written to the

7   15th Street Church of God in Christ, what were those checks for?

8   And after seeing all the evidence in this case, that question

9   has one simple answer:  Those checks were for Steve Jones.

10  Those checks were to pay Steve Jones to influence him in his

11  official acts.  And we're going to talk about all the ways that

12  you know that.

13       First, those checks were only written to the church when

14  the defendant was meeting with Steve Jones.  You know that

15  because you saw how the check was tied to that meeting in 2011.

16  It started with the calls.  In 2011, it started with the call we

17  just heard.  The defendant made his demand that Phillip Carter's

18  buddy, Steve Jones, put a stop to the Mid-South referral policy.

19  And you remember this chart (indicating), and you remember what

20  Agent Spainhour told you about this chart.  Every time Phillip

21  Carter called and talked to the defendant between the time he

22  made that request and when he met with Steve Jones is on this

23  chart and is going to be on a CD that will be back there with

24  you.  You can listen to them.  And every time Phillip Carter

25  talked with Steve Jones, from the time the defendant made the

1    request and when they met, will be on this chart and will be

2    back there for you to listen to.  And you'll see every time the

3    defendant talked to Phillip Carter after that first call, they

4    talked about either setting up a meeting with Steve Jones or

5    getting Steve Jones to do what needed to get done.  And every

6    time that he talked to Steve Jones after that time was about the

7    same thing.  And it was only after that meeting had been

8    arranged that that check from Millenia to 15th Street Church of

9    God in Christ got written.

10          You remember the meeting the defendant had with Phillip

11   Carter on September 8 at Colton's.  It was just the two of them.

12   And afterwards, Phillip Carter called his boss, Chip Barnes, and

13   what did he tell him?  He told him a meeting had been set for

14   that Sunday, September 11, with Steve Jones.  They had set that

15   meeting on September 8.  And what happens the very next day?  A

16   check gets issued to the church, only after the Colton's

17   meeting, only after the Steve Jones meeting was set.  And you

18   watched that meeting.  You saw the defendant pick up Phillip

19   Carter from the Cracker Barrel in West Memphis, Arkansas.  You

20   saw him drive to Memphis, Tennessee, to the Texas de Brazil.

21   You saw him meet Steve Jones inside.  And afterwards you saw

22   them head back to West Memphis, Arkansas, and you saw them part

23   ways in the Cracker Barrel parking lot.  And when the three of

24   them were inside that restaurant, when the defendant knew he was

25   going to get what he was paying for, Steve Jones, the defendant

1    made that payment.  And watch how he does it, folks.  And note

2    this time stamp because you can go back there and watch this

3    again.

4          (Video clip played in open court.)

5          Did you see how the defendant waited until Steve Jones left

6    the table and couldn't see what was going on?  He looks to make

7    sure Steve Jones is gone.  Then he sneaks over to Phillip

8    Carter's side of the table.  And look how close he gets to

9    Phillip Carter.  Look how uncomfortably close he bends over him.

10   They're the only two people at the table.  Why does he need to

11   get that close?  And you saw how quickly the defendant shoved

12   the check into Carter's hand and continued to bend over him

13   until he had put it away.

14         Ladies and gentlemen, when you go back into that room to

15   deliberate, you don't have to check your common sense at the

16   door, and this is one of those moments where your common sense

17   comes in.  Why is the defendant passing the check that way?

18   It's not because he wants to make a private donation.  And by

19   the way, which way does the defendant want it?  On the one hand,

20   he tried to explain this check away by saying he always made

21   anonymous donations, but on the other he paraded many people in

22   here yesterday to tell you about his reputation for making

23   donations.  Those two positions are not consistent, it doesn't

24   make sense, and you know why.  Because this is not an anonymous

25   donation.  If he wanted to make a private donation, he would

1   have given Phillip Carter the check in the Cracker Barrel

2   parking lot before they ever left West Memphis.  He would have

3   given it to him on the way over to Texas de Brazil.  He would

4   have given it to him in the parking lot of Texas de Brazil, or

5   on the way back from Texas de Brazil, or even in the parking lot

6   of the Cracker Barrel when he got back, or at Colton's three

7   days earlier, or he would have mailed it to the church, or he

8   could have given it directly to Pastor Bennett.  The defendant

9   said the Pastor is the church.  But he didn't do any of that.

10  He didn't do any of it.  Instead, he waited until he was at

11  Texas de Brazil with Steve Jones.  He waited until no one was

12  around to pass the check, because that check was for Steve

13  Jones.  That's not how you make a charitable contribution.

14  That's not how you pay Phillip Carter.  That's not how you give

15  a donation to Pastor Bennett.  That's how you buy Steve Jones.

16      How else do you know that check was for Jones?  Because

17  when Carter eventually paid him, Jones was expecting it.

18  Remember that call with regard to the payment.  Carter asked

19  Jones if he's going to be in town because he has that little

20  package he owes him from the last meeting.  And what's Jones's

21  response?  "Oh, yeah, I'm in town."  He doesn't say:  What are

22  you talking about?  What package?  What meeting?  He doesn't say

23  any of that.  Instead, he tells Carter that Carter's kind of

24  like the Lord; he doesn't always come when you want him, but he

25  comes right on time.  And when Carter handed Jones a thousand

1   dollars in cash through a car window, Jones didn't ask any

2   questions.  Jones knew exactly what that money was for.  He came

3   in here and he admitted that that money was tied to that Texas

4   de Brazil meeting.  He admitted that he thought that that money

5   was coming from the defendant.

6        And ladies and gentlemen, we're going to talk about Steve

7   Jones in a minute, but for now, he came in here yesterday and

8   admitted where that money came from.  And when did he do that?

9   When my colleague Mr. Keller confronted him with the recording

10  of his own voice planning that cash drop and talking about what

11  the defendant wanted from him, he admitted it when he was

12  confronted with the tapes and couldn't deny it anymore.  And why

13  did he know that it came from the defendant?  Because Carter had

14  had that package for him so many times before, always after

15  those meetings, and Jones accepted it, no questions asked.

16       Now, the defense is going to get up here and tell you that

17  the FBI gave Carter that money to complete the bribery scheme,

18  that the FBI picked Carter to set up this crime.  And what's

19  your answer going to be to them?  The FBI didn't pick Carter.

20  The defendant picked Carter.  The defendant had been picking

21  Carter for years.  You heard it on the tape.  The defendant

22  picked Carter to pass his request to Steve Jones.  The defendant

23  picked Carter to set up that meeting.  The defendant picked

24  Carter to take that check.  You saw it right there (indicating).

25  You saw the defendant pick Carter.  He had Carter do his dirty

1    work, he had Carter pass his bribes.  All the FBI did was

2    confirm that that was the case.

3         And how do you know the defendant was paying for him in

4    2011?  How do you know he was paying to influence Steve Jones?

5    Because you heard it straight from the defendant's own mouth.

6    On the call I played for you at the beginning, the defendant

7    wanted Jones to put a stop to the Mid-South policy.  That

8    nonprofit was getting $10 million a year in Medicaid

9    reimbursements in that region, and the defendant wanted a piece

10   of that $10 million pie for his for-profit enterprises.  And

11   every conversation you heard about Mid-South around that

12   September 11 meeting was about getting action from Jones, and

13   getting it quietly, without a big fight.  Carter didn't bring up

14   that issue.  The defendant did (pointing) because it would

15   benefit the defendant's companies and he wanted it done.

16        And the defense wants you to think that this is just about

17   fairness.  The defendant sat up here yesterday and tried to tell

18   you that the referral policy was illegal and he just wanted to

19   stop it.  Well, one, when they tried to make that point, what's

20   your answer to that?  So what.  That's not a defense.  You know

21   that's not a defense because Judge Wilson just instructed you

22   that paying for official action is bribery, no matter whether

23   that official action would benefit the public or not.  And two,

24   you know the defendant was only looking out for himself.  And a

25   legal policy he wanted changed?  Please.  If you think something

1    illegal is happening at DHS and your only interest is in getting

2    that stopped, you don't have Phillip Carter, a Crittenden County

3    probation officer, pass that message along for you.

4         You heard the defendant tell Phillip Carter he was

5    marketing for referrals in Blytheville and he had to get the

6    policy changed to do it.  It's not about fairness.  The

7    defendant wanted DHS to change the rules to help his business

8    and he paid to do it.  That's not about fairness.

9         And folks, there aren't magic words the defendant had to

10   say for you to find bribery.  The Judge told you that.  You know

11   it's bribery based on everything the defendant and his

12   co-conspirators said and did, on camera and on tape.  You heard

13   the purpose of that meeting and the calls; it was to address the

14   Mid-South issue.  The defendant told you they talked about

15   business at that meeting.  And you heard the defendant claim the

16   only reason meeting with Steve Jones ever came up in the first

17   place was because he was complaining about DHS policies.  You

18   don't complain to the second highest ranking official at the

19   agency that could fix your problem just to complain.  You

20   complain to get something done about it.  And when you add money

21   to that attempt to get something done, that's a bribe.  And you

22   know the defendant wasn't just paying to meet with Steve Jones

23   either.  Steve Jones told you he would have met with the

24   defendant without getting paid.  Steve Jones had an open-door

25   policy.  So the defendant didn't have to pay to meet with Jones.

1   So what did he have to pay for?  He had to pay for action.

2   Official action.  And he wanted results.  He wanted Steve Jones

3   to put a stop to it.  He even told him how he could do it:

4   "Write a memo or just tell the people who work for you to stop."

5        Remember what he told Phillip Carter one point about the

6   monitoring notes?  He said, "You're going to really have to

7   press him, really have to press Steve Jones, because you know

8   how he is, and I'd like to see them.  I'd like to see them."

9   That's what he's paying for.  He was paying so that when

10  something came up, he could count on Steve Jones to be there for

11  him.

12       And let's talk about the defendant for a minute.  Remember

13  his reaction to the tapes when Mr. Keller played them for him?

14  Remember when he sat up there (pointing), slumped down, started

15  talking quietly when those tapes were played?  And he tried to

16  avoid even acknowledging the words on the screen.  He tried to

17  twist those words beyond reason as he sat there yesterday to

18  make you think that what he said on those calls, what he said

19  when he thought no one was listening, wasn't what he meant.  You

20  know what he meant.  He meant to have Steve Jones put the stop

21  to it, he meant to have Steve Jones giving inside information,

22  and he meant to pay for it.

23       So right there, right there on your screens, where the

24  defendant handed off that check, that's the crime.  When he made

25  that payment intending that it go to Steve Jones and intended

1   that it induce Steve Jones to help the defendant's companies,

2   that was the bribe.  It doesn't matter if Phillip Carter

3   secretly kept the money later.  Judge Wilson told you in those

4   instructions, bribery is about what the defendant intended when

5   he made or offered the payment.  You know from what you heard

6   exactly what the defendant intended that check to be for, right

7   there, on September 11.  And how else do you know that that

8   check was a bribe?  Think about how the defendant talked about

9   the scheme with Phillip Carter.  Think about how Carter and

10  Jones talked.  They'd clearly done this before.  They used code

11  words.  When the defendant talked to Carter, it was never:  Ask

12  Steve this or tell Steve this.  It was:  Ask your buddy, tell

13  your buddy.  The defendant used plenty of other people's names.

14  He talked about Janie Huddleston, Phillip Carter by name, Pastor

15  Bennett, Scott Tanner, the guy behind that legislation they were

16  discussing.  So this isn't just how the defendant talks.  He's

17  using code words to tell the defendant [sic] when he talks about

18  Steve Jones, and it's because he had something to hide.  That's

19  how crime works.  That's how corruption works.  You hide what

20  you're doing because it's bribery and it's against the law.

21       And look at what Jones said when he tells Phillip Carter he

22  has some inside information for the defendant.  He tells Carter

23  they ought to get back on schedule.  We ought to get back on

24  schedule.  Jones admitted to you what that meant.  He wanted to

25  schedule another meeting so he could get paid by Ted Suhl.  He

1  wanted Ted Suhl to think he was still trying to look out on the

2  inside, because Steve Jones knew he only got paid when the

3  defendant thought he was doing something for him.  He knows the

4  deal.  You can tell by the way they talk about it.  And think

5  about what the defendant never says on these calls.  He never

6  says:  Hey, I got that check for the church, I got that donation

7  for Pastor Bennett.  I'll bring that money for the church on

8  Sunday.  He never says that.  You can listen to every call and

9  you won't hear it.  And why?  Because those payments weren't for

10  the church.  They were for Steve Jones, just like they always

11  had been.  He didn't need to tell Carter that, and he didn't

12  want to.  This is a bribery scheme; you don't talk about money

13  on the phone if you don't have to.

