IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

UNITED STATES OF AMERICA,
Plaintiff,
v. No. 4:15CR00300-01 BRW

October 27, 2016
Little Rock, Arkansas
10:00 a.m.

THEODORE E. SUHL,
Defendant.

**TRANSCRIPT OF SENTENCING PROCEEDINGS**
BEFORE THE HONORABLE BILL WILSON,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

On Behalf of the Government:

MR. JOHN D. KELLER, Trial Attorney
MS. LAUREN BELL, Trial Attorney
MS. AMANDA R. VAUGHN, Trial Attorney
United States Department of Justice -
Public Integrity Section
1400 New York Avenue NW
Washington, D.C. 20530

On Behalf of the Defendant:

MR. ROBERT M. CARY, Attorney at Law
MR. THOMAS LANGDON HARRIS, Attorney at Law
Williams & Connolly LLP
725 Twelfth Street NW
Washington, D.C. 20005-5901

MR. CHARLES A. BANKS, Attorney at Law
Banks Law Firm, PLLC
Post Office Box 251310
Little Rock, Arkansas 72225-1310

Defendant Present.

Proceedings reported by machine stenography and displayed in realtime; transcript prepared utilizing computer-aided transcription.

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

P R O C E E D I N G S

THE COURT: Good morning. Be seated, if you will, please.

We're here today for sentencing in United States against Ted Suhl, Case No. 415CR00300. The defendant, Mr. Suhl, is here with his lawyer, Mr. Rob Cary. And the prosecution will be -- I believe Mr. Keller is going to speak for the prosecution today. Is that correct?

MR. KELLER: Yes, Your Honor.

THE COURT: All right. We're here for sentencing under the guidelines and applicable statutes. Are the parties ready?

MR. KELLER: Yes, Your Honor.

MR. CARY: Yes, Your Honor.

THE COURT: I'm going to be like a preacher that says, before I talk to you, I'm going to tell you something.

I want to ask the prosecution about -- I'm going to give them a hypothetical situation. The guidelines suggest that Mr. Suhl should be given some points because he testified but he was found guilty, in essence, of finding that he committed perjury but denying he was guilty.

Let me ask you a question, Mr. Keller. Let's take the situation where a man is charged with first degree murder. At the scene there was one eye witness and he says the defendant -- he identifies the defendant and said he shot this

man apparently just to watch him choke and die. The defendant takes the stand and denies that he's guilty. He says he was somewhere else. But the jury convicts him. Should he be enhanced?

MR. KELLER: Under those facts, Your Honor, yes.

THE COURT: What's the theory: That he lied?

MR. KELLER: That he lied, Your Honor, especially with the added detail that you said he was somewhere else. And the jury clearly disbelieved that testimony, he lied under oath, and therefore obstructed justice and qualifies for the enhancement.

THE COURT: Well, I think that's what the guidelines say. It feels un-American to me. I don't like it.

What says the defense?

MR. CARY: Your Honor, one of the cases cited by the government, the *Ring* case by Judge Huvelle in the District of Columbia, makes exactly the point I believe your hypothetical illustrates, that the defendant, in the hypothetical you addressed and in terms of what happened in this courtroom, exercised his constitutional right to deny the charges. And there's certainly case law, especially with one witness, that denying a charge, denying guilt, does not constitute perjury. I understand that the guidelines say something a little different. And, frankly, Your Honor, we thought we had bigger fish to fry than to challenge that particular enhancement.

THE COURT: I understand.

MR. CARY: And in order to enhance our credibility with the Court, we picked our battles. But I certainly agree with the proposition it's un-American to give a 2-point enhancement to someone who exercises his constitutional right to go to trial and his constitutional right to take the stand to deny the charges.

THE COURT: This is not the first time I've faced it. It's a gravel in my shoe. At any rate, we'll get to that later.

I'm going to summarize how we got to this point. Y'all stay with me, and if I get the summary wrong, you correct me.

A December 2, 2015, indictment charged Mr. Suhl with the following: Count 1, conspiracy to commit bribery and honest services fraud from on or about April 2007 through February of 2012.

Counts 2 and 4 -- through 4: Aiding and abetting honest services wire fraud on August 16, Count 2; September 9 in Count 3; September 12, 2010.

Count 5, aiding and abetting bribery concerning programs receiving federal funds from on or about August 2010 through November 2011.

Count 6, aiding and abetting a violation of the Travel Act on or about September 11, 2011.

On July the 20th of this year, a jury found Mr. Suhl

guilty of Counts 2, 4, 5, and 6, and not guilty on Counts 1 and 3. Is my summary correct?

MR. KELLER: That's correct, Your Honor.

MR. CARY: We agree with that summary, Your Honor.

THE COURT: All right. Mr. Suhl, are you satisfied with your lawyers?

THE DEFENDANT: Yes, Your Honor, I am.

THE COURT: 100 percent?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. Of course, in determining the sentence I'll consider the factors listed at 18 U.S.C. Section 3553 in the sentencing guidelines and other applicable statutes.

The Sentencing Reform Act of 1984 created sentencing guidelines. The guideline range that we'll -- that I will come up with is merely a recommendation, it's not given any presumption of correctness, and I'm free to go above or below, pretty much.

Let's go over the sentencing report and see about the disputations. I'll need to resolve those. Then we'll work through the guidelines and see what range we come up with. And then Mr. Cary can speak on behalf of Mr. Suhl. Mr. Suhl, you can speak on your own behalf if you want to. And, incidentally, I've read your mother's good letter, just finished reading it. You can speak on your own behalf if you

want to, but, on the other hand, if you don't want to, it's up to you 100 percent and I won't hold it against you that you didn't speak on your own behalf. If I forget to call on you and you want to speak, I'll leave it up to you and Mr. Cary to get my attention before I call on Mr. Keller to close for the government.

Have both parties had all the time they need to review the presentence report?

MR. KELLER: Yes, Your Honor.

MR. CARY: Yes, Your Honor.

THE COURT: All right. Of course, I've got the paragraph 43 objection under consideration.

Does the defendant still stand on the objection to paragraph 80 based on the probation officer's response?

MR. CARY: Your Honor, we -- if I understand it correctly, we understand that the cost of incarceration and supervision can be used for purposes of determining a fine, and that's acceptable to us.

THE COURT: All right. I believe both parties object to paragraphs 25 and 38 that talk about the value of the benefits. Am I correct on that?

MR. KELLER: That's correct, Your Honor.

MR. CARY: Yes, Your Honor.