14      So we've talked about one check in 2011.  And you saw calls

15  about a meeting, an official act, and you saw the defendant meet

16  with Steve Jones and Phillip Carter at Texas de Brazil, where

17  the defendant used his credit card to pay for dinner.  And you

18  heard how familiar the defendant and the co-conspirators were

19  with the scheme, how little they had to say to make it happen.

20      Katherine Black, the FBI forensic accountant you heard

21  from, told you that she reviewed phone records, bank records,

22  and credit card statements covering the entire length of the

23  scheme, 2007 to 2011.  She used what she saw, and she used what

24  she knew from 2011.  The same thing you saw on the video, the

25  photos and you heard on the tapes, she used that to see if

1   anything like that happened before in the records.  And what did

2   she discover?  She discovered that for 13 of the 14 checks

3   Millenia wrote to the 15th Street Church of God in Christ during

4   that time, she discovered the same cluster of activity; the

5   calls between Carter and the defendant, the calls between Jones

6   and Carter, a credit card charge for around 150 to $200, a check

7   to the church.  And because you heard those calls yourselves,

8   saw that check get passed, saw the meeting, saw the credit card

9   charge in 2011, you know exactly what was going on at all those

10  clusters of activity and all those other times.  The defendant

11  admitted that he met with Steve Jones multiple times.  You know

12  exactly what those other checks were for.

13       And what else did Ms. Black discover?  The Millenia check

14  was never deposited before that charge at Texas de Brazil.

15  Never.  Think about that.  Sometimes the check was written

16  several days before the Texas de Brazil charge but still not

17  deposited until that meeting.  That's because that check is tied

18  to that meeting.  And what was that meeting about?  Influencing

19  Steve Jones and paying him for it.

20       And why pass the money to Jones through a church?  Well,

21  the defendant and his family had been writing checks to the

22  church for years.  They had a long-standing business

23  relationship with the church.  He was happy to give money to

24  Pastor Bennett.  But that's the point, isn't it?  That's the

25  point.  Criminals try to cover up their crimes.  They wouldn't

1    be good criminals if they didn't.  And that's what the defendant

2    was doing here.  He had been writing checks to Pastor Bennett

3    and the 15th Street Church of God in Christ for years.  Who was

4    going to notice when he sprinkled some bribe payments in there

5    too?

6         Phillip Carter told you that he and Pastor Bennett

7    understood exactly what the defendant was trying to do.  They'd

8    come up with a cover story in case anybody asked, that these

9    were all donations.  And you heard when Steve Jones showed up at

10   Pastor Bennett's house after he'd been approached by the FBI,

11   Pastor Bennett used that cover story.  You heard those tapes

12   here in court.  But everyone knew what those checks were really

13   for.  Pastor Bennett confirmed it.

14        Remember Pastor Bennett's response when Carter said:

15   "Every check that we got from Ted came to the church.  You cash

16   -- you gave me cash.  I gave him," referring to Steve Jones,

17   "cash."  "You didn't give him no money?"  And what's Bennett's

18   response?  "That's right."  "That's right."  Did you hear Pastor

19   Bennett deny the scheme?  No.  He confirmed it.

20        Ladies and gentlemen, those checks were written to the

21   church to stop this day from ever coming, to stop any light from

22   being shed on the true purpose of those checks.  That's why the

23   defendant wrote checks from a Florida company with an unfamiliar

24   name and passed them through a church.  He hid behind the

25   church.  But light has been shed on those checks, and everybody

1    in the bribery scheme knew the church was the cover, and now you

2    know it too.

3        And we talked about a couple of the ways the defendant

4    tried to influence Jones already.  We talked about the Mid-South

5    referral and the monitoring notes, but let's talk about a few

6    more.  He asked Steve Jones to help get the area expanded from

7    which his companies could get patients.  Remember what Phillip

8    Carter told you and what you saw in the documents.  The

9    defendant had an office in Marion.  He wanted to get patients

10   from Forrest City.  He couldn't open a new office, so he had to

11   get the radius expanded.  His lobbyists had been working on it

12   for years, and he tried to get Steve Jones to take care of it

13   for him.  He tried to get the number two guy at the department

14   to take care of it for him.  The defendant wanted Steve Jones to

15   take over Medicaid.  Jones admitted to you that he had switched

16   departments before, so why couldn't he do it again?  Think what

17   that would have meant to the defendant, the guy on his payroll

18   controlling Medicaid payouts.  And he paid Jones to try to get

19   him to pressure other government officials.  He wanted to be

20   reappointed to the Child Welfare Board by the governor.  Jones

21   told you he made that request.  And he paid him to help support

22   legislation.  Jones told you about that too.

23       And how do you know the defendant was paying to try to

24   influence official acts instead of just voicing a provider

25   concern with no strings attached?  Think about how the defendant

1    reached out to Jones.  He did it through Phillip Carter.  You

2    heard that.  Phillip Carter was the go-between.  But you heard

3    Steve Jones; he handed out more business cards than anyone in

4    the history of DHS, he said.  He had an open-door policy.  Even

5    Mr. Romain acknowledged in opening that Steve Jones wanted the

6    people of Arkansas to have direct access to him.  So if that's

7    the case, why is Ted Suhl going through a Crittenden County

8    probation officer to talk to Steve Jones; going through Carter

9    to set up the meeting to tell Jones about the problem?  Why is

10   he meeting with Steve Jones on a Sunday, after church, out of

11   state, in Memphis, Tennessee?

12        Ted Suhl had direct dealings with Steve Jones before too.

13   You saw that contract that they entered into in 2004, when the

14   defendant agreed to pay Steve Jones a thousand dollars a month

15   for no work and while Steve Jones was a state legislator.  Both

16   of their signatures are on here.  They knew each other.  They

17   had had direct dealings.  So why not go straight to Jones?  You

18   know why.  Because this was not on the up and up.  This was not

19   a typical constituent request.  This was bribery.  The defendant

20   was just asking Steve Jones to fix his problems and he was

21   paying him to try to get him to do it.  And he didn't want

22   anyone to know about it.  You don't talk to the public official

23   you're bribing on the phone about it.  You use a middleman, and

24   that's what the defendant did with Phillip Carter.  You heard it

25   on the wires, you saw it in the records, and you heard it from

1    Phillip Carter.  The defendant used Carter to distance himself

2    from Jones and those payments.  He used Carter to keep his hands

3    just a little bit cleaner to get some plausible deniability.  He

4    hid behind Carter just like he hid behind the church.  And now

5    Carter's in prison.  You saw him come in here in his prison

6    jumpsuit.  But that's because Carter committed a crime.  Carter

7    helped the defendant (pointing) bribe Steve Jones.

8        And, now, maybe the defendant didn't always get what he

9    wanted from Jones.  But what he actually got isn't what matters

10   under the law.  Judge Wilson just told you that, and there it is

11   on your screen.  What matters is what the defendant intended

12   that money to buy.  So when Mr. Cary gets up here and tries to

13   get you to focus on what Mr. Jones didn't do for the defendant,

14   don't let him distract you from what's really at issue in this

15   case.  This is about what Ted Suhl did.  This is about what Ted

16   Suhl wanted.  This is about what Ted Suhl was paying for.  And

17   what he was paying for was an insurance policy.  He was paying

18   so he could try to influence Steve Jones in his official acts.

19   You can't pay a public official with the intention that in

20   return they'll help you out whenever the opportunity might

21   arise.

22       And why did the defendant do these things?  Think about it.

23   These were all ways -- why did he want these things?  They were

24   all ways the defendant could protect and expand his Medicaid

25   dollars.

1       That DYS legislation, for example, think about that.  That

2  would have set a precedent of no-bid contracts.  No-bid

3  contracts.  And what did Anita Castleberry tell you, from DHS?

4  Defendant's companies made over $125 million a year in Medicaid

5  reimbursements between -- or $125 million total over 2007 to

6  2011 in Medicaid reimbursements.  They made $28 million in 2011

7  alone.  And Katherine Black, the forensic accountant, told you

8  just how much that was worth in the defendant's own pocket.

9  When you follow the trail from the Arkansas companies through

10  the Florida holdings and back into the defendant's pocket, you

11  see the defendant was raking in millions from his Medicaid

12  businesses every year.  The defendant admitted yesterday that he

13  made money off those kids.

14       THE COURT:  You have about five minutes.

15       MS. VAUGHN:  That's why it was huge when Steve Jones

16  became the number two guy at DHS.  The defendant had someone on

17  the inside.  And let's talk about Steve Jones.  The government

18  brought him in here so you could see him, warts and all.  That

19  man was an exhibit for what corruption does.  It's a fact.  You

20  heard Mr. Cary ask Steve Jones about all the things he'd done in

21  his life, and you saw how proud he was of his accomplishments.

22  But Steve Jones was also in Ted Suhl's pocket for four years.

23  And even though he came in here and admitted what he did, he was

24  still too proud to call it what it was; bribery.  Instead you

25  saw him come in here and squirm.  You saw him try to avoid

1    giving a straight answer.  He said he was given thousands of

2    dollars over the course of years to advise on a video and a

3    magazine.  But he finally told you what he did when he was

4    confronted with those tapes.  Jones accepted bribes.  He's in

5    prison for it.  He accepted bribes from the defendant

6    (pointing).

7        Ladies and gentlemen, the defendant tried to hide behind

8    Phillip Carter, he tried to hide behind the church, but he

9    couldn't hide from those tapes when he sat up there and

10   testified yesterday.  And he can't hide from that video, and he

11   can't hide from those photos, and he can't hide from the

12   records.

13       The evidence is clear, the defendant engaged in a years'

14   long bribery scheme.  He kept Steve Jones on his payroll so that

15   when he needed something from DHS, Steve Jones would be at the

16   ready.  You heard it on the calls, you saw it in the video, you

17   saw it in the records, you saw it in the photos, and you heard

18   it in the testimony.  So what's the answer to that simple

19   question:  What were those checks for?  Those checks were to

20   bribe Steve Jones.

21       And so the defendant committed a crime.  He committed

22   several crimes.  Let's talk about them.  Let's talk about honest

23   services bribe.  Why is the defendant guilty of honest services

24   wire fraud?  Every citizen of the state of Arkansas was entitled

25   to the honest services of Steve Jones while he was deputy

1    director at DHS.  Every citizen was entitled to have Steve Jones

2    make decisions solely on what was best for the public and not

3    what was best for his wallet and Ted Suhl's businesses.

4         So when the defendant paid Steve Jones to make decisions in

5    his favor, he deprived the citizens of their right to honest

6    services, and the defendant and Steve Jones and everyone else

7    hid that from the public.  And every time he did it by check, he

8    committed honest services wire fraud.  Ms. Townsley, the

9    representative from Regions Bank, she told you that in order for

10   the money to be pulled off the Millenia account, an image of the

11   check has to be wired from Tennessee to Alabama.  That's the

12   interstate wire.  When you use interstate wires to further your

13   bribery, it is honest services wire fraud.  You saw the

14   defendant cause interstate wires on 13 checks, but he's only

15   charged with the last three; the one in September 2011 that you

16   watched, and the one in August 2010 and September 2010.

17        The defendant is also charged with federal funds bribery.

18   There's four elements.  Let's walk through each.  One, Steve

19   Jones was an agent of DHS, an employee of a state agency.  Two,

20   that agency received more than $10,000 a year in 2010 and 2011

21   in federal funds.  In fact, it earned billions of dollars a year

22   in federal Medicaid money.  Three, the defendant corruptly gave

23   Steve Jones money in connection with business at DHS.  What was

24   that business?  It's oversight and control of the Medicaid

25   reimbursements that the defendant's companies were getting each

1  year.  The defendant was paying to protect that.  And four, that

2  business was worth more than $5,000 in each year, in 2010 and

3  2011.  You heard it was worth millions.  When the defendant

4  bribed an agent of a state agency that received billions of

5  dollars a year in federal money and he did it to protect

6  millions of dollars a year in Medicaid business, he's guilty of

7  federal funds bribery.

8       Interstate travel in aid of bribery, what does that mean?

9  It means when you travel across state lines to further your

10  bribery scheme, you've committed a crime.  Why is the defendant

11  guilty of this?  Because as you heard and saw, on September 11,

12  2011, the defendant picked up Phillip Carter in West Memphis,

13  Arkansas, they drove across the state line to Memphis,

14  Tennessee.  And why did the defendant do that?  You saw it on

15  the tape.  So he could pay off Steven Jones.  When the defendant

16  traveled across state lines to commit bribery, he committed

17  interstate -- he's guilty of interstate travel in aid of

18  bribery.