THE COURT: All right. Give me your rendition, Mr. Keller, of what the government thinks a proper amount would

be and tell me how you calculated it.

MR. KELLER: Yes, Your Honor. There are three alternative methods the Court can use to calculate the benefit to be received for the bribes paid under the guidelines in this case.

First, there's the profits to the defendant's companies derived specifically from Medicaid revenue from the Department of Human Services. So the defendant was paying bribes to Steven Jones, he's second in command, the deputy director of the Department of Human Services --

THE COURT: Paying him indirectly?

MR. KELLER: Excuse me?

THE COURT: He was paying him indirectly, right?

MR. KELLER: That's correct, Your Honor, but he is paying Mr. Jones -- the scheme starts in 2008 where a new administration has been ushered in, both federally and at the state level. Mr. Suhl perceives these administrations as being hostile to him. He has not been reappointed to an influential child welfare agency review board, and so he sees his business in jeopardy, he sees the possibility of policies coming into play that will affect that Medicaid revenue stream that he depends on from the Department of Human Services.

He starts meeting with Mr. Jones, paying Mr. Jones bribes to protect that revenue stream. And the profits from that revenue stream end up being $1.8 million over the four years of

the scheme.

The cases cited in the government's sentencing memorandum show that we don't have to prove that the defendant paid each bribe as to specific dollars that he received from the Department of Human Services. It's enough for the government to show that he made payments with the intent to facilitate the Medicaid revenue that was coming from the Department of Human Services to his companies. So here that's exactly what the jury found he did, and what the Court has even referenced in its denial of the defendant's motion -- second motion for a new trial, that he was paying bribes to Jones to enhance his companies' financial situation, and that was all based on the Medicaid revenue that was coming from the Department of Human Services.

So then if you look at the profits, because the guidelines in the case law are clear, it's only profits, it's not gross revenue, it must be net proceeds. And the net proceeds based on that Medicaid revenue stream is about $1.8 million. I do think it's important to note, because it can get confusing, for me anyway, that this $1.8 million figure is not what we are -- what the government is saying the defendant received, that he actually received $1.8 million in return for his bribe payments. We are saying that $1.8 million reflects what he intended to receive, the benefit that he intended to receive when he paid bribes to Steven Jones, because the government

agrees that Steven Jones didn't actually do very much to give any business to the defendant, but the defendant didn't know that when he started this bribery scheme and as he continued the bribery scheme. So it is the defendant's intent to protect that Medicaid revenue stream, to facilitate that Medicaid revenue stream, that makes that -- the profits on that revenue stream the benefit to be received.

Admittedly, that connection between the bribe payments and the full Medicaid revenue stream from the Department of Human Services over the course of the scheme, that connection is not as direct as the connection between the defendant's final bribe payment, the payment in September of 2011, and the action that he requested in exchange for that bribe payment, namely, changing the policy that was directing business to Mid-South. So the government has provided that as an alternative method for the Court to use to calculate the benefit to be received under the guidelines, because in that situation --

THE COURT: How much do you -- what is your figure that you ultimately came up with?

MR. KELLER: It's approximately $170,000, if you look --

THE COURT: 176,000?

MR. KELLER: I believe that's correct, Your Honor. I can check the exact figure.

THE COURT: I wish you would. I think I have it, but

I want to make sure.

MR. KELLER: The exact figure, Your Honor, is $176,820.05.

THE COURT: Tell me how you got that.

MR. KELLER: Okay. So the defendant makes a request through Phillip Carter initially that Jones put a stop to a policy that's directing business to a competitor, to Mid-South. The defendant has argued that, first of all, we don't know how much this policy actually impacted the business going to Mid-South, No. 1; and, No. 2, we don't know how much of that business of Mid-South's business the defendant stood to gain even if Jones changed his policy. But the best evidence we have as to what the defendant believed the policy impacted are the defendant's own words to Phillip Carter on tape. He says exactly how much of Mid-South's business that he thinks this policy impacts that he wants Jones to change.

So if you look at Government's Exhibit 8-A from trial, this is a recorded call from July 25, 2011, and this is the transcript. The highlighted portions here toward the bottom of the page, page 1, the defendant is obviously talking about this policy that we're addressing now, "the DHS in Northeast Arkansas, they give all their referrals to Mid-South in outpatient and that needs to have a stop put to it."

He then continues, "all their Medicaid, all their families." He doesn't say, "You know, I realize this only

affects a few of their clients or a few of their families, or it only affects a small percentage of their business, but it's just not fair and so I want Jones to change it." He says, "all their Medicaid, all their families." And so that is what is determinative here, what the defendant thought the policy impacted. And here, clearly, based on his own words, he thought the policy applied to all of Mid-South's Medicaid.

So if you then look at Mid-South's Medicaid in 2011, in their Northeast Arkansas provider sites, those numbers are listed here. And the government has only used the numbers in the zero to 20 column because that's the -- that is the client base that the defendant competed with Mid-South for. So he only competed for minors, zero to 20. So the government did not include the 20-plus Medicaid revenue that was going to Mid-South.

But if you look at all of the revenue going to Mid-South in 2011, Medicaid revenue, for minors, for the treatment of minors, you get a total of $4,735,193.10 in 2011. And that's taken directly from the Medicaid data that was admitted at trial from the Department of Human Services. Now, again, that is a gross number, it is a gross revenue number.

THE COURT: You don't contend that the defendant would have made that much money if he had gotten that business, do you --

MR. KELLER: That he would have profited --

THE COURT: -- net?

MR. KELLER: -- that much money? No, no, no.

THE COURT: How do you calculate what he would have gotten?

MR. KELLER: So you have to look at what the defendant's profit margin was for his own company that was trying to obtain that business for Maxus or Arkansas Counseling Associates. And if you look at the defendant's tax returns for 2011 for Maxus, which was attached as Government's Exhibit 1 to its sentencing memo, you see this is Maxus, Inc., 2011, the adjusted gross revenue highlighted there in line 1E that the defendant's company Maxus obtained that year was $16,444,693. And then after all of the deductions that he claims, all the expenses, the overhead, you get an income or profit number of $478,673. So that 478,000 is 2.9 percent of the gross proceeds, the 16.4 million. So if you apply that same profit margin, 2.9 percent, to the gross proceeds of Mid-South, that $4.7 million number, you get $137,000 -- $137,320.59 for 2011.

THE COURT: Hang on just a minute. I need to consult with my lawyer.

(Court/Law Clerk conference.)