19       Finally, let's talk about conspiracy.  What is conspiracy?

20  It's an agreement to commit a crime.  And what did you see here?

21  The defendant agreed with Steve Jones, Phillip Carter, and

22  Pastor Bennett to commit all the crimes we just talked about; to

23  help the defendant bribe Steve Jones and to help Steve Jones

24  accept bribes.  It's that simple.  An agreement and one act to

25  further it.  You only need to find and agree on one act.  You

1    saw there are many acts that these folks took to move the plan

2    along.  And the agreement doesn't have to be openly talked about

3    either.  And you saw how little the defendant and his

4    co-conspirators had to discuss what the goal was to know what

5    needed to be done.

6         Ladies and gentlemen, throughout this case, witnesses and

7    the defense have been referring to Phillip Carter as a hustler.

8    The defense wants you to think that this scheme was another

9    Phillip Carter hustle.  This was not Phillip Carter's hustle.

10   This was the defendant's hustle.  He hustled the citizens and

11   the State of Arkansas.  He was receiving millions of dollars a

12   year from the State of Arkansas, and to keep that money flowing,

13   he bought someone on the inside.  He bought Steve Jones, and he

14   kept him on the payroll for four years.  He bought an insurance

15   policy.  And by doing so, he cheated the citizens of this state

16   out of their right to Steve Jones's full and honest service.

17             THE COURT:  You have about a minute to wrap it up.

18             MS. VAUGHN:  He cheated the citizens of this state of

19   having a public official who acted only in the interest of what

20   is best for the public, not for the interest of what is best for

21   Ted Suhl.  That is bribery.  That is corruption.  The defendant

22   is guilty.

23             THE COURT:  For the defense.

24             MR. CARY:  Thank you very much.

25        Not one conversation, not one dollar, not one act.  That's

1    what Alex said in opening statement.

2         We've now heard all the evidence, heard the testimony.

3    We've heard the evidence about the incredible investigation that

4    took place in this case; cooperators wearing wires, wiretaps,

5    surveillance, threats made to wives to get people to plead

6    guilty.  After all that evidence, it's still true what we opened

7    with:  Not one conversation, not one dollar, not one act between

8    Ted Suhl and Steve Jones.

9         We heard in opening, and I think we heard just now, that

10   this case is about millions of dollars of Medicaid, but the

11   evidence is absolutely clear that Steve Jones didn't send one

12   dollar of Medicaid money to Ted Suhl's companies.  It wasn't

13   even in his jurisdiction.

14        And we heard in opening that we would see a bribe payment,

15   from start to finish, unfold before our eyes.  And in fact, that

16   was the September 11 check to the church, and, in fact, that

17   didn't turn out to be a bribe payment to Steve Jones at all.

18   Not one cent of that money went to Steve Jones.  A thousand

19   dollars stayed with the church; Pastor Bennett and Carter spent

20   the rest.

21        Mr. Romain, Alex, told you in opening that this case

22   doesn't make any sense, and the reason it doesn't make any sense

23   is because Ted Suhl never got anything.  And that's the point.

24   It doesn't make any sense.  What does make sense, ladies and

25   gentlemen, is that Ted Suhl was a generous man who gave a lot of

1   money to Christian causes, and these were donations to the 15th

2   Street Church of God in Christ, which they supported for years,

3   and not bribe payments.  That's what makes sense.

4       Ladies and gentlemen, my name is Rob Cary.  On behalf of

5   Alex Romain, Chuck Banks, and myself, and especially Ted Suhl

6   and his family, we thank you for the attention you paid to this

7   case, we thank you for the duty to the judicial system and our

8   country.  As Judge Wilson said on the first day, this is very

9   important service, and we thank you for it.

10      This is my time, on behalf of the defense, to sum up the

11  evidence, to summarize it.  Mr. Romain said that this is sort of

12  like chapters of a book.  Well, this is the final chapter.  I

13  also like to think of it like a jigsaw puzzle.  We, as defense

14  lawyers, don't control the order in which the evidence comes in.

15  It's sort of like pieces of a puzzle.  This is my opportunity to

16  try to pull it all together for you.  So let's begin.

17      Who is Ted Suhl?  Ted Suhl, the evidence is absolutely

18  unequivocal, he is a generous man.  He's an unapologetic

19  evangelical Christian.  We've heard from witnesses Scott McLean

20  from Pathway to Freedom; Rhonda Pearson, Trinity clinical

21  director; Tina Smith, Rob Smith, that he is generous to

22  Christian causes.  That's what he did.  That's the kind of guy

23  he is, and there's nothing wrong with that.  Charity should not

24  be a crime.

25      Let's start with the van checks.  This is the fleet of vans

1   that the Suhl family had available to them.  They didn't need an

2   arrangement with the church for vans, but they made a generous

3   arrangement to rent vans, and they wrote check after check after

4   check to that church with the idea of trying to help the church.

5   You heard Mr. Suhl say that at some point the lawyers said that

6   it's not a very good idea to have nonemployees driving the vans,

7   you should stop it, for liability issues.  But those checks

8   continued because they wanted to help the church.  They

9   continued to pay for the van payments even after the vans were

10  no longer used.  The total of that was over $128,000.

11        There are also additional donations.  There's Pastor

12  Bennett.  Pastor Bennett, we heard the testimony that when he

13  preached at The Lord's Ranch, he would get a check.  We heard

14  the testimony that even on Bud Suhl's deathbed, they provided a

15  check to Pastor Bennett, they supported him throughout the

16  years.  And they supported the church with undisputed charitable

17  donations that are exactly that, charitable donations.  That's

18  all they are.  Nobody can suggest these were bribes, for a

19  second, over and over and over again.  When he ran for bishop,

20  they supported him, generously.  They wanted him to be a bishop,

21  and nobody disagrees with that.  Here are some of the causes

22  that are part of his ministry, Operation Pull and the Sober

23  House, that the Suhl family supported.

24        And then we heard on tape, which is Defendant's Exhibit 5,

25  Defendant's Exhibit 6 -- I counted them up -- five different

1    times on that tape Pastor Bennett says:  What Ted Suhl gave me

2    was a donation.  Everything he gave me I said was a donation; I

3    said, in fact, he even helped me with my campaign for bishop.

4    He says that over and over and over again on a tape that was

5    secretly taped by Phillip Carter.  And it doesn't make any sense

6    when he's just talking to Carter that he would be coming up with

7    some sort of cover story.  That doesn't make any sense at all.

8    That's what he said over and over again.  And the proof is in

9    the pudding on this one because the FBI knew about these tapes,

10   and they waited and waited and waited and never went to

11   interview Pastor Bennett until eventually he died.  It's then

12   and only then that they go after Steven Jones.  That's what we

13   heard.  This is the best reflection of what happened from the

14   perspective of Pastor Bennett.  And we heard, there was one

15   little clip played, if you'll listen to it carefully, at one

16   point he says he cashed a check for Steven Jones.  But he always

17   comes back to the fact that, from Ted Suhl's perspective, these

18   were donations, they were donation s.  That's what he did.

19        Now, against this evidence that Ted Suhl's a generous man,

20   a Christian man, a man who has supported this church for years

21   and years and years, we have a case that the government comes in

22   here that doesn't make any sense.  And the reason it doesn't

23   make any sense is because Steve Jones never sent any business to

24   Ted Suhl.  Over and over and over again, he never sent any

25   business, he never did anything for Ted Suhl.  In the

1   government's case, I was trying to think of an analogy.  It's

2   kind of like going to the grocery store and paying for your

3   groceries again and again and again and not getting any

4   groceries in return.  You might do that once or twice, but

5   you're not going to do it over and over again.  If you go order

6   a pizza and you don't get the pizza, but you keep paying, or

7   order something on Amazon.  It doesn't make any sense.  Why

8   would Ted Suhl keep paying if he wasn't getting anything in

9   return?  It doesn't make any sense.

10         Here's something else that doesn't make any sense.  The

11  Child Welfare Review Board that we heard about.  Let's look at

12  the evidence.  Mr. Suhl's term ended on March of 2008.  There

13  was a Democrat in office.  Everybody acknowledges that there was

14  no chance he was going to get reappointed.  Even Mr. Carter said

15  that.  Mr. Carter says at one point he didn't even ask.  In

16  May 2008, someone else is appointed to his spot, the spot that

17  he used to have.  That month, $2,500 goes to the church.  But

18  what follows is a pattern of payments to the church that the

19  government says are bribes, in June of 2008, July 2008,

20  August 2008, September 2008, after someone else has been

21  appointed.  It doesn't make any sense.  The so-called official

22  act that the government says that Mr. Suhl was paying for, it

23  was already done, there was no chance anything was going to take

24  place.  And everybody acknowledges there was zero chance that

25  Governor Beebe, a Democrat, was going to appoint a Republican

1    like Mr. Suhl to this board.

2         Here's something else that doesn't make sense.  I'd like to

3    play a clip here.  This is the RSPMI issue.  I want to play this

4    tape.  This is from January 22, 2011.

5         (Audio clip played in open court.)

6         Mr. Carter just talks about the 50-mile radius and he says,

7    "It's gonna pass."  We heard Agent Spainhour on the stand say

8    that's the reason that they allege that Mr. Suhl was trying to

9    influence the 50-mile-radius issue.  The problem with that is --

10   and he says it all happened in January; the charge in the

11   indictment, that it happened from January 2011 forward.  Let's

12   look at what's wrong with that.  There's the allegation:  Jones

13   asked to help in January 2011.  Spainhour relied on Carter.  The

14   problem with that, the reason it doesn't make any sense is that

15   by August 30, 2010, months earlier, DHS had already decided to

16   expand the radius.  On January 1, 2011, the new radius takes

17   effect.  And it's January 22, 2011, Carter's talking about it.

18   It shows that Carter doesn't know what he's talking about.  He

19   is in fact a hustler.  He's a player.  He doesn't make any

20   sense.  He's just talking.  That charge does not make any sense

21   at all.  And we heard from Mr. Jones that he didn't even know

22   what those initials stood for.  We heard he had absolutely

23   nothing to do with it.  We heard that when he testified on a

24   previous occasion, he thought the issue was moving from 30

25   miles, collapsing it down to 20 miles.  He didn't know anything

1    about it.  He was no more involved in that issue than the man in

2    the moon.  Doesn't make any sense.

3         Senate Bill 218, it's another thing that doesn't make

4    sense.  On February 3, 2011, the bill was filed.  February 21,

5    2011, the bill is withdrawn by its author.  It was pending for

6    18 days.  It was withdrawn.  There are no meetings that anybody

7    says -- there's no evidence of any meetings in February 2011, no

8    evidence of phone calls in 2011 between these people, and,

9    moreover, that bill did absolutely nothing for the Suhl

10   companies.  It makes no sense.  It applied to nonprofits and DYS

11   contractors.  Mr. Suhl's companies were neither of those things.

12   It's nonsense.  It doesn't make any sense.

13        Let's talk about the monitoring agenda.  There is no

14   evidence in this case that that was provided to Ted Suhl.  Let's

15   look at it.  On August 3, 2011, in one of those taped calls, Ted

16   Suhl talks about it.  He says:  "I think I have it, it's no big

17   deal."

18        On August 4, 2011, Carter and Jones meet at a meeting here

19   in Little Rock for their church.  Jones says he thinks he gave

20   something to Carter, but he doesn't remember what it was.

21   Carter says he did not give it to Ted Suhl.  And when asked here

22   whether he'd seen it, he says he's never seen it before.  Never

23   seen it.  There's no linkage, no evidence that it was actually

24   provided to Ted Suhl, and he said he'd never seen it before.

25   And that's proven out, because in June of 2012, there are dozens

1    of agents that search the Suhl businesses for two days, haul off

2    everything, and they don't find it.  It's not there.  He didn't

3    have it.  But it was no big deal -- and by the way, Ted Suhl

4    testified, and there's absolutely no contrary evidence that it

5    was available under FOIA, under the Freedom of Information Act.

6    He testified that his company used that all the time and he

7    could have gotten it easily.  And the only thing that the

8    government says is confidential in that document -- they didn't

9    put on any evidence that anything is confidential except for one

10   reference to a fraud investigation.  Well, it turns out that we

11   were able to bring in the letter about that fraud investigation,

12   and it turns out it was a self-report from the company to pay

13   back more than they thought they'd owed to the state.  That's

14   all it was.  They knew about it.  There was nothing confidential

15   in that document.  It was no big deal.  And Ted Suhl never got

16   it.