THE COURT: I think my calculation is the same as yours, but I want to -- 2.9, you come up with $137,320.60?

MR. KELLER: My rounding came to 59 cents, but, yes.

THE COURT: All right. Let's go to 2012.

MR. KELLER: So then looking at 2012, this is also -- this was filed as Exhibit 1 to the defendant's sentencing memorandum. Again, this is the Maxus tax return for 2012, the adjusted gross revenue number for Maxus in 2012 is $18,621,186. That's line 1C of the tax return. Looking down at line 21, which is the profit the company made, the profit the company declared to the IRS after taking all of its deductions, you get $173,661. That number represents .9 percent of the gross proceeds for 2012. So if his profit margin was .9 percent, and you apply that to Mid-South's Medicaid revenues for minors in 2012, which is about 4.38 million -- .9 percent applied to that gross number for Mid-South of 4.38 million that the defendant was trying to obtain for his own companies gets you down to $39,499.46.

So that's 137,000 for 2011; 39,000 for 2012. You add those numbers together and you get to the 176,820 that we discussed before, the total number for 2011 and 2012 that the defendant intended to have the ability to obtain through paying this bribe to Steven Jones.

Now, the defense has argued that we can't prove -- the government cannot show that all of that Medicaid going to Mid-South would have gone to the defendant even if he was successful in his bribe to Steven Jones. But the case law is clear that we don't have to show that. The government only has to show that the defendant's bribe was intended to facilitate

that Medicaid business, that that Medicaid business was what was on the table, that that was what the defendant was trying to obtain. And as we cited in our sentencing memo from the Seventh Circuit case, *Sapoznik*, where there was a gambling operation that a defendant was accepting bribes to not interfere with, he was a law enforcement officer accepting bribes, the Court found that that gambling operation generated 6 million in revenue. The defendant said, "Well, you can't prove that just because I accepted bribes, I'm responsible for all 6 million of that gambling revenue. Even if I hadn't taken bribes, there still would have been gambling going on, and you can't attribute the full 6 million to me."

That's essentially what the defendant is arguing here, "Even if I had been successful, you can't attribute the full 4.7 million in 2011 or the full 4.3 million in 2012 to me." But *Sapoznik* makes clear the government doesn't have to show that and the sentencing court doesn't have to find it; merely, that the defendant's bribes were intended to facilitate his access to that business, facilitate his ability to obtain that business.

And then what *Sapoznik* really stands for is that the government must use a net number as opposed to a gross number. And that is exactly what we've done here. We've used the defendant's own profit margins and applied them to the Medicaid money going to Mid-South and come up with these net profit

numbers that the defendant was paying to receive.

I would also note, using 2011 and 2012 is somewhat of a conservative figure because presumably the defendant was paying so that he could have access to this business for the years to come. We could include 2013, we could include 2014, we haven't done that. 2011 and 2012 --

THE COURT: I doubt the defense appreciates your charity on that.

MR. KELLER: Well, I don't intend to make light of it --

THE COURT: I understand what you're saying.

MR. KELLER: -- but it does -- because the case law requires only a reasonable estimate, this is a reasonable estimate. And the defense makes a point in their sentencing memo that you can't attribute the full proceeds of 2011 to the defendant because he didn't even make this ask of Carter until July and he didn't make the payment to Jones until September. But, again, trying to make a reasonable estimate, it would be reasonable for the Court to use all of 2011 and all of 2012. And even if the Court only used approximately half the proceeds from 2011, because the defendant didn't make the ask of Carter until July of 2011 -- even if you cut the 137,000 from 2011 in half, that still gets you roughly $65,000. And you can then add that to the $39,000 from 2012 as an alternative guidelines calculation that would be even more conservative, should the

Court wish to go that route.

And then, finally, Your Honor, the final alternative method here for calculating the guidelines is the bribes paid amount. And here the bribes paid were the $29,500 in checks that the defendant wrote to the 15th Street Church of God in Christ and that he passed to Mr. Carter and to Pastor Bennett with the intent that they pass that money on to Jones. The defense argues that we should only use the amount that Jones testified he received, approximately 4- to $6,000. First of all, that testimony was not credible at trial.

THE COURT: By the way, there was some mention in the presentence report or maybe one of y'all's pleadings that said that Jones had gotten a reduced sentence. And there hasn't been a motion filed to reduce his sentence, has there?

MR. KELLER: That's right, Your Honor, and the government does not intend to file such a motion. Jones' testimony at trial was not credible. The figure that he gave, the 4- to $6,000, appeared to be him minimizing what he actually received in the scheme. But even if you credit that testimony, the 4- to $6,000, it's clear that the defendant paid more in bribes than what Jones actually received because Carter and Pastor Bennett were skimming off the top, they were taking money for themselves. That doesn't affect the defendant's intent. His intent was that they pass the money as bribes to Jones. And so that bribery figure, the bribes paid amount, is

$29,500.

The defense argues that --

THE COURT: I'll tell you what. Mr. Cary, would you mind addressing this issue at this point rather than later?

MR. CARY: No. I'd be happy to. Yes.

THE COURT: Let's let him address it and I'll give you a rebuttal if you think he doesn't do right.

MR. KELLER: Understood, Your Honor. Thank you.

MR. CARY: And, Your Honor, I understand you want me to address the loss amount, the benefit amounts?

THE COURT: That's the only thing we're considering right now, and you'll get to get back up and do other things later.

MR. CARY: So there are three different alternatives presented by the government. The first is that all of Mr. Suhl's companies' profits during the time period --

THE COURT: That's out.

MR. CARY: Thank you, Your Honor.

So with respect to the Mid-South -- their theory that all the Medicaid money of Mid-South would have gone to Mr. Suhl's companies, and then you multiply that by a profit margin, we think that's also illogical and doesn't meet the standard.

The evidence at trial was -- and the evidence on the tapes and what's in the indictment is that Mr. Suhl was concerned about an exclusive referral program. There's zero evidence in

this record, nothing that's been cited by the government, that shows what percentage their Medicaid of Mid-South -- Mid-South's Medicaid revenues would have come from DHS referrals.

And we learned from Ms. Castleberry recently that -- and I understand Your Honor's denied our motion, but that there was no referral system, there was an after-the-fact approval system, but no referral system. What the testimony was at trial from Mr. Etchinbury [sic] and from Mr. Suhl was that they were concerned that there were foster care referrals being made. There's all sorts of other ways they get Medicaid revenue, but there was a small amount, and basically an insignificant amount, for Mr. Suhl's businesses, for his marketing plan, was attributable to foster care referral.