17        The final so-called official act is Medicaid.  This is a

18   redraw of the org charts we put in evidence as Exhibit 1300, and

19   it shows that there are two different divisions, two different

20   sides of the house; Steven Jones is on one side, and Janie

21   Huddleston is on the other.  And Janie Huddleston is down there,

22   circled down there (indicating), the Division of Medical

23   Services.  She's in charge of Medicaid.  And Steven Jones told

24   you he didn't want Medicaid.  Steve Jones had absolutely no

25   power to reach over there and grab and take care of Medicaid.

1    That would have to have been done by John Selig.  It doesn't

2    make any sense.  It's why these checks are for the church, not

3    for Steve Jones.  The so-called official acts in this case don't

4    make any sense; none of them do.

5         Let's talk about something else that doesn't make sense,

6    the September 9, 2011 check that's alleged to be a bribe.  Let's

7    look at what the evidence is on that.

8         First of all, Mr. Carter was the one who was calling Ted

9    Suhl again and again and again.  The government presents it

10   like, boy -- I think they said in their opening that Phillip

11   Carter was his right-hand man.  That's not what the evidence

12   shows.  There's call after call after call, you can listen to

13   them in the jury room, nine different calls where Carter's

14   trying to get ahold of Ted Suhl in the summer of 2011.

15        Can I get the last one played, please?

16        (Audio clip played in open court.)

17        Does that sound like Phillip Carter is his right-hand man?

18   I mean, of course, this family treated the man kindly, they

19   supported the church.

20        And if I could have another call from the time period where

21   Ted Suhl says it's no rush.

22        (Audio clip played in open court.)

23        So let's talk about what happens in September '11.  They do

24   have a dinner at the Texas de Brazil.  He gives him a $2,000

25   check.  And then Phillip Carter, you can see -- Agent Spainhour

1    won't acknowledge it, but Phillip Carter pretends like he's

2    taking a phone call and he calls Pastor Bennett and talks about

3    how it's a great day.  And the reason that it's a great day is

4    because the church got $2,000; a thousand stayed with the

5    church, and Carter and Bennett spent the rest.  Pastor Bennett

6    was the pastor.  It was appropriate for him to do it.  Carter

7    stole the rest.  And then what happens?  The government says you

8    see it unfold from start to finish.  But none of the money went

9    to Steve Jones.  Not one cent of Ted Suhl's $2,000 check to the

10   church went to Steve Jones.  In fact, a thousand dollars stayed

11   with the church, never left the church.  There are no calls the

12   entire rest of September.  There are no calls in all of October.

13   And it's not until November 23, the day before Thanksgiving,

14   when the FBI goes out and recruits Big Fish, Phillip Carter, to

15   pay money to Steve Jones, to entrap Steve Jones, which he does

16   on the 27th.

17        Now, here's something that Mr. Romain asked about in

18   opening.  And as Judge Wilson said, you get to use your common

19   sense.  Why didn't Phillip Carter go to Ted Suhl?  He's all

20   wired up.  Why didn't they go to him and have him say, Hey, Ted,

21   I need some money for Steve Jones?  If he were guilty, that's

22   what he would have done.  But Phillip Carter knew that wasn't

23   going to work.  Proof of Mr. Suhl's innocence.

24        There's the form where he signs his name as "Big Fish,"

25   Defendant's Exhibit 1726.

1       So despite all this evidence, all this investigation,

2   there's still not one conversation, not one dollar, not one act.

3   None.  Zero.  It doesn't exist.

4       Here's another thing that doesn't make any sense about the

5   case.  Mr. Suhl is a wealthy man.  He was very successful in

6   business, at least until his business was raided in June of

7   2012.  Why didn't he use cash?  He had access to cash.  I think

8   Agent Spainhour said that's the preferred way to do things.  If

9   Mr. Suhl wanted to commit a crime, he could have just slipped

10  cash to Steven Jones, or have Carter slip cash to Steven Jones.

11  He wrote checks to 15th Street Church of God in Christ, and

12  that's because he wanted to give money to the church.  It makes

13  no sense.

14      I want to pause and talk about something here.  Right out

15  on Capitol Avenue, underneath the flagpole, there is a plaque

16  with the Bill of Rights listed on it.  And one of those rights,

17  the First Amendment, protects the right of the people to

18  petition the government for redress of their grievances.  There

19  is absolutely nothing wrong in meeting with a government

20  official.  And to the extent the government is suggesting

21  otherwise is protected by the Constitution.  There's no

22  inference of improper conduct that could be drawn from that.

23  And there's nothing wrong in this country in meeting with a

24  friend of a government official, or responding after he calls

25  you nine times and then saying, Hey, I do have an issue with

1    something they're doing down there, I think it's illegal, I

2    don't think it's right, you know, it would be good if you put a

3    stop to it.  There's nothing wrong with it.  That is protected.

4    We're free to communicate with one another.  We're free to

5    express our complaints to government officials, and we're free

6    to express it to other people as well.

7         Let me talk about pattern.  I think we heard a little bit

8    about the pattern, or a pattern in the FBI agent's testimony.

9    Let's talk about the December 2007 transaction, which I think is

10   a check, which is Government's Exhibit 19.  There's no pattern

11   here.  Ted never called Carter.  You can read this exhibit as

12   many times as you want, and all the attachments to it.  There's

13   not one call from Ted Suhl to Phillip Carter.  There's no

14   meeting alleged here, they don't allege there was a meeting on

15   this particular occasion.  And the checks, the checks to Jones

16   do not in fact go to Jones.  And I asked Agent Spainhour, and he

17   cannot explain why the checks were endorsed by somebody with

18   Jones's name and never went to him.  And where did they go?

19   They went right back into the church.  That's where they ended

20   up.  That's not a bribe.

21        June 2008, there's no pattern here.  Sweet Mrs. Suhl wrote

22   that check.  That wasn't a bribe.  You heard her say it.

23        July 2008, July 5, there's no pattern here because there's

24   actually no meeting between Carter, Suhl, and Jones.  How do we

25   know that?  We had to bring in the manager of Texas de Brazil

1    who showed us the reservation for two people at 8:00 p.m.,

2    July 5, 2008.  Mrs. Suhl came in, and she said:  My grandmother

3    had died.  We were in San Antonio.  And we showed the American

4    Express statement showing that on July 2, 2008, they were there;

5    July 3, 2008; July 4, 2008.  And they were there through July 5,

6    2008.  It turns out that the hotel bill is one day off, because

7    on the last night, the Suhls stayed with family.  But they were

8    clearly there through July 5, 2008, came back to Memphis and had

9    dinner.  And how much is the cost of the dinner?  It's

10   consistent with two people, not three.  And I thought I might

11   hear the government acknowledge, okay, that one didn't really

12   take place.  Mr. Suhl and Mrs. Suhl really were there right

13   after this very traumatic event in Mrs. Suhl's life.  And I

14   didn't hear it.  Instead I hear, well, you know, maybe there

15   were times where -- it was suggested maybe there were times

16   Jones didn't eat.  It doesn't make any sense.

17        And we haven't brought this out in testimony yet, but you

18   can look at the exhibits back there.  And if you look at

19   Government's Exhibit 22-A, you'll see that Carter's on the phone

20   during the entire time of this dinner.  He clearly wasn't there.

21   He told you he was.  He wasn't.  That's one reason you can't

22   trust what Phillip Carter tells you, and that's one reason there

23   isn't a pattern, it's why they're trying to fit a square peg

24   into a round hole in this case.

25        Here's another one.  First of all, the June, July 2009

1    summary exhibit, it says the Millenia check is deposited or

2    cashed.  They can't trace what happened to that check.  There's

3    another one in there as well.  But, also, this is another

4    occasion where there was no meeting.  The $115 at Texas de

5    Brazil, that's consistent with two people, not three.  And how

6    do we know that?  Here's the reservation, 5:45 p.m., for two

7    people, not three.  Here's the charge, consistent with only two

8    people, not three.  And then this is the best of all.  These are

9    the phone records, Government's Exhibit 22-B.  During the time

10   of that dinner, Phillip Carter calls Steve Jones not once, but

11   twice.  It couldn't have taken place.  Surely he's not sitting

12   there at dinner with Ted Suhl, calling him.

13        There's no pattern here.  You can't count on this evidence.

14   They're trying too hard.  They look at everything through a lens

15   of corruption and cynicism when, in fact, sometimes checks to a

16   church really are checks to a church.  This cynical lens, I call

17   it dirty windows, makes everything look rough; every hammer sees

18   a nail.  In fact, these people in good faith give money to a

19   church.  And two of these meetings didn't happen.  Those are the

20   ones we could prove.  And Phillip Carter lied to you about it.

21   He swore those meetings took place.

22        September 2010, this is the second to the last of the

23   so-called pattern.  All of the money, every cent of it that Ted

24   Suhl gave the church, stayed with the church.  Agent Spainhour

25   acknowledged that on the stand.

1        And then the same thing happens on September 11.  None of

2   that money went to Steve Jones.  And there's so much about this

3   one, because now the investigation is going -- and I'll blow

4   this up in just a minute here, because there's so much

5   information, I can't pack it onto one slide.  So let's look at

6   it.

7        First, all the calls from Carter to Suhl.  Their summary

8   exhibit just begins with July 25, as if that's when Ted Suhl

9   gets this whole thing going.  Carter is trying over and over

10  again to get ahold of Ted Suhl that summer.

11       And then the call takes place on July 25.  And it is true,

12  he said, "Should put a stop to it."  You heard him say he very

13  much believes that what they were doing was illegal.  He also

14  said, and it's not disputed, it was not a big part of their

15  business.  It wasn't $10 million worth of Mid-South business.

16  It was a small part of their business.  They didn't do a lot of

17  work from DHS referrals.  But he thought it should stop.  He

18  thought it was illegal.  He complained about it.  In that call

19  also, and I don't have it on this chart, but if you listen

20  carefully to it, he makes reference to the "any provider" law.

21  He uses the word "any provider," which is reference to the

22  Any-Willing-Provider law.  And then he says all sorts of other

23  things like that that the government wants to ignore, that they

24  don't put on their summary chart.  "We can really help make it

25  more competitive.  Whoever is providing the best job needs to

1   get the outpatient service.  It needs to be just about the

2   truth."  And then the best:  "We're not asking for anything

3   special.  We're just saying that everybody should have an

4   option."

5       And you can listen to that tape as many times as you want

6   to.  And it is true that Mr. Suhl had issues, and he was

7   complaining about them.  But you will never get the impression

8   that Steve Jones is bought and paid for in any of those

9   conversations.  And Steve Jones didn't think he was bought and

10  paid for either.

11          THE COURT:  You have about three minutes in your first

12  part.

13          MR. CARY:  Thank you, Your Honor.

14      Real quick, the hustle points.  There are lots of other

15  things going on at that time.  Phillip Carter, he owes money to

16  Roger Smith.  He tells him -- he tells Roger Smith that he's

17  going to try to get money from Suhl.  He hustled Pastor Bennett

18  in asking to borrow a thousand dollars.  We'll get more to that

19  in just a minute here, when we talk about Phillip Carter.  And

20  then, of course, as we pointed out, the money stays with the

21  church.

22      And finally, after months go by, the FBI didn't see what

23  they wanted to see, so they put a sting on Steve Jones and give

24  him a thousand dollars.

25      There's no evidence -- Steven Jones said he wasn't bribed,

1    he wasn't bought and paid for.  The only -- and the government

2    likes to say that the only evidence in this case that matters is

3    Ted Suhl's intent.  Well, ladies and gentlemen, there's one

4    witness and one witness only, besides Mr. Suhl who took that

5    stand and said that they were all charitable donations, only one

6    person that can talk about what Ted Suhl's intent was, that

7    claims to know Ted Suhl's intent, and that's Phillip Carter, and

8    Phillip Carter is a flawed witness who cannot be trusted.

9         Let's look at some -- just a little bit of it.  I'll do

10   this slide, and then we'll take a break.

11        He says that they were hiding.  We just heard the same

12   thing in the government's opening closing statement, that they

13   went out of state to hide, to get away.  We heard Mr. Jones say

14   it's one of the most popular restaurants in the area.  He knows

15   lots of people there.  He described a balcony.  You can look at

16   the video that the government likes to show so much.  There are

17   people all around.  They talk about how he leaned close.  It's

18   next to the salad bar in one of the most popular restaurants in

19   Memphis.  They were not hiding from anybody, and Carter's

20   suggestion that they were is a lie.

21        We've heard all these statements that -- twice, I think --

22   that he put money in his sock, that that was somehow evidence of

23   something illegal.  Phillip Carter says he always puts money in

24   his sock.  And once again, he's in the middle of this busy

25   restaurant.