So our position is to assume that every single cent of Medicaid money that Mid-South was receiving was going to go to Mr. Suhl is completely inconsistent with the record and there's no evidence that that would have happened.

And to the extent the government says, "Well, you could cut it in half or you could cut it somewhat," that is not the sort of specific and reliable evidence that's required under the sentencing guidelines to provide for a -- for the loss amount.

The *Sapoznik* case from the Seventh Circuit, that's a case where a police officer accepted bribes in order to not shut

down a gambling operation. There's real causation there. If the police officer had not accepted the bribes and enforced the law, he would have shut it down. And it is true that the Seventh Circuit sent it back to be reduced by actual profits. But there's a direct cause and effect in that case: Bribe paid, gambling operation allowed to exist. That's not the case here at all.

And, you know, we actually -- and I understand Your Honor's denied the motion, but we were stunned to hear from Ms. Castleberry that there was no referral process at all. The testimony at trial, which if we had been able to show that, would have corroborated Mr. Suhl's testimony and Mr. Etchinbury's testimony that, in fact, DHS referrals were very small, was not a significant part of their business.

So that takes us back to what we think is the best way to estimate the number that has to be determined for the sentencing guidelines, and that's what this Court has done twice before with respect to Mr. Jones and with respect to Mr. Carter.

The law is very clear that with respect to a bribe recipient, you have to take the greater of the value of the bribe or the benefit to be received by the briber. They were sentenced in March, I believe it was, maybe it was February, long after this indictment was in place, long after this case had been indicted, and the government agreed that the proper

loss amount there was 6,500 to $15,000, the amount of bribes that were -- that everybody agreed at that time had been paid. That's what ought to be applied here. We actually believe now that Mr. Jones has testified and the jury has acquitted on one of the bribery counts, that it should be 4- to $6,000. But that's what worked then, it works now. And I'm getting ahead of myself just a little bit, but it's consistent with the guidelines, as well, the factors, the sentencing factors that similar sentences should be given to people similarly situated.

THE COURT: Thank you.

I'm ready to rule. I believe the government's calculation is correct, we're off a penny or two, and I'm finding the total is $176,820.06, and that's based on the 2011 and 2012 calculations that's outlined by the government, and I'm adopting that over the objection of the defendant.

All right. Let's move on to another area.

Prosecution, you got anything else?

MR. KELLER: No, Your Honor.

THE COURT: All right. Are there any other objections to the presentence report?

MR. KELLER: None from the government, Your Honor.

MR. CARY: No, Your Honor.

THE COURT: All right. I'll adopt it with the -- I adopt the presentence report with the calculations just outlined that I've accepted. I am not going to give an

enhancement. I'm ruling now I'm not going to give an enhancement for his testifying and being found guilty. As I said earlier, this seems un-American to me. I've given it a lot of thought. On the one hand, you can say: Well, he can go to trial and not testify and he won't get punished. And there was a circuit -- colorful circuit judge that presided here in Pulaski County many years ago. I practiced before him for several years. And he was fond of saying that a defendant has a right to lie in his own defense, has a constitutional right. Well, that doesn't seem to square with traditional notions of fair play and justice. But I -- I'm very uncomfortable when we've got a question of intent here -- and I realize the defendant -- the jury found against Mr. Suhl on what his intent was, and I accept the jury verdict, but I'm not going to give him -- I'll let the government go to the Eighth Circuit if they want to and let the Eighth Circuit clarify this.

MR. KELLER: Your Honor, if I could just state for the record, I understand the Court's sentiment. There is a distinction, I think, between testifying generally in one's defense and making explicit statements like when he passed that bribe check to Carter after Jones left the table was because he wanted to be anonymous in his donation. I mean, there were specific statements that I think would be shown to be false based on the jury's verdict. But I understand the Court's sentiment.

I would only propose, I guess, that based on the Court's disagreement with the guidelines viewed, that the Court reflect that in a variance as opposed to a finding that the guideline enhancement doesn't actually apply, that the Court just essentially varied two levels downward at the end.

THE COURT: I don't mind calling it a variance because I'm just not going to apply it.

MR. KELLER: Understood, Your Honor.

THE COURT: And I realize there are degrees here. At some point, when a person gets up, is blatant -- and you may contend it's blatant in this case, and some of them were pretty clearly, strongly -- pretty clearly, strongly supported the jury verdict, but I just don't like the idea of, in effect, penalizing someone for going to trial. And I can be reversed, of course, on a variance if it's not reasonable, but -- so I'm not adopting that.

All right. Are y'all ready for me to determine the guideline range now based on the rulings and the presentence report?

MR. KELLER: Yes, Your Honor.

THE COURT: All right. The base offense level is 12 -- if I state one of these and you disagree with it, other than your objection, if you've got something new, let me know right then.

More than one bribe, that's under the specific offense

characteristics, plus 2. As stated earlier, the value of the intended benefit to be received was 176,820.06, so I increase it by 10. The offense involved an elected public official, so that's a plus 4. Come up with a total offense level of 28.

Under my rulings, do the parties agree to that?

MR. KELLER: That's correct, Your Honor. I believe the Court said the offense involved an elected public official. Here it involved a high-level decision-maker as opposed to elected.

THE COURT: Appointed -- he was an appointed public official and a decision-maker, you're correct. Thank you.

According to the presentence report, the criminal history score is zero, which put him in a category of I.

Imprisonment. The maximum statutory term of imprisonment for Counts 2 and 4, not more than 20 years; Count 5, not more than ten years; Count 6, not more than five years. Is that correct?

MR. KELLER: That's correct, Your Honor.

MR. CARY: Yes, Your Honor.

THE COURT: All right. Under the guidelines, based on a total offense level of 28 and a criminal history category of I, the guideline imprisonment range is 78 to 97 months. Am I correct on that calculation?

MR. KELLER: Yes, Your Honor.

MR. CARY: Yes.

THE COURT: Supervised release is, under the statute, not more than three years; the guidelines, not less than one, and not more than three.

Probation. Statutory provides not less than one year and not more than five years. The guidelines hold probation is not applicable and I will not do probation in this case.

Fines. The statutory maximum is $250,000 per count. Under the guidelines, the fine range for the offenses is 12,500 to 125,000. Is that right?

Mr. Suhl declined to fill out the net worth statement, the cash -- monthly cash flow statement and declined to sign the authorization to release information regarding personal and financial data. However, he noted -- he told probation that his net worth is over 5 million, and therefore he could pay a lump sum payment or installment payment if he's fined.