1      We've heard about tapped phones.  Carter said:  Oh, my

2   phone was tapped.  I was very careful about what I said.  You

3   heard him talk to Steve Jones about his wacky idea that surely

4   it must have been illegal to raffle a car in order to get people

5   to come out and vote, to give them free raffle tickets.  Jones

6   said:  I'll look into it.  He wasn't buying into it.  And nobody

7   talks like that if they think their phone is tapped.

8      And then, finally, Phillip Carter says Ted Suhl used codes

9   words like the word "buddy."  You can listen to those recordings

10   as many times as you want.  Ted Suhl only uses the words "your

11   buddy" three times to describe Steve Jones, and he also uses

12   Steve's name.  He says "Steve," on the very first tape that the

13   government played for you, they said it was a code word.  And

14   I've played for you the tapes, over and over again, Ted Suhl

15   using the word "buddy."  That's the way he talks.  Those aren't

16   code words.  When Phillip Carter says they were using codes, you

17   can't rely on that at all, just like you can't rely on Phillip

18   Carter.  And we'll get to him after our break.

19      THE COURT:  Ladies and gentlemen, not quite yet.

20   Don't start making up your minds.  Don't talk to anybody about

21   this case, including amongst yourselves.

22      Let the jury stand out.  Everyone else remain as you are.

23      We'll take lunch orders during this break.  Y'all may stand

24   out.

25      We'll start back in about 15 minutes.

1        (Whereupon, the jury exited the courtroom and proceedings

2   continued in open court as follows:)

3        THE COURT:  We'll be in recess until about 24 till by

4   this clock on the wall.  Be at ease.

5        (Recess at 11:22 a.m.)

6                        C E R T I F I C A T E

7      I, Eugenie M. Power, Official Court Reporter, do hereby

8   certify that the foregoing is a true and correct transcript of

9   proceedings in the above-entitled case.

10

11   /s/ Eugenie M. Power, RMR, CRR, CCR        Date:  July 20, 2016
     United States Court Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Proceedings continuing in open court at 11:38 a.m.)

2              THE COURT:  You may proceed.

3              MR. CARY:  Thank you, Your Honor.

4        I want to begin by addressing something that Ms. Vaughn

5    with the government addressed this morning, and that is, she

6    asked a question:  Why is Ted Suhl talking to Carter about

7    this?  Well, the first answer is, Carter called him nine times

8    that summer.  When he finally got through and called his mother

9    and got through to him, he said, "Yeah.  There is something on

10   my mind that has been bothering me."  There is nothing wrong

11   with that.  Ted Suhl wasn't desperate.  And we also heard him

12   talk about how there was no rush for the meeting.  He wasn't

13   desperate to set it up.

14       And we also have Phillip Carter who was asked by the

15   government, "I am asking you about phone calls, why the

16   defendant would use you to make the phone calls to Steven

17   Jones."  And his answer -- Carter's answer was, "Well, I had

18   better contact with Steve.  Steve and I was friends.  If I

19   call, Steve pretty much will come."

20       We heard from Mr. Jones as well that he was the chair of

21   the Democratic Party in Crittenden County, was very involved in

22   politics.  They had a relationship, and there is nothing wrong

23   with when Phillip Carter calls nine times and you finally

24   return the call saying, "Yeah.  There is something on my mind,"

25   and expressing that view.  Also, Carter and Jones spoke all the

1   time.  That's what Jones said.  There is nothing unusual about

2   the fact that they were speaking except these phone records

3   indicate a pattern.  We heard the raffle call.  There are other

4   calls that Steve Jones talked about where they spoke

5   frequently.  That's what they did.  Steven Jones even said he

6   tried to be a mentor to Phillip Carter, who was a somewhat

7   younger aspiring politician.

8        So let's go back to Phillip Carter.  Here are things that

9   have been proven false in this case.  First of all, the Texas

10  de Brazil meetings.  Phillip Carter took that stand and said he

11  was at a meeting with Ted Suhl and Steven Jones in July 2008,

12  June 2009, and I just proved to you that was impossible.  He

13  said that there were 20 meetings that the reservations and

14  phone records prove.  This is more of Suhl's testimony.  He

15  said there were 20 meetings and checks from Texas de Brazil

16  meetings.  He is just making that up.  This is a guy who

17  doesn't care about the truth.  You can't trust him.  He is the

18  only witness who talks about Ted Suhl's intent, the only person

19  who says Ted Suhl intended these to be bribes, not

20  contributions to the church.  He got on the stand in direct and

21  said he got advantages and referrals because his wife worked

22  for ACA.  In fact, in cross-examination he had to admit there

23  was no advantage.  They didn't get any special treatment.

24        And finally, there are many things he says false, but

25  these are some that we were easily able to prove.  Carter

advances, he said they were forgiven.  Here is his testimony.

He said some of them he actually forgave and didn't take them

back, talking about Ted Suhl, when it was suggested he was

bought and paid for by Ted Suhl.  In fact, we had to bring in a

payroll accountant from the company to show that every single

one was paid back.

And this case is not about numerous Carter's advances,

it's not about referrals in Crittenden County, but it is about

Phillip Carter and whether you can trust him to convict Ted

Suhl.  If you can't believe him on these little things, you

can't believe him on the big things either.

Phillip Carter had some of the most amazing testimony,

admitted twice by my count that he is a hustler.  He talked on

Mr. Romain's cross-examination about a loan from Roger Smith,

how he was put on Roger Smith that he owed money to.  He was

trying to get money, a thousand dollars, from Pastor Bennett.

He was trying to get money from the bank, trying to get money

from Ted Suhl.  He told people repeatedly that he was trying to

get money from Ted Suhl in August of 2011.  And then here are

his words.  This is amazing.  He is trying to get money from

Pastor Bennett, kind Pastor Bennett.  When asked to describe

it, he said, "I have done my share of hustling and everything

like everybody else.  They all hustled me and used me and so

what I was doing, I was in the same boat.  I was hustling them

back.  I was probably smoke screening and BS'ing Pastor

1   Bennett."  That's Phillip Carter.  He played Ted Suhl.  Just

2   like I said in opening, he played Ted Suhl, and he played

3   Steven Jones.  He is a hustler and he admits it.

4         Here are some other inconsistencies in Phillip Carter's

5   testimony which shows why you can't rely on it and can't count

6   on it in such an important matter.  He at one point said that

7   $10,000 was a donation from Ted Suhl to Pastor Bennett and the

8   church.  Later said, "It wasn't a donation at all.  It was just

9   a loan to Bennett which was not repaid."  Inconsistent stories.

10  He tells different stories all the time.  In the instructions,

11  that's one of the things you can use to judge the credibility

12  of a witness.  This witness is not credible, not worthy of

13  being presented by the United States government in such an

14  important matter.

15        Checks.  He says at one point there was extra money in

16  those checks for him, Phillip Carter.  At another point he

17  says -- he said Ted Suhl knew that, and then at another point

18  he said Ted had no knowledge of that.  Completely inconsistent

19  stories.  Can't get it straight.

20        Review board, that first thing that I said didn't make any

21  sense about the official acts.  He actually did at one point

22  say Ted Suhl did not ask to be reappointed to the board because

23  he knew it was impossible.  He later changes the story and

24  says, well, Ted did ask.

25        And then the fact that he has been convicted of a felony

1    for election fraud is something very important.  One of the

2    most fundamental core of our democratic process is elections,

3    and Phillip Carter was convicted of voter fraud.  Here is how

4    Jones described it.  "He's a local conman.  He -- we typically

5    refer to him as one of the election vultures.  He was one of

6    the guys who would come to people like me who were in public

7    office and try to get us to pay him money to get votes.  And I

8    never hired him because I knew that he always worked for both

9    candidates in a race, opposing candidates, and so I didn't

10   really care for that.  And he would also say that he could

11   guarantee absentee votes."  He is a felon for what he did with

12   respect to the election process, and he cannot be counted on to

13   give truthful testimony.

14       Here is another big one.  The jury instructions that

15   Judge Wilson gave said you can take into account any incentive

16   that somebody has for why they testify.  Phillip Carter came in

17   here and said that his hope is that he will be released from

18   jail immediately for his testimony in this case.  He said, in a

19   joking manner apparently at one point, that he was going to

20   deliver a big fish -- that's Mr. Suhl -- blackened, fried, or

21   grilled.  He just had to ask how they wanted it.  This is not a

22   joke.  Mr. Carter explained this.  This is not a joke.

23       Now I want to focus on one particular jury instruction

24   Judge Wilson gave this morning, once sentence in that jury

25   instruction.  That's the reasonable doubt instruction.  It

1    reads, "Proof beyond a reasonable doubt is proof of such a

2    convincing character that a reasonable person, after careful

3    consideration, would not hesitate to rely and act upon that

4    proof in life's most important decisions."  This case is

5    riddled with reasonable doubt, ladies and gentlemen.

6         First of all, Steve Jones, I think everybody has to

7    acknowledge, did nothing for Ted Suhl.  It doesn't make any

8    sense.  He wouldn't keep paying bribes when he never got

9    anything.  The real pattern is -- when asked about the pattern

10   evidence here, I think I established there is no pattern on the

11   government's side.  The real pattern is, the Suhl family gave

12   money to this church over and over again, time and time again.

13   They cared about this church.  They cared about mission giving,

14   and that's the real pattern here.

15        And finally, Phillip Carter.  The only witness who can

16   testify as to what Ted Suhl's intent was is absolutely not

17   reliable.  In addition, and this is a small picture, but this

18   is the plaque out in front of the -- underneath the flagpole in

19   front of the courthouse again.  It has the Bill of Rights on

20   it.  In addition to the First Amendment guarantee to petition

21   the government for abuses, the Sixth Amendment guarantees a

22   right to trial by jury.  And unlike anything else we do in our

23   democracy, trial by a jury requires a unanimous vote before you

24   can label somebody a criminal.  In governors elections,

25   congressional elections, local elections, PTA, school board, a

Defendant's Closing

1    simple majority will do.  But in a criminal case in the United

2    States of America, you can only convict somebody with a

3    unanimous verdict.  And why is that?  Because we are so

4    terrified of convicting an innocent person.  Ted Suhl, ladies

5    and gentlemen, is innocent.

6         This is our last opportunity to talk to you for the

7    defense.  Because the government bears of the burden of proof,

8    they get to have a table closer to you, they get to go first

9    and last because they bear a heavy burden, and the government

10   is going to get to stand up again and talk to you one more

11   time.  You can imagine that Chuck and Alex and I are going to

12   want to leap up and say, "That's not true.  That's not how we

13   see it.  That's not how the pieces of the puzzle fit together

14   from our perspective.  We disagree completely."

15        We are not allowed to do that.  This is my last chance to

16   talk to you.  Our work is done.  All I can do at this point is

17   to deliver Ted Suhl from my hands to yours.  When I do, I ask

18   you to go back to that jury room, carefully consider the

19   evidence.  Consider it very carefully.  Think about the fact

20   that Ted Suhl never got anything from Steve Jones.  The

21   government's case doesn't make any sense.  Think that the real

22   pattern is charitable giving, year after year, time and time

23   again for a real church that they cared about a lot.  When they

24   started giving to this church, they didn't know Steve Jones was

25   going to be appointed to some office some day.  They cared

Government's Rebuttal

1    about this church.  They cared about Pastor Bennett.  That's

2    what all the testimony has been in this case.

3        Then finally, I ask you to think about Phillip Carter, a

4    deeply flawed witness.  Out of all these benefits, he is trying

5    to get out of jail.  He admits to being a hustler.  He is

6    inconsistent in his testimony time and time again.

7        Phillip Carter -- the jury instruction says reasonable

8    doubt -- to meet the burden beyond a reasonable doubt, there

9    has to be something you would rely on in the most important

10   decisions in your life.  This is a very important decision, the

11   most important decision in Ted's life ever.  You can't rely on

12   Phillip Carter.

13       Ted Suhl is innocent, ladies and gentlemen.  I ask you to

14   return a verdict of not guilty on all counts.  Thank you.

15           THE COURT:  For the prosecution.

16           MS. BELL:  Thank you, Your Honor.

17       Good morning, ladies and gentlemen, and thank you on

18   behalf of the United States for your attention to this matter.

19   This case is important to the United States in protecting its

20   laws.