Am I correct in what Mr. Suhl told the probation or through himself or through his lawyers?

MR. CARY: Yes, Your Honor.

THE COURT: All right. Are there any objections to my sentencing options other than the objections already made?

MR. KELLER: None from the government, Your Honor.

MR. CARY: No, Your Honor.

THE COURT: All right. Mr. Cary, do you want to speak on behalf of Mr. Suhl?

MR. CARY: Yes, Your Honor.

It's been my privilege, along with Mr. Banks and my colleagues at Williams & Connolly, to represent Mr. Suhl in this matter. He's one of the most gentle, generous, and gracious people I've had the privilege of meeting. He's largely maintained that good grace throughout these proceedings. For example, once Mr. Jones pled guilty, the Medicaid funding was taken away for the facilities he operates, but he's kept them open so that he can provide pro bono services to people who need it. Admittedly, it's a greatly scaled-back operation, but he's gone into his personal assets in order to make that happen.

He has many friends and fans. And today is one of the darkest days of his life. And on times like this, you find out who your real friends and fans are, and he has many. And many of them wanted to testify today, but I convinced them to write letters instead. And we have a number of letters that we've attached that are just samples of the many more letters that we could have submitted if we wanted. And I want to highlight some of these things. I mean, I can tell you that I believe him to be generous and gracious and gentle, but some of the things that he said, that the people who have known him for years --

THE COURT: Let me ask you this. I noticed in one of the exhibits on the credit card -- I think this is something that struck me during the trial -- he left a 10-dollar tip for

the wait staff on a bill for a dinner that was over $100. That didn't appear to be very generous to me.

MR. CARY: I can tell you that I actually noted -- I tend to look at a lot of the tips and I thought that they generally were generous tips. I know a lot of times --

THE COURT: Maybe my memory is wrong. Is my memory wrong?

MR. KELLER: Your Honor, I can't -- I can't represent what the tip was. I do have --

THE COURT: It's a small matter. Don't worry about it.

MR. CARY: So, Your Honor -- and, in fact, I'll get to -- well, I'll get back to his generosity here in a minute.

So I want to just give some flavor in lieu of hearing testimony from these people today of the types of fans and friends that Mr. Suhl has. And I understand the jury has found him guilty of four counts, but I think we need to put that in the context of his life.

Jo Wyatt, who is a compliance consultant for years, writes, "I have worked with owners and CEO's of a variety of organizations in many countries in the course of my career and business ownership, and in that time I've met few who were as conscientious as Mr. Suhl about the moral and ethical operations of his company, or as adamant about abiding by and fully meeting the requirements of licensure, accreditation and

certification."

She writes that he's "honest, morally upright, and serious about organizational development and improvement that demonstrated best practices, met all legal requirements and went the extra mile in showing compassion for the patients they served."

I note that in this -- she goes on to note that he often forgave payment for children in desperate need of health care. I note, in my practice, and I'm sure Your Honor sees this and the Court sees this as well, that there are many health care prosecutions in this country. It is a priority of the federal government. And for all of the investigating that's been done on Mr. Suhl, there's been no indication that he engaged in any impropriety with respect to health care, and that's an area that's rife with fraud.

Now, there was one employee, it came out during trial, that engaged in inappropriate billing practices, and that employee was fired and all of the money was returned.

Greg Young is an accountant here in Little Rock. He says, "I have done a substantial amount of accounting and tax work for Mr. Suhl over the past 8 years, including the handling of IRS audits on his personal income tax returns and some of his entities. These audits never gave rise to any substantial adjustments to his tax returns. In all my dealings with him regarding his income tax preparation, tax planning, and

corporate holdings, he has always been a man of integrity, honesty and high moral character."

"On numerous occasions I have seen Mr. Suhl put the interests of his employees and the needs of his clients above his personal interests, even when it negatively impacted his profits from the entities he owned."

Joel Landreneau has known Mr. Suhl for 26 years, talks about his generosity and talks about the effect that this trial and this proceeding has had on him.

T.K. Smith -- we have a number of people who were former patients contacted us. One we put in here is T.K. Smith. He was a troubled young man. When society had given up on him, he writes, Ted Suhl and his family did not. He is now a successful attorney, devoted husband and father, and he owes a great deal of gratitude to Ted Suhl for his accomplishments. Their "relationship over the years has developed from a mentor-mentee relationship to him now referring to me as 'brother'."

And then we had many, many employees wrote in. Mr. Suhl's company, when it was thriving, was the second-largest employer in Randolph County in Northeast Arkansas.

One writes -- Marilynn Mathews talks about how he took care of a family that lost everything in a tornado, Mr. Suhl did, and notes that he's "continued to pay the salaries and wages of several of his employees since December 2014,"

providing "pro bono services to families in need across the state of Arkansas."

Donald Benson, an employee for seven years, writes that Mr. Suhl is a wonderful man.

Tamala Looney, an employee for 14 years, says he's "been a role model, loyal friend," and a caring employer.

Rhonda Pearson, 15-year employee, "Ted has paid the funeral costs for people that he really did not know simply to help alleviate their burden so that these individuals could focus on family and their loss. Ted has given support to children who otherwise would have gone without basic necessities in life, even though he had no personal ties to them or motivational gains." She writes, "Our community is a place that he belongs, and is better off with him in it."

Sara Creecy, an employee for nine years, says he truly has a heart for people, has an ability to see the best in everyone. She writes, "My personal life has been hit with trials, struggles and financial burdens. Ted Suhl has been there to guide me with knowledge, pick me up when I was falling and simply be an encouragement and light during some dark times."

Mr. Suhl's compliance officer, Kristi Kirk, writes, "As his compliance officer, I have repeatedly been instructed by Ted each and every time that whatever the regulation said was exactly what he expected to occur."

"Ted insisted that our companies be above and beyond

reproach."

"Ted and his family gave to families in need when their homes burned down, when there was a death in the family, when their home had been destroyed by a tornado, when someone was ill, and countless other examples of people in need that have been financially and physically helped by Ted and his family. Multiple employees and services providers were given financial assistance when they were experiencing their own personal or family difficulties. This has been one of the most tragic outcomes of this entire investigative process that led to the suspension of Ted's companies."

"These past years have already been a punishing period for him and his family."

Michelle Ream writes that Ted would give you the shirt off his back. "He has made me a better person and worker. I have learned so much" from him.