21       This case, in case you have forgotten, is entitled United

22   States v Theodore Suhl.  And I say "in case you have forgotten"

23   because I just listened to the defense go on for about half an

24   hour about Phillip Carter, about what Steven Jones may or may

25   not have done, but never once did they play that video for you

1    in which you saw Ted Suhl pay a bribe payment, because this

2    case, United States v Theodore Suhl, is about what that man

3    sitting over in that chair did.  It's not United States v

4    Phillip Carter.  He has already pled guilty for what he did.

5    It is not United States v Steve Jones.  He pled guilty for what

6    he did.  It is United States v Ted Suhl.

7         But I will spare a few minutes to talk about Phillip

8    Carter since the defense spent about half an hour on him.  What

9    I want you to remember about Phillip Carter is that Phillip

10   Carter was a hard worker.  He had about five jobs at any one

11   time, and he was still struggling to make ends meet.  Medical

12   bills, mortgage payments, things that come up in everyday life.

13   So, yes, Phillip Carter looked for more ways to make money.  No

14   one is denying that, not even Phillip Carter.

15        But how he made the most money on the side businesses was

16   by helping the defendant's companies because he knew whenever

17   he helped the defendant's companies, the defendant would pay

18   money back to him.  And so he was always looking out for the

19   defendant to the point where he started calling the defendant's

20   companies "we."  He would refer to "we" to talk about the

21   defendant and him because the defendant had helped Phillip

22   Carter out, but make no mistake about who is running who in

23   that relationship.

24        On one hand, you have Ted Suhl, a wealthy businessman of

25   companies earning multi-millions of dollars every year, here in

1    Alaska (sic) and with holding companies in Florida, and on the

2    other hand you have Phillip Carter who owns his lawn care

3    business.  So who is running who in that relationship?  The

4    defendant remained in control of Phillip Carter, and he picked

5    Phillip Carter precisely because Phillip Carter had these

6    characteristics that made Phillip Carter want to help the

7    defendant.

8         The defendant picked Phillip Carter because Phillip

9    Carter, yes, had financial problems and, therefore, would work

10   hard for the defendant.  But this was not charitable generosity

11   the defendant was giving to Phillip Carter.  All these defense

12   witnesses have commented and described the defendant as being a

13   very generous man.  The defendant's generosity, quote-unquote,

14   to the 15th Street Church of God in Christ depended on what

15   would come back to the defendant's companies and the

16   defendant's ultimate pocket.

17        The defendant could afford to be generous in purchasing

18   vans for the church when those vans were used to transport kids

19   only to the defendant's for-profit companies.  No other

20   companies.  Then the defendant could be generous with those

21   vans.  The defendant could be generous helping Pastor Bennett

22   become bishop of a church because, once he had become bishop,

23   he would have control over 137 very politically powerful

24   churches in Arkansas.  And the defendant could pretend to be

25   generous by giving Phillip Carter's wife a no-show job and --

1    because that would cause Phillip Carter to refer juvenile

2    patients to the defendant's companies.  And starting in 2007,

3    this so-called generosity to the 15th Street Church of God in

4    Christ started happening when and only when the defendant would

5    meet up with Steven Jones.

6          So think about what the defendant's generosity has done to

7    Phillip Carter -- Carter, who considered the defendant to be a

8    friend.  Phillip Carter came in here and was in tears when he

9    described what has happened to his life.  Think about what the

10   defendant's generosity truly did to Phillip Carter, a former

11   city alderman, a former elder in his church.

12         The defendant wants you to believe that these checks were

13   charity, and Mr. Cary just rolled a list of checks past you

14   very quickly to try and make you think that these checks at

15   issue in this case were charity.  But in fact, if you looked

16   closely at that scrolling, those checks were from 2003 until

17   2007.  This case begins in 2007, until 2012.  So the time this

18   case begins, the checks that are flowing to the 15th Street

19   Church of God in Christ, made out by Millenia's company -- not

20   Arkansas Counseling Associate, but Millenia, the Florida

21   company -- by 2007 to 2012 was charged in this case, those were

22   bribe payments.

23         And here is one way, one very easy way for you to

24   understand why those were bribe payments and not charity.  If

25   this whole thing is as the defense wants you to believe, if

1    this all boils down to Phillip Carter and Pastor Bennett just

2    skimming money from the church, if it's all about just

3    embezzling money, all Pastor Bennett has to do, according to

4    even the defendant, is for Pastor Bennett to pick up the phone

5    and call and ask for money.  There doesn't have to be this

6    elaborate plan to get Steven Jones at the table at Texas de

7    Brazil.  There don't have to be 20 calls back and forth.  I

8    bored even myself playing the calls that Carter had to make

9    back and forth from one person to another to set up a time

10   these three men could meet at Texas de Brazil.  None of that

11   had to happen because, as the defendant has testified, anytime

12   he heard from Pastor Bennett, who he loves so dearly, he would

13   have just written a check.

14        So why are we all meeting at Texas de Brazil over and over

15   and over again?  And make no mistake.  Despite defense's focus

16   on two meetings, the July 8th, 2008, and June 2008 meetings,

17   there are records that support three people meeting at Texas de

18   Brazil.  The defense wants you to look at just two of them --

19        Ms. Beard?

20        -- but the government, with that same witness, Allen Eoff,

21   brought in records showing Ted Suhl's reservation for three

22   people.  And again, Ted Suhl's reservation, Mr. Suhl, for three

23   people, Government's Exhibit 101.  And again, slight

24   misspelling, but Ted Suhl, reservation for three people.

25   Mr. Suhl, reservation for three people, September 2010.  What's

1  really fun, September 11, 2011, Steven Jones, reservation for

2  three people.

3       As my coworker said and as the judge has instructed you,

4  what Mr. Jones did or did not do has no bearing on what the

5  defendant did.  The person on trial here is Ted Suhl.  The

6  Texas de Brazil video is so key because, unlike what Mr. Cary

7  told you, it's not just what the witnesses came in here and

8  testified about.  It's not just what the witnesses said,

9  Mr. Carter or Mr. Suhl said about Mr. Suhl's state of mind.

10  That video gives you a direct look at this entire scheme,

11  including the defendant's frame of mind.  That video shows you

12  that the checks are linked only when the defendant sees

13  Mr. Jones in the restaurant.  As Ms. Vaughn showed you, not on

14  the way to the restaurant, not on the way from the restaurant,

15  not in the parking lot at the restaurant.  This is not about

16  having an anonymous donation.  That video shows you the

17  defendant looking over his shoulder to make sure that Mr. Jones

18  was gone from the table and then handing the check, but it was

19  important first for him to have seen Mr. Jones.

20       As I said before, the defense wants you to think that

21  these checks were only linked for the 15th Street Church of God

22  in Christ, but Steve Jones didn't even belong to the 15th

23  Street God in Christ.  He belonged to the Earle Church of God

24  in Christ.  So why is it that these checks, which are going to

25  one church, only seem to occur to the defendant when he sees a

1    member of a different church?  Because these checks were

2    bribes.  They were meant for Steve Jones.

3         And that video shows you the defendant leaning over Steve

4    Jones -- or sorry -- leaning over Phillip Carter and paying

5    that bribe payment.  That one video shows you both the action,

6    the physical act of paying the bribe, as well as the intent

7    because that was shady.

8         Notice that these checks only coincide with Steven Jones,

9    not a member of the church for which the checks are made out

10   to.  And everything on that September 11, 2011, video -- and

11   remember, we only have to prove one act, and that video proves

12   it very well.  Every single thing about that video shows the

13   defendant's request, it shows Carter's role as the middleman,

14   the calls that went up to it, and it shows Jones on the inside.

15   Everything is caught on audiotape and videotape on that

16   September 2011 thing, and there is no reasonable doubt in that.

17        You have the request from July 25.  You have the payment

18   on September 11.  And none of that depends on the witness

19   testimony.  That's all the records.  That's all the audio.

20   That's all the video that you saw with your own eyes.  There is

21   no reasonable doubt from that evidence.  And you-all took an

22   oath to this Court that when you found proof beyond reasonable

23   doubt, you would find the defendant guilty.  Your oath demands

24   that you find Ted Suhl guilty of the charges in the indictment.

25   Thank you.

1        THE COURT:  Would you swear the bailiff, please?

2     (Oath administered.)

3        THE COURT:  Ms. [Juror 13] and Mr. [Juror 14], you are

4  alternates, and your duty is finished now.

5     Would you take them to the jury room to retrieve their

6  things?

7     When you retrieve your things in the jury room, I want to

8  talk to you a little after we send the other jurors out.

9     Just be at ease for a little bit here while we get their

10  stuff.

11     All right.  I am giving my instructions to the bailiff.

12  Follow the bailiff.  The 12 jurors, follow the bailiff to the

13  jury room.

14     And the two alternates, I want you-all to take a seat once

15  they have left.  I want to talk to you a little.

16     Let the jury stand out.  Everyone else remain as you are.

17        JUROR 1:  We can talk about the case now?

18        THE COURT:  Yeah.  You can start talking about the

19  case when all 12 of you are together in the jury room.  You

20  betcha.

21     (Jury exits the courtroom.)

22        THE COURT:  As I said, your duties are to end and

23  y'all are free to go in just a minute, but I want to thank you

24  for coming and serving.  You are very important because if the

25  number of jurors in a fairly long trial like this dropped below

1    12, with only 12 we would have to have a mistrial.  And so you

2    were here -- I don't want to refer to you as spare tires, but

3    you were here in case we had a blowout with 2 jurors -- 1 juror

4    or 2 jurors -- and dropped below 12.  If you weren't here, as I

5    said, we would have had to declare a mistrial and start all

6    over again.  I thank you very much for doing your duty.  I

7    realize it's an imposition on your time.  It's one of our

8    duties -- like when you get drafted in the service, it's one of

9    our duties.  It's very important.  I wish I had a bumper

10   sticker to give you that says:  I have done my duty, jury duty.

11        You are free to go now.  Thank you very much.

12        Oh, where do they get their work releases?

13        In the jury room you will get your work releases,

14   downstairs.

15        (Dismissed jurors exit the courtroom.)

16        THE COURT:  All right.  Normally I have the lawyers

17   get together and gather up the exhibits and make sure we don't

18   have any strays in there, and then we send them back to the

19   jury room.  No. 1, I want to ask, are there any exhibits that

20   either side wish to withdraw that haven't been used or referred

21   to?  Those that we admitted or stipulated to earlier?

22        MR. KELLER:  No, Your Honor.

23        MR. ROMAIN:  No, Your Honor.

24        THE COURT:  What do you-all propose we do about the --

25   we will have to get a U-Haul trailer to take them all to the

1    jury room.  Do you-all think we should do that?

2         MR. KELLER:  I do believe the exhibits should go back,

3    Your Honor.

4         MR. ROMAIN:  We have no objection to that, Your Honor.

5    There are three disks that are at issue --

6         THE COURT:  Let me get my hearing piece on here.  Say

7    that again.

8         MR. ROMAIN:  The government has two disks that contain

9    its audio recordings.  There are two recordings that are

10   supposed to be redacted that we can't actually play.  They

11   don't play, so they wouldn't play for the jury.  And so we are

12   trying to get new versions, which we should do shortly, and

13   then check those.  And I think the government would like to

14   listen to Defendant's Exhibits 5-B and 6-B.  We should be able

15   to make that happen before the end of lunch, and then the

16   exhibits can all go back.

17        THE COURT:  You talking about dinner?

18        MR. ROMAIN:  I meant dinner.

19        THE COURT:  Yeah.  That will be all right.  Keep at

20   least one lawyer right here in case the jury sends out a

21   question, and you may want to send out for dinner.  Of course,

22   Mr. Suhl will have to be here near at hand.

23        MR. CARY:  We will stay, Your Honor.

24        THE COURT:  I will be right next door here, and so we

25   will be in -- I guess you-all need to get together and get the

1    admitted exhibits that are ready to go back, get them stacked

2    up so we can take them back.

3          MR. CARY:  May I check with Mr. Morgan quickly on

4    something, Your Honor?

5          THE COURT:  Yeah, surely.

6          MR. CARY:  Mr. Morgan suggested, and I agree, there is

7    an issue with respect to how the jury is going to play the

8    recordings in this case, and I know we had built a clean laptop

9    that doesn't have anything else on it.  I am sure the

10   government would want to see before it goes back to the jury,

11   but --

12       Do we have that nearby?

13         MR. ROMAIN:  We do.

14         MR. CARY:  We can make that available and --

15         THE COURT:  Why wouldn't we have the jury back out in

16   open court and play whatever they want to play?

17         MR. CARY:  That's fine with us, Your Honor.

18         THE COURT:  What does the government say about that?

19         MS. BELL:  I believe if the jury wanted to listen to

20   exhibits, it might reveal the status of their deliberations,

21   and that would be improper.  If we provide them with a laptop,

22   while they are deliberating they could just listen to the audio

23   themselves.