Marti Little, an employee for 12 years, says, "If a child did not have clothing or shoes, these things were provided for them." She notes that at Christmastime, "employees would go and shop for the patients to ensure that despite their backgrounds or situations, they had the best holidays possible. Mr. Suhl felt it especially important that each child knew he or she was valuable."

"If you visited Mr. Suhl's home," she writes, "you would find it to be humble in comparison to the money he gave to

various churches, charities, and needs in the community."

"The world can benefit from his skills."

Mark Brown, the medical director for 26 years, writes about Mr. Suhl's involvement personally at Christmastime providing clothing, toys, and presents for children, and also how he was sensitive to those who were not Christian so that they also were treated in a sensitive way. He also writes that Ted "donated vans, drivers, nursing and medical services" to flood victims after Hurricane Katrina. Also talks about the pro bono program that he's continued to run after Medicaid funding ran out.

Final employee, Your Honor, is Harold Lowry, there are many more, but he writes, "I am married and have six children."

"Ted always provided me with assistance and never let my family and I do without essentials. There are times that he assisted with Christmas presents for my children, help with utilities, and keeping my old car running. I am sure that I am not the only one he provided help to."

A residence of Warm Springs, which is a community that doesn't even have a stop light -- I don't think they have a stop sign, much less a stop light, writes that he's the -- was the second-largest employer in Randolph County and gave "charitably to families with losses from fires and death," even sent their own physicians out to homes in the community when people needed them.

His high school classmate at Maynard High School in Northeast Arkansas, Russ Spencer, writes, "Ted and I went through high school together as well as college."

"Ted was the best man at my wedding many years ago. Ted is one of the greatest men I have had the pleasure of meeting and knowing in my entire life."

"I grew up being a troubled child and with the help and only the help of Ted he kept me out of trouble and taught me how to control my temper and basically kept me alive."

"You can't find a better man to call your friend."

Pauline Montgomery wrote before her death -- when this first started, she was 93 years old, she was a friend of the Suhl family, from Los Angeles -- that she has known Teddy since he was "five years old when he started serving people dinner" at the Mission in Los Angeles. She died on September 21st and Ted was an honorary pallbearer at her funeral. His picture was in the funeral program, though he was not able to attend in Los Angeles.

And then, Your Honor, to get to the charity, I frankly didn't note what -- the tip you noticed, but there is a track record of charity that is really unlike anything I've seen. His long-time accountant writes, Jim Scruggs, I've "witnessed Ted, and his family, give generously to many charitable organizations, both solicited and unsolicited. He has helped many of his employees, business associates, friends and family

members in need." He "has not only given monetarily, but he has helped when there was no benefit to him other than trying to do the right thing. I know of a local church that was struggling. Ted gave them the use of a nice facility, rent free for the last few years. There was no benefit to him; it was simply helping someone in need. That is but one example of his generosity."

And Ted doesn't like to talk about it, he didn't especially want to talk about it in this courtroom, but we can't keep his friends from talking about it and that's what they are all saying, it's all consistent.

Carla Garvin runs an addiction program with her husband in Warm Springs.

Ted was the single biggest supporter and obviously got nothing in return for that, the American Bible Society, global outreach center.

And, Your Honor, we attached to our papers, and I know Mr. Suhl gave Mr. Hernandez some additional materials as well, showing large amounts of charitable contributions. None of those on that list were of the type of situation that was described in this courtroom. And I just wanted to note that over $550,000 were for Millenia, the Florida company that Mr. Suhl is the sole owner of, and those were -- there's no suggestion at all that he got anything in return for those amounts.

I understand that there's only so much weight that can be given to charitable giving, but one of the factors for sentencing is the character of the person. And the character of this man's life is very different than what was portrayed in this trial, and I ask you to take that into account.

I also ask you to take into account -- and we tried to be very credible in what we presented to Your Honor as a sentencing recommendation. You know, we -- there's a lot of lawyers who would come in and say, "We're going to ask for zero, and then hope that we split the difference" or something like that. We asked for 33 months because we thought that under the factors were similarly-situated people who get the same -- get treated the same way.

I was at Mr. Jones' sentencing. Mr. Jones is a person who had given a lot to a lot of people, had led an exemplary life except for what he pled guilty to, his mistake. Mr. Suhl is very similarly situated to that. He has led an exemplary life. He runs a health care company -- or ran a health care company, there's just a shadow of it now, that was very helpful to very many people in need in the state of Arkansas. And he did it in a way that didn't lead to any charges except for this one aberration that the jury has found he's guilty of.

Justice, Your Honor, in this case, we believe, would be a sentence of 33 months. Mr. Suhl did not plead guilty as Mr. Jones did, so he doesn't get two points for acceptance of

responsibility, but that is more than Jones received. And I frankly don't remember there being any -- I don't remember it being in the papers that Jones received a lighter sentence. I don't think -- I'm not aware of it, but --

THE COURT: I'm pretty sure it hasn't happened.

MR. CARY: Thank you, Your Honor, for that. That's our understanding as well.

And, Your Honor, that -- we believe that would be justice in this case. The statute requires a sentence that is sufficient, but no more harsh than necessary, in order to fulfill the policies of sentencing, and also requires that there be proportionality among the sentences.

I notice the *Edwards* case is one of the cases that the government cited in their papers, that was a case of 33 months as well.

So, Your Honor, we would ask -- based on proportionality, with Mr. Jones especially, based on Mr. Suhl's life well led, we suggest, respectfully, that 33 months is a sentence that fulfills the policy needs of the statute, but is not harsher than necessary.

THE COURT: Mr. Suhl, do you wish to speak?

THE DEFENDANT: No, Your Honor.

THE COURT: I will not hold it against you.

THE DEFENDANT: Thank you.

THE COURT: Do you want to break before you speak,

Mr. Keller? I don't care whether we have a break or not. Do you want a break of ten minutes?

MR. KELLER: No, Your Honor. I think we can proceed.

THE COURT: All right. Does anybody in the -- does anybody need a break?

MR. CARY: I don't need a break, but I would like to add one more thing.

THE COURT: Surely.

MR. CARY: And that is, Mr. Harris just passed me a note that we had noted that occasionally there were some small tips on there, and usually that was a case where that was an additional tip above and beyond what was already on the bill at Texas de Brazil. And I just wanted to clarify that.

THE COURT: All right. I think I'll take a ten-minute break whether you want it or not. Let's start back at 5 after by the clock back there.

We're in recess. You can be at ease.