24         THE COURT:  I will take that under advisement, as

25   judges say.  I am inclined to have them out here.  I don't

1    think the question would reveal what they might be thinking.

2    So I am inclined to do that, but I might be persuaded.  I will

3    have to mull it over in my mind.

4         Is there anything else before the lawyers get together and

5    start getting the exhibits two-blocked?

6              MR. KELLER:  Not from the government, Your Honor.

7              MR. ROMAIN:  No, Your Honor.

8              THE COURT:  All right.  We're in semi-recess, I guess

9    I would call it.

10        (Recess at 12:10 p.m., until 12:45 p.m.; jury not

11   present.)

12             THE COURT:  All right.  Have a seat.  Question from

13   the jury dated today at 12:40:  Does Ted belong to 15th Street

14   Church?  If not, does he belong to any other, and does he give

15   money to other churches?  Signed by Mr. [Juror 4], Juror No. 4.

16        I think my answer is, they will have to depend on the

17   evidence that has been admitted.

18             MR. KELLER:  The government agrees with that, Your

19   Honor.

20             MR. CARY:  We do, too.

21             THE COURT:  I am going to write it out, and then I am

22   going to read it.

23        All right.  Here is what I have written out:  You will

24   have to depend on the evidence that has been admitted.

25        Any objection?

1          MR. KELLER:  No, Your Honor.

2          MR. CARY:  No, Your Honor.

3          THE COURT:  All right.  I have signed it, and it's

4    7/19/16 at 12:47.

5          MR. KELLER:  Your Honor, today is the 20th.

6          THE COURT:  Good point.  Objection sustained.  All

7    right.  I changed it to the 20th.  I have handed the note to my

8    law clerk to take to the bailiff to hand the jury.  We are

9    in recess.

10        How close are we to having the exhibits two-blocked?

11         MR. KELLER:  We have the hard copies ready to go, and

12   they could go back right now.  But we are working on a couple

13   of CDs that have the audio recordings.

14         THE COURT:  Okay.  When my law clerk comes back, take

15   the hard copies to the bailiff to hand to the jury.  We are in

16   recess.  Be at ease.

17        (Recess at 12:49 p.m., until 1:18 p.m.; jury not present.)

18         THE COURT:  All right.  We are on the record.  Do you

19   have a proposal?

20         MR. KELLER:  Yes, Your Honor.  I believe all the

21   electronic exhibits, the audio exhibits are now accurate and

22   appropriate and have been provided to the courtroom deputy.

23   The defense has also provided a laptop that the government has

24   reviewed that is a clean laptop, doesn't have any other files

25   on it.  I don't believe it can access the internet, and so our

1    proposal would be that the laptop go back with the disks so

2    that the jurors can listen to the tapes at their leisure, so

3    that they can stop a tape in the middle of the recording and

4    discuss it if they want to and replay it if they want to and

5    really include it in their deliberations as opposed to them

6    having to stop their deliberations every time they want to

7    check a recording and come into court to do that.

8            THE COURT:  Who would operate it for them?

9            MR. KELLER:  I believe that the jurors would be able

10   to just put the CD in the disk drive and play the different

11   files that are on the CD, Your Honor.

12           THE COURT:  Is this something that anybody familiar

13   with laptops can do?  In other words, I wouldn't know how to do

14   it.

15           MR. KELLER:  I believe so, Your Honor.  I believe the

16   jurors will be able to do this fairly easily.

17           THE COURT:  What says the defense?

18           MR. ROMAIN:  Your Honor, our position would be that we

19   think it would be more appropriate for the jurors to come out

20   here and to listen, as the Court had suggested, similar to a

21   juror question.  But we do have a laptop, and we agree with the

22   government's representations.  Those are, in fact, accurate

23   exhibits that they could listen to through the laptop.

24           THE COURT:  Let me do some research on this.

25        Mr. Morgan, come around here if you will, please.  Don't

1    frown.  Turn that frown upside down.

2            THE LAW CLERK:  I'm not frowning.  My computer has

3    been broken for two hours, and so I can't do any real research.

4            THE COURT:  He is my computer guru.  That was my

5    research.  I assume we're suggesting that they go back only if

6    they ask for it; is that correct?

7            MR. KELLER:  Your Honor, that is not the proposal.  I

8    would propose that it go back just like all the other evidence

9    has gone back at this point.  I am sorry.  You mean the laptop

10   specifically?

11           THE COURT:  Yeah.

12           MR. KELLER:  That's fine, Your Honor, yes.

13           THE COURT:  What says the defense?

14           MR. ROMAIN:  That would be fine, Your Honor.

15           THE COURT:  I will probably let it go back if they

16   send a request out.

17       We are in recess.

18       (Recess at 1:22 p.m., until 1:51 p.m.; jury not present.)

19           THE COURT:  All right.  We have a question from the

20   jury.  This one is not dated nor timed.  "Can we get the

21   transcript from the testimonies of Phillip Carter and Steve

22   Jones?"  And of course the answer to that is no.  I could say:

23   No transcripts available, but I can send back the CDs of the

24   recorded conversations with a laptop if you want them.  Any

25   objection to that answer?

1      MR. CARY:  Your Honor, we would object to that because

2  that's not what they are asking for, and I think it might

3  suggest that that is an appropriate response to this question.

4  And I don't think that would be appropriate.

5      MR. KELLER:  We would not object to that, Your Honor.

6      THE COURT:  I am just going to say:  No transcripts

7  are available.

8      MR. KELLER:  And just so the record is clear and I

9  understand, have the CDs gone back and just the laptop has not

10  gone back?

11      THE COURT:  No.  Laptop, I am going to send it back.

12  I have decided to do it that way.  I understand there is no

13  internet connection, is that correct, for the laptop?

14      MR. KELLER:  That's my understanding, Your Honor.

15      MR. ROMAIN:  That's correct, Your Honor.

16      THE COURT:  I am just going to say:  No transcript

17  available.  I will say:  No transcripts of any witness

18  available.  Any objection?

19      MR. KELLER:  No objection, Your Honor.

20      MR. ROMAIN:  No objection.

21      THE COURT:  That's signed by Mr. [Juror 1], by the

22  way, Juror No. 1.  1:52 p.m.  All right.

23      MR. CARY:  May I ask one question?  I am sorry.  I

24  will let you read it.

25      THE COURT:  No.  Go ahead.

1          MR. CARY:  My question is, what is the Court's

2    procedure if they ask to have something read back in the

3    courtroom?

4          THE COURT:  I usually do it to a limited extent.  If

5    they want lengthy testimony, I don't do it.

6          MR. CARY:  I am somewhat concerned that the proposed

7    response suggests to them that that's not possible.  I wonder

8    if it should say:  Transcripts cannot go back.

9          THE COURT:  What kind of language would you suggest to

10   cure that concern?

11         MR. CARY:  I would suggest something along the lines

12   of:  It is not possible to send transcripts into the jury room

13   or something along those lines.

14         THE COURT:  That's what I am saying:  No transcripts

15   of any testimony available.

16         MR. CARY:  I would add "to be sent to the jury room"

17   to that response.

18         MR. KELLER:  No objection, Your Honor.

19         THE COURT:  To adding that?

20         MR. KELLER:  To adding -- if I can piece together the

21   two pieces, "No transcripts available to be sent to the jury

22   room," no objection to that.

23         THE COURT:  All right.  Here is what I have got:  No

24   transcripts of any testimony available to be sent to the jury

25   room.  Is that what both of you approve?

1        MR. CARY:  Yes, Your Honor.

2        MR. KELLER:  No objection to that, Your Honor.

3        THE COURT:  I will read again what I have got here:

4   No transcripts of any testimony available to be sent to the

5   jury room.

6        Any objection?

7        MR. KELLER:  No objection, Your Honor.

8        MR. CARY:  No objection.

9        THE COURT:  All right.  Mr. Davis, will you hand that

10  to the bailiff to hand to the jury?

11       We are at recess.  You can be at ease.

12       (Recess at 1:56 p.m., until 1:59 p.m.; jury not present.)

13       THE COURT:  All right.  We're back on the record.  I

14  believe the prosecution has a question or a point.

15       MR. KELLER:  Yes, Your Honor.  I misunderstood the

16  Court earlier.  I thought the Court had ruled that the actual

17  CDs with the evidence from this case, the audio recordings that

18  were admitted into evidence in this case would go back to the

19  jury room and that, if the jurors asked for a way to play the

20  files, that then the Court would submit the laptop.  It's my

21  understanding now that neither the recordings that were

22  actually admitted into evidence are going to go back to the

23  jury room, nor is the laptop going back to the jury room.

24       It's our position, again, we have admitted these

25  recordings in evidence.  They have been talked about throughout

1    the entire trial.  They were talked about in closing.  We

2    represented to the jury that they would be able to play those

3    calls, those recordings, if they wanted to during

4    deliberations, and we strongly feel that they should be made

5    available to the jury during deliberations.

6              THE COURT:  All right.  If I send them now, why

7    wouldn't that emphasize them to the jury?

8              MR. KELLER:  I understand that, Your Honor, and our

9    position would be that they should have gone back initially.

10   But because of the timing, you know, if we want to wait a half

11   an hour to send those back, I would understand wanting a little

12   bit of separation between the response to their note and

13   actually sending them the CDs.  But I do feel strongly that

14   they should be sent back.

15             THE COURT:  Mr. Romain, what do you say about that?

16             MR. ROMAIN:  I agree that we would be severely

17   prejudiced if these CDs with specific recordings, many of which

18   the government has highlighted, would be sent in response or so

19   shortly thereafter.  And I would say they are, in fact,

20   available if the -- if the jury wanted to listen to the

21   recordings.  I suspect that this jury that has not been shy

22   about making requests would ask to be able to listen to one.

23   So I think that would be our position, Your Honor.  There is

24   a -- I think the Court appreciates the potential prejudice of

25   having these recordings sent back after they're looking to hear

1    about the testimony that was actually provided in court.  And I

2    would just say they are available.  If they ask for them, they

3    can be made available to listen to them.

4         THE COURT:  I wish I had sent them back originally,

5    but I don't see how I can send them back now without suggesting

6    that:  Hey, listen to these.

7         MR. ROMAIN:  We agree, Your Honor.

8         MR. KELLER:  If I can just respond briefly.  I

9    understand the Court's concern and the defense's concern, which

10   is why I suggested a buffered time period.  But at a minimum,

11   if the Court is not going to send them back, we request the

12   Court send a note to the jury at least informing them that the

13   audio evidence that was admitted in this case is available

14   should they wish to review it.

15        THE COURT:  I think that would be more suggestive.

16        MR. ROMAIN:  We agree, Your Honor.

17        MS. BELL:  I think this could be resolved just by

18   writing a note to the jury that this is not in response to the

19   prior question.  We could simply inform the jury that we are

20   sending this evidence back because it was mistakenly kept out

21   the first time without suggesting that it's related to a juror

22   question.

23        THE COURT:  What about a note that says, I note that

24   I -- I don't want to lie to them and say I forgot it, but what

25   about if I say:  I note that I failed to send these exhibits

1   back with the rest of them, so here they are.

2        MS. BELL:  Your Honor, I think that solves any

3   prejudice that could arise.

4        MR. ROMAIN:  Your Honor, I must emphasize that we

5   strongly disagree.  I think that having the Court identify and

6   provide these documents or the CDs in this way case would

7   emphasize them unduly, and coming so soon after a question

8   where they are trying to remember this testimony, which is not

9   the same thing as the transcripts, would severely prejudice us.

10       MR. KELLER:  Your Honor, I just -- this is difficult

11  for me to comprehend.  I understand the prejudice issue that

12  has been raised based on the last jury note, but this is like

13  not sending physical evidence back to the jury room.  If this

14  were a weapon in a case that the government had offered as

15  evidence of a crime, there is no doubt that the evidence would

16  be made available for the jury to review.

17       THE COURT:  No.  There is a difference because sending

18  these back, it would be obvious what I have done.  The

19  contraband or whatever, you send it back, it would be obvious

20  that it should have been sent back in the beginning, but I

21  can't see sending these without suggesting -- I want to send

22  them, but I have got to think of some way, if I can, to do it

23  without unduly drawing the jury's attention to it.  I disagree

24  that it's the same as sending a gun back.

25       MS. BELL:  And, Your Honor, I think the way to make

1   the jury understand that is, the things that we did send back

2   were just paper documents.  They were in binders.  I think we

3   could say the CDs were mistakenly kept out of the binder, and

4   we are now sending them back.