(Recess from 10:56 a.m. until 11:05 a.m.)

MR. CARY: Your Honor, may I raise one issue first?

THE COURT: Just a minute. Let me get hooked up here.

MR. CARY: Yes.

THE COURT: All right.

MR. CARY: This relates to the loss amount. And Mr. Harris points out to me that -- and of course we preserve all of our objections. But if you take the 2011 figure that

they came -- the government came up with, $137,320, that -- three-quarters of that amount takes place before the alleged bribe payment in September of 2011. And, therefore, there should be a discount applied to that number because Mr. Suhl could not have been paying a bribe to get retrospective Medicaid revenues. And if you discount it by 75 percent, the number is actually, instead of 137,000 for the year, it's $34,330, which would have a four-level effect on the loss amount.

THE COURT: What says Mr. Keller? Do you want time to calculate on that, or are you ready?

MR. KELLER: No, your Honor, we addressed this briefly. The ask the defendant made of Carter to relay to Jones to stop this policy was made on July 25th of 2011. This was one ask in the course of a four-year bribery scheme where the defendant had Jones essentially on retainer. So there's no reason to calculate this amount from September when the bribe payment was actually made.

If you're -- if the Court were inclined to carve out a portion of 2011, the Court should use the July 25th, 2011, date when the request was made. So that would mean essentially we're starting in August of 2011. So August, September, October, November, December -- five months out of the year. Five divided by 12 is a little bit less than half. So a little bit less than half of that 137,000-dollar figure for 2011 would

be roughly $60,000. So 60,000 plus the 39- from 2012 puts us at roughly $100,000. So that still puts us into the next guideline range where it should be a six-level enhancement as opposed to a four-level enhancement. In other words, even discounting and starting from August of 2012, the Court still gets to a number in excess of $90,000.

THE COURT: Overrule the most recent objection, save the exception, along with all the other objections.

All right.

MR. KELLER: Your Honor, the sentencing factors suggest that --

THE COURT: Let me ask you this before I forget it. Should I consider the fact that he refused to give financial information -- should I take that into consideration in any way? And if so, why and how?

MR. KELLER: Your Honor, I think the refusal to provide financial information dovetails, to some extent, with the defendant's entire sentencing presentation and his testimony at trial. It's all consistent with a refusal to acknowledge what he has been convicted of, to acknowledge the conduct, to accept any responsibility, show any contrition or remorse. Instead, just as the defendant did in this offense where he attempted to buy his way out of what he saw as a problem, a new hostile administration coming in, he tried to buy his way out of that situation by bribing Mr. Jones --

THE COURT: I believe your answer to my question is, yes, I should consider it, is that correct?

MR. KELLER: Your Honor, yes, you should consider it.

THE COURT: All right.

MR. KELLER: His unwillingness to provide the detailed financial information, but his willingness to provide a lump sum payment to try and offset the sentence that the Court might impose, is just another example of him trying to buy his way out of a problem.

THE COURT: All right. Go ahead with your other points.

MR. KELLER: The conduct in this case spanned four years, it involved repeated bribe payments, not once, not twice, roughly a dozen bribe payments to Mr. Jones. It involved millions of dollars of Medicaid proceeds. And it involved significant profits for the defendant's business.

The sentence should reflect the nature and circumstances of this offense. The sentence should reflect the duration of the scheme, the repetitive nature of the scheme, the fact that this scheme would not have stopped had it not been for the FBI's investigation. The sentence should reflect the fact that the defendant was the individual who was driving this scheme, driving this conduct. He was the one with the money who could entice Mr. Jones to come to these meetings. He was the one who was willing to continually reach out to Mr. Jones to set up

meetings so that he could try and corrupt this taxpayer-funded agency that was responsible for providing aid to the neediest populations in the state.

The defendant spent the entire portion of his sentencing argument on the good that the defendant has done for the state, on the help that he has provided for people after fires or in other situations of need. But the fact remains that he was convicted of corrupting the second-highest official at the agency -- in the state of Arkansas, the largest state agency responsible for helping those neediest populations: The blind, the elderly, foster care kids, people in nursing homes.

The defendant wanted to corrupt the second-highest official in that agency so that the awards of that money was not based on -- those awards were not based on the needs and the best interests of those needy populations. Instead, the defendant wanted the decisions about those awards -- the awards of that aid, to be based on what was best for the defendant, what was best for the bottom line for his companies. That is completely at odds with a picture of charitableness and concern for the neediest populations in the community. So that argument falls flat, Your Honor, in asking this Court to exercise restraint or extreme or excessive moderation in fashioning the sentence here.

The other point, Your Honor, is that the very factors that the defendant is relying on for -- to influence the Court in

coming up with a sentence today, his charity, his devotion to religious causes, those are the same ideals, the same qualities, that he falsely invoked, that he fraudulently invoked, in trying to cover up this bribery scheme. He paid these bribes through a church through a pastor. He disguised the bribe payments as charitable donations because he wanted to corrupt Steven Jones. To have the gall to come in and then ask for a reduction in sentence because he gave charity to other groups is -- is noteworthy. Not only did the defendant use charity and religion to try to disguise his scheme throughout the course of the scheme, he came into court and he falsely invoked those same ideals in trying to explain what he did to the jury.

I understand that the Court is not imposing the obstruction of justice enhancement against the defendant, but his testimony is relevant to a consideration of where his sentence should fall with respect to the guidelines. And his testimony was that he made these donations because he was devoted to Pastor Bennett, he was devoted to the church, he wanted to give anonymously because that was in his character. Those were all lies. He gave those donations to try and corrupt Steven Jones.

He gave them -- he gave the final bribe check to Phillip Carter when Steven Jones left the table, not because of some sense of modesty or humility or desire to remain an anonymous

donor. He did it so that Jones couldn't point the finger at him in court and say that he ever saw him pass a check to Carter.

The circumstances for Mr. Suhl are highly distinguishable from the circumstances for Mr. Jones. Mr. Suhl has not accepted any responsibility, acknowledged to any extent what he did. He was the one with the millions of dollars of profits at stake. He was the one who continued to reach out to Mr. Jones over the course of four years, to continue to bring Jones back to the table. He was the one who actually wanted to get Jones to change policies at the Department of Human Services to benefit the defendant without regard --

THE COURT: I don't consider the other two fellows as comparables.

MR. KELLER: Thank you, Your Honor. Then the government feels strongly that a guideline sentence is appropriate. There are simply no factors that the defendant has identified or provided to the Court today that would warrant a sentence outside the guideline range, and so the government recommends a guideline sentence.