5       I just want to note for this Court, this includes defense

6   exhibits as well.  There are defense CDs as well.  So the jury

7   has a right to review all the evidence from both sides, and I

8   think just telling them this is unrelated to their questions

9   and there was an inadvertent mistake that kept them from seeing

10  them and now here they are.

11      MR. ROMAIN:  The only thing I would say in response to

12  that, Your Honor, is it's true.  Our exhibits are out here as

13  well.  If they want to listen to them, they can send a note and

14  say we would like to listen to the tapes that have been

15  emphasized, and then we can make them available to be listened

16  to.

17      THE COURT:  I think one of my lawyers walked up here a

18  minute ago.

19      THE LAW CLERK:  I backed down.  I was going to point

20  out about -- what you pointed out about guns and ammunition

21  don't always go back.

22      THE COURT:  I think guns do, but ammunition don't.

23  But I might be wrong on that.  I know the ammunition never has.

24      I am cerebrating.  If you have another idea or an angle, I

25  will be glad to hear you, but I am thinking about it right now.

1        How many of these are there?

2             MR. ROMAIN:  Are you talking about the number of

3   disks?

4             THE COURT:  Yeah.

5             MR. ROMAIN:  There are six -- sorry.  There are six

6   disks with audio recordings and one disk with a video

7   recording.

8             THE COURT:  So there are seven total?

9             MR. ROMAIN:  Yes, Your Honor.

10            MR. KELLER:  Again, Your Honor, the video was central

11  to the government's case.  It has no audio to it.  There are no

12  statements recorded that are part of that video.  That would,

13  at minimum, seem unrelated to their recent note about

14  transcripts.

15            THE COURT:  Okay.

16            MR. ROMAIN:  Our view would be that there is no

17  distinction.  As a matter of fact, in highlighting that

18  particular video, with respect -- and putting the Court's

19  imprimatur on that would not be appropriate.  I would

20  emphasize, Your Honor, that these are available to the jury.

21  If they ask for it, they will get it.

22            THE COURT:  Here is what I am going to do:  To Jury,

23  July 20, 2016.  Here are seven disks that were admitted into

24  evidence that I realize I failed to send back with the other

25  exhibits -- the usual practice is to send to the jury room all

1  exhibits that were admitted.  My name and 2:10 p.m.

2      I note the defendant's objection and save your exception.

3          MR. ROMAIN:  Your Honor, we would like to clarify for

4  the record.  The second note sent from the jury, has a response

5  been sent back yet?

6          THE COURT:  The one about transcripts?

7          MR. ROMAIN:  About the transcripts.

8          THE COURT:  Yes.

9          MR. ROMAIN:  And so the Court has preserved our

10  objection.  Thank you.

11          THE COURT:  I think it's the usual practice that I

12  send it back, and this is the best I can do to palliate.  They

13  call that palliative care in the hospital.

14      We are in recess.

15      (Recess at 2:12 p.m., until 2:38 p.m.; jury not present.)

16          THE COURT:  All right.  We're on the record.  You need

17  to leave at least one Justice Department lawyer here in the

18  courtroom or right outside in the hall who has full authority

19  to speak for you.  I don't like to wait too much.  Patience is

20  not my strong suit.

21      I want to ask you a question, and I want to think about

22  your responses.  Normally at 5:00 o'clock, after a full day, I

23  send the jury home and with a careful admonition and have them

24  come back at 9:00 o'clock the next morning, but if the lawyers

25  want me to, I will ask if they want to deliberate beyond 5:00.

1    I am available to do it.  I would like to see what you-all's

2    thought is.  The general idea is, I don't like them

3    deliberating while they are tired.

4           MR. CARY:  For the defense, Your Honor, we very much

5    agree with that, and we think they should go home at a normal

6    closing time.

7           THE COURT:  What says the prosecution?

8           MR. KELLER:  No objection either way, Your Honor.

9           THE COURT:  I more than likely will send a note to

10   them and tell them I am inclined to send them home unless they

11   feel like they are very near a verdict.

12          MR. CARY:  I object to that, Your Honor.  It suggests

13   that perhaps patience isn't the Court's virtue.  I am troubled

14   by that.

15          THE COURT:  I will say:  But I am not rushing you.  I

16   will add that.  I might not do that.  I may just ask them if

17   they want to or not.

18      Anybody else want to bring up anything?

19          MR. KELLER:  No, Your Honor.

20          MR. CARY:  No, Your Honor.

21          THE COURT:  All right.  I will think about that.  I

22   appreciate y'all coming back.

23      We are in recess again.

24      (Recess at 2:40 p.m., until 3:22 p.m.; jury not present.)

25          THE COURT:  We have a jury question dated the 20th,

1   3:15.  Do we have to have a verdict today?  And it's signed by

2   Mr. [Juror 4].

3       All right.  My immediate thought is to say:  No.  Do you

4   want to stop at 5:00 today or do you want to deliberate longer?

5   Please advise.

6           MR. KELLER:  No objection to that, Your Honor.

7           MR. CARY:  We would have a preference for -- that they

8   be allowed to -- simply say "no," but -- and -- I don't have an

9   objection.

10          THE COURT:  In other words, you would have a

11  preference if I just give a definitive monosyllabic "no"?

12          MR. CARY:  Yes, Your Honor.

13          THE COURT:  What says the government on that?  I am

14  undecided.

15          MR. KELLER:  No objection either way, Your Honor.

16          THE COURT:  I am just going to put, "No."

17      All right.  I am handing that answer to my law clerk to

18  take to the bailiff to hand to the jury.

19      We are in recess.  You can be at ease.

20      (Recess at 3:24 p.m., until 4:10 p.m.; jury not present.)

21          THE COURT:  If the jury is going to deliberate past

22  5:00, we need to order them supper.  I am inclined to send them

23  a note and ask them if they want to deliberate past 5:00.  And

24  if so, we will order them supper.  If not, we won't.  Then we

25  will recess at 5:00 and come back in the morning for

1    deliberation.

2         What is your reaction?  Start with the prosecution.

3         MR. KELLER:  That's fine with the government, Your

4    Honor.

5         MR. CARY:  Our preference would be that you ask them

6    what time would they like to stop deliberating rather than -- I

7    am just worrying about anything that suggests that there is a

8    rush here or that the Court expected them to deliberate past

9    5:00 this evening.  That's our position.

10        THE COURT:  Let me think about it.  I can't help but

11   remember one jury.  I was defending a college student here at

12   UALR who shot and killed her mother and was charged with

13   first-degree murder.  The jury reached a verdict about 4:30,

14   but decided to wait and eat supper at the expense of the county

15   before returning the verdict.  I found out about it later.

16   That's the only jury in my whole experience that I was ever mad

17   at.

18        What about just saying:  Do you want to recess at 5:00 and

19   come back in the morning at 9:00 and deliberate or do you want

20   to deliberate further -- or want to deliberate longer today?

21        MR. CARY:  That's fine, Your Honor.

22        THE COURT:  Does that suit the government?

23        MR. KELLER:  Yes, Your Honor.

24        THE COURT:  See how this works:  Do you want to recess

25   at 5:00 p.m. today and come back tomorrow at 9:00 a.m. to

1    continue deliberations or do you want to continue deliberations

2    further -- I don't know whether it's "further" or "farther" --

3    further (after 5:00 p.m.) today?  Your choice.  Bill R. Wilson,

4    Judge.

5            MR. CARY:  That's fine, Your Honor.  Thank you.

6            MR. KELLER:  No objection, Your Honor.

7            THE COURT:  Mr. Davis, would you take that to the

8    bailiff, please?

9            THE LAW CLERK:  I will.

10           THE COURT:  We are in recess.

11       (Recess at 4:16 p.m., until 4:23 p.m.; jury not present.)

12           THE COURT:  Answer from the jury, not signed or timed:

13   Can you please check back at 5:00 p.m.?  We are making

14   progress.

15       I think I will say, "Yes," and I will let it go at that.

16       "Can you check back at 5:00 p.m.?  We are making

17   progress."  I think I will just answer, "Yes."  And if they

18   decide to go beyond 5:00, I will just let them go to about 6:00

19   and we won't buy them supper.

20           MR. KELLER:  That sounds good, Your Honor.

21           MR. CARY:  Agreed, Your Honor.

22           THE COURT:  I am putting date and time on this.  All I

23   did was say, "Yes," and put my name, my signature, date and

24   time.

25       We are in recess.  Be at ease.

1          (Recess at 4:24 p.m., until 4:52 p.m.)

2          (Jury enters the courtroom.)

3          THE COURT:  Ladies and gentlemen, I understand you

4     have reached a verdict; is that right?

5          JUROR 1:  Yes, Your Honor.

6          THE COURT:  Would you hand it to the bailiff, please,

7     so he can hand it to me?  Thank you.

8          Ladies and gentlemen of the jury, as I read the verdict

9     form, Count 1, you find the defendant not guilty; Count 2, you

10     find the defendant guilty; Count 3, not guilty; Count 4,

11     guilty; Count 5, guilty; Count 6, guilty.  Signed by the

12     presiding juror, 7/20/16.

13          I am going to ask each one of you, starting with

14     Mr. [Juror 1] and going down the row, one after another, if

15     each of these is your individual verdict, say, "Yes."  If it is

16     not your individual verdict, say, "No."  Starting with

17     Mr. [Juror 1] and go that way.

18          JUROR 1:  Yes.

19          JUROR 2:  Yes.

20          JUROR 3:  Yes.

21          JUROR 4:  Yes.

22          JUROR 5:  Yes.

23          JUROR 6:  Yes.

24          JUROR 7:  Yes.

25          JUROR 12:  Yes.

1          JUROR 11:  Yes.

2          JUROR 10:  Yes.

3          JUROR 9:  Yes.

4          JUROR 8:  Yes.

5          THE COURT:  Does either side wish anything else from

6    the jury?

7          MR. KELLER:  No, Your Honor.

8          MR. CARY:  No, Your Honor.

9          THE COURT:  Ladies and gentlemen, I want you to go to

10   the jury room just briefly.  I want to talk to you, not about

11   the case, but to find out if you have any suggestions how we

12   can make the courthouse more user friendly for future jurors.

13   I will only take a minute of your time.

14        Let the jury stand out, and everyone else remain seated.

15        What is the prosecution's position on the defendant's

16   being out waiting for sentencing?

17          MR. KELLER:  We recommend continued release, Your

18   Honor.

19          THE COURT:  All right.  I will do that.  You need to

20   be in contact with the presentence officer immediately and stay

21   in contact with them and still follow the rules and regulations

22   that you are under, Mr. Suhl.

23        All right.  If there is nothing else, we will recess.

24          MR. CARY:  Your Honor, a couple of issues.  One, we

25   renew all of our previous motions for the record.

1          THE COURT:  Denied.  Exception saved.

2          MR. CARY:  And second, we would ask for an extension

3   of time to file posttrial briefing, new trial motion, Your

4   Honor, of 30 days.

5          THE COURT:  I will say this.  We won't have sentencing

6   within 30 days.

7          MR. KELLER:  Your Honor, no objection.

8          THE COURT:  All right.  You will have 30 days from

9   today.  When will that be?

10          MR. CARY:  August 19 by my -- I don't know whether

11   that's a weekday or not.

12          THE COURTROOM DEPUTY:  August 19 is 29 days.  The 20th

13   is on a Saturday.

14          THE COURT:  Let's do it on -- the 22nd is a Monday?

15          THE COURTROOM DEPUTY:  Yes, sir.

16          THE COURT:  You will have until August 22nd at noon.

17          MR. CARY:  Thank you, Your Honor.

18          MR. KELLER:  Your Honor, we would ask for the same

19   amount of time to respond, so 30 days to respond.

20          THE COURT:  That's fine.  You will have -- when is 30

21   days after that?

22          THE COURTROOM DEPUTY:  September 19 -- September 20.

23          THE COURT:  All right.  Until noon, September 20.

24      Is there anything else we need to tend to?

25          MR. KELLER:  No, Your Honor.

1          MR. CARY:  No, Your Honor.

2          THE COURT:  The lawyers have handled this invariably

3    in a professional manner, and I very much appreciate all of you

4    from each side.

5          We are in recess.  Be at ease.

6          (Proceedings adjourned at 4:58 p.m.)

7                    C E R T I F I C A T E

8          I, Cheryl Nelson Kellar, Official Court Reporter, do

9    hereby certify that the foregoing is a true and correct

10   transcript of proceedings in the above-entitled case.

11

12   /s/ Cheryl N. Kellar, RPR, CRR, CCR   Date:  July 20, 2016
         United States Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25