THE COURT: All right. Have I heard you out, both sides?

MR. KELLER: Yes, Your Honor.

MR. CARY: Yes, Your Honor.

THE COURT: All right. Based on the -- by the way, I

want to again commend the lawyers for superb work. I don't believe I've ever had a case that's been as thoroughly briefed and professionally presented.

Based on the Sentencing Reform Act of 1984 and considering the provisions found in 18 U.S.C. 3553, Mr. Suhl is committed to the custody of the Bureau of Prisons to be imprisoned for 84 months on each count to run concurrently, concurrently. I recommend that he participate in mental health counseling during incarceration. This is because of statements made in the presentence report.

I note, again, that the guideline range would have been higher if I had applied the obstruction because he testified in his own defense. And that's a very close issue, but I don't feel that it's appropriate to use it and I'm making a variance on that.

On release from the Department of Correction federal -- FCI, he'll be on supervised release for a term of three years on each count to run concurrently.

He'll be required to report to the probation office in the district to which he is released within 72 hours of release from the custody of the Bureau of Prisons.

He'll have to comply with all mandatory and standard conditions that apply. One thing, he must cooperate in the collection of DNA as directed by the probation office.

He cannot possess or own a firearm, ammunition,

destructive device, or any other dangerous weapon whatsoever.

He is ordered to pay a fine to the district clerk in the amount of $200,000, payable immediately to the U.S. District Court. I'm going above the guidelines with respect to the fine because it's my opinion that using religion to grease the skids for a bribe is particularly egregious. It -- and it has a widespread effect. It hurts people who are honest and straightforward in their religious beliefs, and the leaders of those religious groups are hurt when a person uses religion to enhance the chances of a bribe or make a bribe. So that is the reason I'm going above the guidelines.

Mr. Suhl cannot make an application for any loan or enter into any credit arrangement without approval from the probation office unless all penalties have been paid including the fine. He must disclose business and personal information, including all assets, unexpected financial gains, and liabilities to the probation office.

He may not sell, transfer, give away, or otherwise convey any asset without approval of the probation office until all penalties are supplied -- have been met.

A 400-dollar special penalty assessment is mandatory, $100 per count, and it's due immediately.

Does Mr. Suhl want time to report?

MR. CARY: Yes, Your Honor. We would ask for January 2nd, which is a little more than 60 days, which is

roughly what Mr. Jones got.

MR. KELLER: Your Honor, the government doesn't have an objection to that specific request. Generally I think the BOP sets the report date, and the government would request that the defendant just follow whatever BOP says.

THE COURT: I'm going to set the report date. What is January the 2nd, what day of the week?

THE COURTROOM DEPUTY: A Monday.

THE COURT: All right. I'm going to leave him out. Is there any objection to leaving him out until the report date?

MR. KELLER: There's not, Your Honor.

THE COURT: All right. It will be January 2nd by 2:00 p.m.

Mr. Suhl, if you didn't report by 2:00 p.m. on January the 2nd of next year, 2017, you would be subject to being charged with a felony failure to appear. You've got to be there by 2 o'clock. If you choose to report on your own without being transported by the marshal, you have to pay your own way there, wherever the FCI might be, Federal Correction Institution. You have to be there no later than 2:00 p.m. Do you understand that?

THE DEFENDANT: Yes, sir, I do.

THE COURT: All right. I rule that the fine is payable immediately. Does he need a few days, ten days?

MR. CARY: Yes, Your Honor.

THE COURT: All right. What is ten days from today?

THE COURTROOM DEPUTY: It's a Sunday, so the next day would be Monday, November the 7th.

THE COURT: By 2:00 p.m. on Monday, November the 11th.

THE COURTROOM DEPUTY: 7th.

THE COURT: Is there anything else we need to tend to?

MR. CARY: Yes, Your Honor. I'm going to have -- I'm sorry, Mrs. Beard. I don't want to interrupt you.

THE COURTROOM DEPUTY: November 7th.

THE COURT: 7th. I'm sorry. I misspoke. 7th.

MR. CARY: Yes, Your Honor. We do have a motion for release pending appeal that we would like to present.

THE COURT: All right.

MR. CARY: I'm happy to hand it up now.

THE COURT: I'll read it right now.

(Reading document.)

On the first page of the brief, it refers to the comments I made about Carter and about the government objecting to the previous fraud issues about him. I don't have the doubts that I had at one time. I think my ruling was correct on that.

Clarence Darrow once said that everyone thinks his own opinion is right or else he wouldn't hold them. And I would concede the first point. I don't believe Mr. Suhl is likely to flee or pose a danger to the safety of any other person or the

community. But I do not believe that there's a likelihood of reversal on appeal. I'm going to allow -- that's my ruling at this point. I'm willing to reconsider it.

How much time do you need to file a brief in response to their brief, Mr. Keller?

MR. KELLER: Ten days, Your Honor, ten business days would be sufficient.

THE COURT: How much is ten days? What day is it?

THE COURTROOM DEPUTY: Monday, November 7th.

THE COURT: All right. That's the same thing it was a while ago. My lawyer is giving me --

(Court/Law Clerk conference.)

THE COURT: All right. My lawyer tells me that I didn't -- I didn't announce that I've given him 60 months on Count 6; all to run concurrently. If I didn't, I hereby do.

MR. KELLER: Your Honor, that's reference to the term of imprisonment on Count 6, 60 months?

THE COURT: Yes.

MR. KELLER: Understood.

THE COURT: But it's to run concurrently.

MR. KELLER: Understood.

THE COURT: All right. I apparently overlooked that. So it will -- you'll have a brief in by the 11th, on the 11th by 2:00 p.m.?

MR. KELLER: I believe it's the 7th, Your Honor, but,

yes.

THE COURT: 7th. 7 and 11 sound a lot alike.

All right. I'll give you three days to file a reply brief, no longer than nine regular -- no longer than nine pages on the reply or response to your reply.

Is there anything else we need to tend to?

MR. KELLER: Not from the government, Your Honor.

MR. CARY: No, Your Honor.

THE COURT: All right. We're in recess. You can be at ease.

(Proceedings adjourning at 11:30 a.m.)

C E R T I F I C A T E

I, Judith A. Ammons, Official Court Reporter, do hereby certify that the foregoing is a true and correct transcript of proceedings in the above-entitled case.

/s/ Judith A. Ammons, RPR, CRR, CCR   Date: October 27, 2016
United States Court Reporter